# IN THE UNITED STATES BANKRUPTCY COURT FOR
# THE DISTRICT OF DELAWARE

----------------------------------------------------------------x
In re:                                                          :    Chapter 11
    United States of America Rugby Football    :    Case No. 19-_____ (___)
    Union, Ltd.,                                 :
        Debtor.                  :
                                                           :
----------------------------------------------------------------x

## FIRST DAY DECLARATION OF MR. ROSS YOUNG[1]

I, Mr. Ross Young, hereby declare under penalty of perjury, as follows:

1.    I am the CEO of the Debtor.

2.    I previously served as the General Manager to Rugby World Cup Limited, for the 2003, 2007, and 2011 tournaments.

3.    Since joining the organization in April of 2018, I have been focused on stabilizing the Debtor's financial situation.

4.    Under my leadership, the Debtor has undertaken a governance review and restructure of the organization.

5.    I have a thorough understanding of the Debtor's leadership and finances.

---

[1] Mr. Young makes these statements under the penalty of perjury and states that he will attest to the same under oath. At this time, due to the COVID-19 pandemic and the exigent circumstances surrounding the filing, he has been unable to secure a notary. A notarized version of this declaration will be provided as soon as is practicable. In addition, Mr. Ross will be attending the first day hearing in this matter in whatever form the Court prescribes given the national circumstances.

1. *History*

6. Rugby union, widely known simply as rugby, is a contact team sport that originated in England in the first half of the 19th century. One of the two codes of rugby football, it is based on running with the ball in hand.

6. In its most common form, a game is played between two teams of 15 players using an oval-shaped ball on a rectangular field with H-shaped goalposts at either end.  There is also a variant known as 7's rugby, which is played by seven rather than 15.

7. Internationally popular, Rugby is played by more than 6 million people worldwide, of whom 2.36 million were registered players.

8. International matches have taken place since 1871, when the first game was played between Scotland and England at Raeburn Place in Edinburgh. The Rugby World Cup (the "World Cup"), first held in 1987, is contested every four years.  This event occurred last in 2018 for the 15's teams, and in 2019 for the 7's team.

9. Annually, the World Rugby Sevens Series ("Sevens Series") is an annual series of international rugby 7's tournaments run by the World Rugby Federation ("World Rugby").  These tournaments feature national 7's teams playing in 10 tournaments that generally begin in November and last until May. The venues are the United Arab Emirates, South Africa, Australia, New Zealand, the United States, Canada, Hong Kong, Singapore, France and England.

10. The Debtor fields teams for the Sevens Series and the World Cup, as well as a team for the Olympics.

2. *United States of America Rugby Football Union, Ltd.*

11. World Rugby Limited ("World Rugby"), previously called the International Rugby Football Board (IRFB) and the International Rugby Board (IRB), has been the governing body for

rugby union since 1886, and currently has 101 countries as full members and 18 associate members.

12. Founded in 1975, the Debtor is the national governing body for the sport of rugby in America, a Full Sport Member of the United States Olympic and Paralympic Committee, and World Rugby. USA Rugby oversees four national teams, multiple collegiate and high school All-American sides, and an emerging Olympic development pathway for elite athletes. Currently headquartered in Lafayette, Colorado, USA Rugby is charged with developing the game on all levels and has over 120,000 active members.

13. The Debtor enforces World Rugby's rules in U.S. tournaments. It also organizes these tournaments and fields the U.S. national teams that participate in the international competitions highlighted above, as well as others. When organizing rugby games, the Debtor provides insurance coverage for the participants and organizers. Specifically, it provides "Member Accident" coverage that insures against injuries during the course of play, and this insurance is what allows venues to host rugby events.

14. USA Rugby was organized as a non-profit Delaware corporation on 25 January 1978, and is governed by a Board of Directors, which in turn are overseen by the Congress, which represents the interests of its members. A thumbnail of each group is set forth herein:[2]

- The Board of Directors is charged with managing the Debtor's affairs. Per the bylaws, the board is to be comprised of nine voting Directors, including six at-large Directors, two athlete representative Directors (each, an "AR Director"), and one Congress representative Director.

---

[2] A copy of the operative bylaws are attached hereto as **Exhibit A**.

- The Congress is the representative body of the Members, which has oversight and approval authority over the Board.

- The Members, who are players, coaches, referees and other participants.

The current members of the Board are Barbara O'Brien (Chair), Paul Santinelli (Vice-Chair), Phaidra Knight (AR Director), Kevin Swiryn (AR Director), Julie Lau, Mike McKenna, Jim Brown and Mike Crafton (Congress representative Director).

15. Day-to-day management of the organization is handled pursuant to the organizational chart attached hereto as **Exhibit A**.[3] The organization is comprised of departments with respect to the game and event operations; marketing; commercial partnerships; fundraising; national teams and administrative functions.

16. The Debtor has only one partially-owned subsidiary, USA Rugby Partners, LLC ("Partners"), a non-debtor entity that is a for-profit licensee of certain of the Debtor's intellectual property. The Debtor owns 78% of this entity, and the term of the license granted by the Debtor to Partners on 19 June 2015 is fifteen years.

3. *The Debtors' Capital Structure*

17. The Debtors assets currently total $1,126,894.69, including restricted funds and its share of the funds held by a partially-owned subsidiary, and its liabilities total $5,995,000.00.

18. The Debtor's sole secured creditor is JPMorgan Chase Bank, N.A., which is owed $467,820.00 and has filed a financing statement asserting a lien on all current and after-acquired Inventory, Chattel Paper, Equipment and General Intangibles, and associated accessions, additions, replacements, substitutions, records, and proceeds.

---

[3] This organizational chart will be updated due to substantial layoffs taking place on 27 March 2020, and is attached only for general reference.

19. The Debtor's largest unsecured creditor is, at $3.6 million, World Rugby. Beyond that, the Debtors have unsecured debt in the form of credit cards, legal counsel bills, potential liability for Olympic tickets and various trade and vendor debt.

20. The Debtor has no priority debt.

4. *The Events Leading to The Chapter 11*

21. In 2018, the Debtor hosted the World Cup 7's Championship in San Francisco. A series of cost-overruns and revenue shortfalls left the Debtor unable to afford to put on the event or to finance continued preparations. The Debtor contacted World Rugby, which after a series of negotiations, provided $4.4 million in unsecured financing to the organization in an effort to shore up the Debtor's (and therefore the Championship's) finances. These events related in a change in management and substantial board turn over.

22. At the same time, the Debtor was facing a $40 million breach of contract suit initiated by United World Sports, LLC ("UWS"). In 2005, UWS purchased the perpetual rights to host the US portion of the Sevens Series tournament described above. UWS claims it invested in these tournaments and that, but for its efforts, the growth of rugby would have stalled nationwide. When the tournament became successful, UWS alleges that World Rugby undermined this perpetual grant and that the Debtor conspired in World Rugby's efforts. The Debtor contests these claims, and believes it has valid contractual contractual claims based on what it views as UWS' use of Debtor funds for the funding of unrelated UWS operations. The suit has cost the Debtor $480,000.00 to date.

23. While this initial suit was ultimately dismissed, the dismissal was in favor of arbitration. This matter is now scheduled for arbitration before the American Arbitration

Association, and the Debtor cannot afford the $100,000.00 retainer sought by its counsel; the answer to the arbitration complaint is due 1 April 2020.

24. As this was progressing, and over the summer of 2019, the Debtor incurred substantial shortfalls associated with the Men's 15's preparation for their World Cup event.[4] Specifically, the Men's team exceeded their $2.1 million budget by an estimated $750,000.00. At the same time, revenues from donations fell short of expectations by approximately 50%.

25. As a consequence of the suit, the overruns and the declined philanthropy, the Debtor was once again verging on insolvency. To remedy the situation, the Board initiated discussions with World Rugby, which supplied $1 million to continue operations.

26. At the same time, the Debtor undertook major cost-cutting measures including freezing certain credit lines, layoffs, and a reduction in corporate travel. Assuming the projections in place on 1 February 2020 had held, the Debtor would have been able to operate until May 2020. The plan was to seek recapitalization at May's World Rugby Expo.

27. The COVID-19 outbreak made this impracticable. USA Rugby suspended sanctioned competition and rugby activities for a 30-day period on March 13 and indefinitely on March 20, 2020. As a result of this suspension, the dues revenue previously forecasted failed to materialize and the May timeline shortened to March. As a consequence, the Debtor would be unable to operate long enough to secure relief at this expo.

28. For the foregoing reasons, with the assent of the Board and Congress, the Debtor elected to file a chapter 11 bankruptcy proceeding in the District of Delaware.

5. *Evidentiary Support for First Day Motions*

---

[4] As a note, the World Cup events are held every four years, but the 7 and 15 player events are held in different years. Accordingly, there was a 2018 7's World Cup and a 2019 15's World Cup.

29. Concurrently with the filing of its chapter 11 petition, the Debtor has also filed certain First Day Motions seeking relief that the Debtor believes is necessary to enable it to operate in this Chapter 11 Case with minimal disruption and loss of productivity. I respectfully requests that the relief requested in each First Day Motion be granted because such relief is a critical element in stabilizing and facilitating the Debtor's operations during the pendency of this Chapter 11 Case.

30. I have reviewed each First Day Motion, and all of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtor's operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtor's management team and the Debtor's advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtor's operations and financial condition. A summary of the relief requested in each First Day Motion and the facts supporting each First Day Motion is set forth below. The First Day Motions (each as described in more detail below) include:

- MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING THE DEBTORS' CONTINUED USE OF THEIR CURRENT CASH MANAGEMENT SYSTEM, EXISTING BANK ACCOUNTS, AND BUSINESS FORMS; (II) AUTHORIZING THE DEBTORS, AFTER NOTICE TO OPEN AND CLOSE BANK ACCOUNTS; AND (V) SCHEDULING A FINAL HEARING ON THE MOTION

- DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO AND (B) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE POLICIES IN THE ORDINARY COURSE OF BUSINESS AND (II) GRANTING RELATED RELIEF

- DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANIES, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY

COMPANIES, (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICE AND (IV) GRANTING RELATED RELIEF

- DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

*a.    Cash Management*

31.    In the Cash Management Motion, the Debtor requests entry of an order (a) authorizing the Debtor to (i) continue to use its Cash Management System (as defined below), seeking entry of interim and final orders, substantially in the forms attached to this Motion as Exhibit A and Exhibit B, respectively: (i) approving the Debtors' continued use of their current cash management system, existing bank accounts, and Business Forms; (ii) authorizing the Debtors to open and close bank accounts and pay all bank related fees; and (iii) scheduling a final hearing on the Motion.

32.    As described in detail in the Cash Management Motion, the Debtors' employed a cash management system to collect, transfer, and disburse funds generated by their business operations (the "Cash Management System"). The Cash Management System facilitated cash monitoring, forecasting, and reporting, and enabled the Debtors to maintain control over their Bank Accounts (as defined below). To avoid any further disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, it is essential that the Debtors be allowed to maintain their well-developed, long-standing Cash Management System.

33.    The description of each account set forth in the motion is true and correct.

34.    Certain of these accounts, as noted in the motion, contain funds that are restricted for certain uses by the donors.

35. Each Bank Account (as defined in the motion) is maintained at a Bank (also as defined by the motion) that is insured by the Federal Deposit Insurance Corporation (the "FDIC") and, therefore, complies with section 345(b) of the Bankruptcy Code. All of the Debtors' Bank Accounts are FDIC insured and are maintained with Banks identified on the list of authorized bank depositories for the District of Delaware.

36. The Cash Management System constitutes an ordinary course and essential business practice, providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. The use of the Cash Management System historically has reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner. Any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates and proceed with the orderly wind down of the Debtors' businesses. Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System post-petition in accordance with their existing cash management procedures.

b.  *Insurance*

37. By this motion, the Debtor seeks authorization to (i) continue existing insurance coverage entered into prepetition and satisfy obligations related thereto in the ordinary course of business and (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business and (b) granting related relief.

38. The Debtors procure insurance for general operations, including workers' compensation, commercial property, general, travel and directors and officers' policies. In

addition, and most relevantly, the Debtors also procure insurance that their members rely on to participate in and conduct rugby events. This event insurance provides member accident insurance and event liability coverage associated with the games and tournaments overseen by USA Rugby and forms an integral part of the services that they provide to the members. The list attached to the motion as Exhibit B is true and correct.

39. The Debtors' ability to continue the Insurance Policies and enter into new insurance policies, as necessary, is essential to preserving the value of the Debtors' business and operations. In many instances, regulations, laws, and contracts that govern the Debtors' commercial activities mandate the Debtors to have insurance coverage. In addition, these policies are the primary reason why clubs affiliate with the Debtor, and a lapse of these policies would frustrate, if not wholly destroy, the Debtor's business as it would preclude the playing of rugby.

c.   *Utilities*

40. By this motion, the Debtors seek interim and final orders pursuant to sections 366 and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving the Debtors' proposed form of adequate assurance of payment for post-petition Utility Services, (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these chapter 11 cases or that a debt owed by the Debtors for Utility Services rendered before the Petition Date was not paid when due.

41. To the best of my knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment

interruptions that may be caused by the commencement of these chapter 11 cases. Further, the Debtor's estimated utility services are true and correct to the best of our knowledge.

42. The Debtors' businesses involves the management of multiple membership interests, the organization and planning of rugby games and tournaments nationwide, and coordination on Olympic matters. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.

d.   *Cash Collateral*

43. The goal of the motion is to permit the Debtor to use all cash on hand beyond the $467,820.00 encumbered by the secured facility provided by JPMorgan Chase Bank, NA ("JPM").

44. The Debtor holds cash in the amount of $840,545.00, of which $248,707.00 is restricted in usage by its donors. The remaining $591,838.00 is available for the Debtor's unrestricted usage.

45. The Debtor requires cash to fund its ongoing operations, including for its staff, certain insurance payments, and general expenses including rent and utilities. At the same time, the Debtor can adequately protect JPM by way of holding a balance of $467,820.00 in unrestricted funds at all times. Accordingly, JPM's principle will be fully protected.

6.   *Applicable to All Motions.*

46. I believe that the relief requested in each of the First Day Motions is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Case with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the First Day

Motions, on behalf of the Debtor, I respectfully submit that the relief requested in the same be granted, as denial would result in immediate and irreparable harm to the Debtor.

7.    *Filing*

47. I have been authorized to sign this affidavit, the petitions herewith and to advance all motions by authorization of the Debtor's Board of Directors based on the receipt of a promise from the World Rugby Limited to provide DIP financing.  I hereby submit that this petition is being filed in good faith and for the betterment of the Debtor.

I HEREBY DECLARE THAT I AM ALLOWED TO EXECUTE THIS, AND AFFIRM, AVER AND STATE UNDER OATH THAT THE FOREGOING STATEMENTS (WHETHER EXPRESSLY CABINED OR OTHERWISE) ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF BASED UPON A DILLIGENT INVESTIGATION.

_____
Mr. Ross Young, CEO