**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------  x
                                                                                  : 

In re:                                                                   :   Chapter 11
                                                                   :

United States of America Rugby Football   :   Case No. 20-10738 (___)
Union, Ltd.,                                            :
                                                                   :

                   Debtor.                  :
-------------------------------------------------------  x

**MOTION TO (I) AUTHORIZE DEBTOR'S LIMITED USE OF CASH
COLLATERAL, (II) GRANTING REPLACEMENT LIENS, ADEQUATE
PROTECTION AND ADMINISTRATIVE EXPENSE PRIORITY TO
PREPETITION LENDER AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001**

United States of America Rugby Football Union, Ltd. d/b/a USA Rugby, the

above-captioned debtor and debtor-in-possession (the "**Debtor**"), by and through its

undersigned counsel, hereby moves the Court (the "**Motion**") for entry of the interim

and final order attached hereto as **Exhibit A** and **Exhibit B**, respectively, authorizing

the Debtor's use of cash collateral:

**I. JURISDICTION AND VENUE**

        1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §

1334.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   This

matter is core within the meaning of 28 U.S.C. § 157(b).

        2.     The statutory predicates for the relief sought herein are sections 105(a),

361, 362, 363(c), and Rule 4001 of the Bankruptcy Rules.

**II. BACKGROUND**

**A.**      **Procedural Background**

        3.     On March 31, 2020 (the "**Petition Date**"), the Debtor filed for

bankruptcy under chapter 11 of the Bankruptcy Code, which was assigned case number

20-10738 (the "**Bankruptcy Case**").

4.     The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

B.     **Overview of the Debtor's Business**

6.     The Debtor is the national governing body for the sport of rugby in the United States, a "Full Sport Member" of the United States Olympic and Paralympic Committee, and a full member of World Rugby.   The Debtor oversees four national teams, multiple collegiate and high school All-American teams, and an emerging Olympic development pathway for elite athletes, and has over 120,000 active members consisting of players, coaches, referees and other rugby participants.   The Debtor organizes tournaments in the United States and fields the U.S. national teams that participate in various international competitions, including the Rugby World Cup and the World Rugby Sevens Series.

7.     The Debtor is organized as a non-profit corporation under the laws of the State of Delaware and is headquartered in Lafayette, Colorado.   It is governed by a Board of Directors (the "**Board**"), which in turn is overseen by a Congress, which has oversight and approval authority over the Board.   The Board is comprised of nine directors, including six at-large directors, two athlete-representative directors, and one representative from Congress.

8.     The Debtor has one subsidiary, USA Rugby Partners, LLC ("**Partners**"), of which it holds 78% of the equity.   Partners is a non-debtor entity that is a for-profit licensee of certain of the Debtor's intellectual property pursuant to a fifteen-year license agreement, dated June 19, 2015.

**C.**     **The Debtor's Pre-Petition Capital Structure**

9.     As of the Petition Date, the Debtor's outstanding secured debt totaled $467,820.00 due to JPMorgan Chase Bank, N.A. ("**Chase**") pursuant to that Credit Agreement, dated January 27, 2019 (the "**Chase Debt**") and attached hereto as **Exhibit A**.  The Chase Debt is secured pursuant to a Continuing Security Agreement, dated January 27, 2019 and also included in **Exhibit A**, by all of the Debtor's current and after-acquired Inventory, Chattel Paper, Equipment and General Intangibles, and associated accessions, additions, replacements, substitutions, records, and proceeds.

10.     In addition, as of the Petition Date, the Debtor's outstanding unsecured debt totaled more than $5.4 million.   The majority of the Debtor's unsecured debt consists of amounts due to the World Rugby Federation Limited, the worldwide regulatory body for the sport, which has extended debtor-in-possession credit by corresponding motion.   Specifically, World Rugby has provided the Debtor with a $3.6 million in unsecured loans and is proposing to be the DIP lender.   The remainder of the Debtor's unsecured debt consists of credit cards, legal counsel bills, potential liability for Olympic tickets and various trade and vendor debt.

**D.**     **The Debtor Needs an Infusion of Cash**

11.     As of the Petition Date, the Debtor had more cash in its bank account than the balance of the amount outstanding on its secured debt.   As a result, it has sufficient cash to meet its immediate needs and Chase – its prepetition secured lender – is adequately protected.   However, the Debtor has significant other debt that far exceeds its available cash, including the amounts owed to World Rugby and expenses and potential liability related to an on-going litigation with United World Sports, LLC.  Thus, the Debtor has an urgent need to restructure.

12.    However, worldwide rugby has been indefinitely suspended because of the COVID-19 pandemic.    Specifically, on March 13, 2020, the Debtor had to suspend sanctioned competition and rugby activities for a 30-day period, and on March 20, 2020, the Debtor had to suspend rugby indefinitely.    As a result of this suspension of rugby, the dues revenue that the Debtor expected dried up, and the tournaments it had planned were cancelled.    As a result, currently, the Debtor has no foreseeable opportunities for any incoming capital pending the re-starting of rugby events and it expects to run out of cash in the next 30 days.    For these reasons, the Debtor will need the additional funds to preserve the value of the Debtor's business operations in the ordinary course.

13.    Prior to Petition Date, the Debtor, in consultation with its advisors, reviewed and analyzed its projected cash needs and prepared the budget set forth as Exhibit B (the "**Budget**").

## III. RELIEF REQUESTED

14.  The Debtor seeks of entry of interim and final orders, substantially in the forms attached hereto:

   a.  Authorizing the Debtor to use Cash Collateral, on an interim basis in the manner prescribed herein and in accordance with the Budget pursuant to Bankruptcy Code sections 363(c)(2) and 552(b);

   b.  Approving pursuant to Bankruptcy Code section 363(e), the proposed adequate protection for the Chase Debt; and

   c.  Establishing a date for final approval of the Debtor's use of Cash Collateral in the manner prescribed herein (the "Final Hearing").

### BASIS FOR RELIEF REQUESTED

**A.  The Debtor's Use of Cash Collateral is Authorized Under Bankruptcy Code Section 363**

15.  The Debtor's use of property of its estate is governed by Bankruptcy Code section 363. Section 363(c)(1) provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions … in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

16.  Section 363(c)(2) establishes a special requirement with respect to "cash collateral" by providing that a trustee or debtor in possession may not use, sell or lease "cash collateral" under subsection (c)(1) unless:

> (A)  Each entity that has an interest in such collateral consents; or
>
> (B)  The court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

17.  "Cash collateral" is defined in the Bankruptcy Code as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. & 363(a).

18.  It is universally acknowledged that the debtor's cash "is available for use even if to a limited extent." In re Mickler, 9 B.R. 121m 123 (Bankr. M.D. Fla 1981.) Courts typically authorize debtors in possession to use cash collateral to continue their operations so long as the interest asserted by secured parties are adequately protected. 11 U.S.C. § 363(e).

19.  As set forth herein and in the Declaration, the Debtor has satisfied its burden for the use of Cash Collateral because (i) the terms of the Proposed Interim Lenders' asserted interest in the Cash Collateral, as well as the Debtor's enterprise value and (ii) the Debtor has complied with Local Rules 4001-2.

**B.  Chase's Interest in the Cash Collateral will be Adequately Protected**

20.  A debtor's use of cash collateral typically is conditioned on providing "adequate protection" to any entity that asserts an interest in such cash. 11 U.S.C. § 363(e). Although the term "adequate protection is not defined in the Bankruptcy Code, section 361 provides three nonexclusive examples of what may constitute adequate protection:

(1)  Requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the … use … under section 363 of this title … results in a diminution in the value of such entity's interest in the property

(2)  Providing to such entity an additional or replacement lien to the extent such … use … results in a decrease in the value of such entity's interest in such property; or

(3)  Granting such other relief … as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

21.  Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" for which a secured creditor is entitled to adequate protection. However, the statute provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11

U.S.C. §§ 361, 363(e); See also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988).

22. Based on the Supreme Court's analysis of the concept of adequate protection in Timbers, Chase is entitled to adequate protection only against the diminution, if any, in its interest in the Debtor's assets by reason of the Debtor's use of Cash Collateral. Where the value of a secured part's collateral is not diminished by the debtor's use, it follows that the secured party's interest in such collateral is adequately protected. Courts in this district have applied this standard and found that, where the value of the collateral does not diminish, and a debtor can operate profitably, the creditor is adequately protected. In re Pursuit Athletic Footwear, 193 B.R. 713, 716-17 (Bankr. D. Del. 1996).

23. The Debtor has agreed to reserve $467,820.00 in funds from its unrestricted pool of cash to adequately protect Chase. As this provides for sufficient security to protect the entirety of their lien, Chase is at little or no risk that the value of its interest will diminish.   At the same time, by allowing the Debtor to use the remaining funds available to operate their organization, the order will permit the Debtor to preserve the value of its estate for all creditors, including Chase.

## C.  The Debtor's use of Cash Collateral will Preserve the Going Concern Value of the Debtor's Business

24. Without access to the cash collateral, the Debtor would be unable to pay its employees, offer its members insurance (a critical part of its mission and offerings) and maintain its ongoing operations.   The results would be disastrous. It would frustrate rugby events and tournaments nationwide, international play and even – quite possibly – prevent the US from fielding an Olympic team.   Such developments, of course, would be disastrous for the Debtor and, importantly, its creditors and stakeholders, including Chase. Accordingly, the use of Cash Collateral to maintain the

Policies will both preserve and maximize the value of the Chase's Collateral and enhance the potential recovery for all parties in interest in this case.

25.  It is well established that, where possible, a bankruptcy court should resolve issues presented in favor of reorganization rather than forcing liquidation merely because the business cannot have access to cash or other property to operate for a short time. See, e.g., In re Dynaco Corp., 162 B.R. 389, 394-95 (Bankr. D.N.H. 1993); In re Heatron, INC., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). As the Heatron court stated in granting a debotr's motion to use cash collateral:

> The Policy of the code as was that of this predecessor statutes, is to encourage reorganization if there is a reasonable possibility of success. At the beginning of the reorganization process, the court must work with less evidence that might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

Heatron, 6 B.R. at 496.

26.  This sentiment was echoed in MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.3d 1393, 1397-98 (11th Cir. 1987), where the Court noted that, "[i]n order to encourage the debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard."

27.  Applying the foregoing, courts frequently have allowed a debtor to use cash collateral in circumstances where such use would enhance or preserve the debtor's reorganization value. Thus, in In re Stein, 19 B.R. 458 (Bankr. E.D. Pa, 1982), the court allowed a debtor to use cash collateral even in a situation where the secured party was undersecured and had no equity cushion for protection. The Court in Stein found that the use of cash collateral was necessary to the continued operation of the

[debtor's business]." <u>Stein</u>, 19 B.R. at 460; <u>see also</u> <u>In re Pine Lake Village Appartment</u>
<u>Co.</u>, 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral
generated from rental income to enhance the value of real property and secured
creditor's claim); <u>In re Karl Neise, Inc.</u>, 16 B.R. 600m 602 (Bankr. S.D. Fla. 1981)
(marginally secured creditor adequately protected by lien in postpetition property
acquired by debtors).

28.   The conclusion that preservation of value is sufficient, without more,
to provide adequate protection follows from the principle that a secured creditor is only
entitled to adequate protection of the secured creditor's interest in its collateral to the
extent that such collateral secures the creditor's allowed claim. <u>See</u> <u>Timbers</u>, 484 U.S.
369-370. Here, Chase remains adequately protected while at the same time, the Debtor
can reorganize to the benefit of its members, and its unsecured creditors. Hence, the use
of Cash Collateral will maximize value for the creditors of the estate while protecting
any and all interests of Chase in the Cash Collateral.

### INTERIM APPROVAL SHOULD BE GRANTED

29.   Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a final hearing on
the Motion may not be commenced before 14 days after service of that Motion (the
"<u>Final Hearing</u>"). Fed. R. Bankr. P. 4001. This Court may, however, conduct a
preliminary hearing before the expiration of that 14-day period and likewise authorize
the use of Cash Collateral, if necessary, to the extent necessary to avoid immediate and
irreparable harm to the Debtor's estate. Bankruptcy Rule 4001(b)(2) and Local Rule
4001(2(b).

30.   In the present case, use of Cash Collateral pending a Final Hearing is
necessary to prevent immediate and irreparable harm to the Debtor and its creditors

because it must fund its ongoing operations. The result will be the liquidation of the Debtor.

## REQUEST FOR FINAL HEARING

31. As noted above, under Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor respectfully request that the Court set a date for the Final Hearing following the entry of the Interim Order.

32. The Debtor respectfully requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filling of objections thereto by first-class mail, upon: (a) the Office of the United States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors, as identified in its chapter 11 petition; (c) counsel to Chase; (iii) Sheppard Mullin as counsel to World Rugby; (d) counsel to any official committee of unsecured creditors appointed in this cases, if formed and (e) those persons who have requested notice pursuant to Rule 2002 of the Bankruptcy Rules. The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under bankruptcy Rules 4001.

## DISCLOSURES PURSUANT TO LOCAL RULE 4001-2

33. Local Rule 4001-2 requires that certain provisions contained in the Interim Order be highlighted, and that the Debtor provides justification for the inclusion of such highlighted provision. The Debtor submits that none of the provisions of the proposed Interim Order implicate Local Rules 4001-2.

## NOTICE AND NO PRIOR REQUEST

34. No trustee, examiner or creditors' committee has been appointed in the chapter 11 case. Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (iii) Sheppard Mullin as counsel

to World Rugby; (iv) JPMorgan Chase Bank, NA; (v) any party that has requested notice pursuant to Bankruptcy Rule 2002; (vi) the United States Attorney's Office for the District of Delaware; (vii) the Internal Revenue Service; and (viii) any other party in interest entitled to notice of this Motion. No prior request for the relief sought in this Motion has been made to this or any other court.

## **CONLUSION**

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form attached hereto granting the relief requested in this Motion and such other and further relief as the Court deems and proper.

1 April 2020                 /s/ Mark M. Billion_____

                         Mark M. Billion (DE Bar No. 5263)
                         Peter K. Schaeffer (DE Bar No. 5255)
                         BILLION LAW
                         1073 S. Governors Ave.
                         Dover, DE 19904
                         Tel: 302.428.9400
                         Email: markbillion@billionlaw.com
                         Proposed Counsel to Debtor and
                         Debtor in Possession

**Exhibit A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
United States of America Rugby Football                 :   Case No. 20-10738 (___)
Union, Ltd.,                                            :
                                                        :
                Debtor.                                 :
------------------------------------------------------- x
```

## INTERIM ORDER (I) AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL, (II) GRANTING REPLACEMENTS LIENS, ADEQUATE PROTECTION AND ADMINISTRATIVE EXPENSE PRIORITY TO PREPETITION LENDER AND (III) SCHEDULING <u>FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>

Upon the motion (the "Motion") of the above-referenced debtor, as debtor-in-possession (the "Debtor"), seeking this Court's authorization pursuant to sections 105, 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. && 101 <u>et seq.</u> (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for the Debtor to use Cash Collateral, in accordance with the terms of this order (the "<u>Interim Order</u>"), upon which the Agent, on behalf of the Prepetition Lender, has asserted first priority perfected security interests and liens in the collateral; and a hearing (the "<u>Interim Hearing</u>") having been held by the Court on April ___, 2020 to consider the relief sought in the Motion; and pursuant to Bankruptcy Rule 4001, due and sufficient notice of the Motion and the relief sought at the Interim Hearing having been given by the Debtor to counsel to the JPMorgan Chase Bank, N.A., the Debtor's twenty (20) largest unsecured creditors; Shepard Mullins as counsel for World Rugby Federation; and to the Office of the United States Trustee; and the Court having considered the offers of proof, evidence adduced and the statements of counsel at the Interim Hearing; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions contained herein necessary and essential to enable the Debtor to continue to operate its business as a going concern, and such relief is fair and reasonable and that entry of this Interim Order is in the best interest of the Debtor and its estate and creditors; and

upon due deliberation and good cause having been shown to grant the relief sought in the Motion:

**IT IS HEREBY FOUND THAT**

A.    On 31 March 2010 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Case"), and has continued with the management and operation of tis business and property as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

B.    The Debtor is a borrower under the agreement attached as Exhibit C to the Motion (the "**Chase Agreement**"). Pursuant to that agreement, JPMorgan Chase Bank, N.A. has asserted a security interest in substantially all of the Debtor's assets (collectively, the "Prepetition Collateral").

C.    The Debtor has requested entry of this Interim Order, pursuant to Bankruptcy Rule 4001(b)(2), and has demonstrated an immediate need to use Cash Collateral (as defined in the Motion) in order to permit, among other things, the orderly continuation of the operation of its business and to satisfy other working capital and operational needs.

D.    The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's businesses.

E.    Without access to and use of Cash Collateral pursuant to the Budget, the continued operation of the Debtor's business would not be possible and serious and irreparable harm to the Debtor and its estate would occur. Absent the entry of this Interim Order, the Debtor's estates will be immediately irreparably harmed.

F.    Based on the record presented to the Court at the Interim Hearing, the terms of the use of Cash Collateral are fair and reasonable and reflect the Debtor's prudent exercise of business judgement with its fiduciary duties.

G.    The Court concludes that sufficient and adequate notice of the Interim Hearing has been given pursuant to Bankruptcy Rules 2002, 4001(b) and (d) and 9014 and section 102(1) of the Bankruptcy Code as required by sections 361 and 363 of the Bankruptcy Code, and that no further notice of, or hearing on, the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

H.    Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. && 157(b)(2)(A), (B), (D), (G), (K), (M) and (O). This Court has

jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. && 157 and 1334.

I.    Good, adequate and sufficient cause has been shown to justify entry of this Interim Order. Among other things, granting the relief set forth in this Interim Order will permit the Debtor to meet its expenses and to maximize value for the benefit of all creditors and stakeholders.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE INTERIM HEARING, AND THE STATEMENTS OF COUNSEL, THEREAT, IT IS HEREBY ORDERED THAT:**

1.    Subject to the terms and conditions of this Interim Order, the Court hereby authorizes the Debtor's use of Cash Collateral provided that the Debtor shall at all times maintain $467,280 in unrestricted funds as adequate security for JPMorgan Chase Bank, N.A.'s security interest described in the Motion.

2.    The Debtor is authorized to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby. The stay of Bankruptcy Code section 362 is hereby modified to permit the parties to accomplish the transactions contemplated by this Interim Order.

3.    The Provisions of this Interim Order Shall be binding upon any trustee appointed during this Case or upon a conversion of this Case to a case under Chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Case to a Chapter 7 case, or dismissing the Case, or any order which may be entered confirming or consummating any plan(s) of reorganization.

4.    The terms of this Interim Order shall be valid and binding upon the Debtor, all the creditors of the Debtor and all other parties in interest from and after the entry of this Interim Order by this Court. In the events this Court stays, modifies or vacates any of the provisions of this Interim Order following any further hearing, such modifications, stays or vacation shall not affect the rights of the Agent/Prepetition Lenders granted pursuant to this Interim Order.

5.    The Final Hearing on the Motion is scheduled for _____, 2020 at _____.m. before this Court.

6.    The Debtor shall promptly mail copies of this Interim Order to the parties having been given notice of the Interim Hearing and to any other party which has filed a request for notice with this Court. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections by no later than _____, 2020 at 4:00 p.m., which objections shall be served so as to be received on such date, upon proposed counsel for the Debtor, BILLION LAW; 1073 S. Governors Ave.; Dover, DE 19904; and the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801, attention _____.

7.    This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.

8.    The Court shall retain jurisdiction to hear and determine all matters arising from the Implementation of this Order.

April _____, 2020

_____
United States Bankruptcy Judge

**Exhibit B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------- x
                                                     :
In re:                                               :    Chapter 11
                                                     :
United States of America Rugby Football              :    Case No. 20-10738 (___)
Union, Ltd.,                                         :
                                                     :
            Debtor.                                  :
---------------------------------------------------- x

**FINAL ORDER (I) AUTHORIZING DEBTOR'S
LIMITED USE OF CASH COLLATERAL, (II) GRANTING
REPLACEMENTS LIENS, ADEQUATE PROTECTION AND
ADMINISTRATIVE EXPENSE PRIORITY TO PREPETITION
LENDER AND (III) SCHEDULING
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Upon the motion (the "Motion") of the above-referenced debtor, as debtor-in-possession (the "Debtor"), seeking this Court's authorization pursuant to sections 105, 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. && 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to use Cash Collateral, in accordance with the terms of this order (the "Final Order"), upon which the Agent, on behalf of the Prepetition Lender, has asserted first priority perfected security interests and liens in the collateral; and a hearing (the "Final Hearing") having been held by the Court on April ___, 2020 to consider the relief sought in the Motion; and pursuant to Bankruptcy Rule 4001, due and sufficient notice of the Motion and the relief sought at the Final Hearing having been given by the Debtor to counsel to the JPMorgan Chase Bank, N.A., the Debtor's twenty (20) largest unsecured creditors; Shepard Mullins as counsel for World Rugby Federation; and to the Office of the United States Trustee; and the Court having considered the offers of proof, evidence adduced and the statements of counsel at the Final Hearing; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions contained herein necessary and essential to enable the Debtor to continue to operate its business as a going concern, and such relief is fair and reasonable and that entry of this Final Order is in the best interest of the Debtor and its estate and creditors; and

upon due deliberation and good cause having been shown to grant the relief sought in the Motion:

**IT IS HEREBY FOUND THAT**

J.    On 31 March 2010 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Case"), and has continued with the management and operation of tis business and property as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

K.    The Debtor is a borrower under the agreement attached as Exhibit C to the Motion (the "**Chase Agreement**"). Pursuant to that agreement, JPMorgan Chase Bank, N.A. has asserted a security interest in substantially all of the Debtor's assets (collectively, the "Prepetition Collateral").

L.    The Debtor has requested entry of this Final Order, pursuant to Bankruptcy Rule 4001(b)(2), and has demonstrated an immediate need to use Cash Collateral (as defined in the Motion) in order to permit, among other things, the orderly continuation of the operation of its business and to satisfy other working capital and operational needs.

M.    The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's businesses.

N.    Without access to and use of Cash Collateral pursuant to the Budget, the continued operation of the Debtor's business would not be possible and serious and irreparable harm to the Debtor and its estate would occur. Absent the entry of this Final Order, the Debtor's estates will be immediately irreparably harmed.

O.    Based on the record presented to the Court at the Final Hearing, the terms of the use of Cash Collateral are fair and reasonable and reflect the Debtor's prudent exercise of business judgement with its fiduciary duties.

P.    The Court concludes that sufficient and adequate notice of the Final Hearing has been given pursuant to Bankruptcy Rules 2002, 4001(b) and (d) and 9014 and section 102(1) of the Bankruptcy Code as required by sections 361 and 363 of the Bankruptcy Code, and that no further notice of, or hearing on, the relief sought at the Final Hearing and the relief granted herein is necessary or required.

Q.    Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. && 157(b)(2)(A), (B), (D), (G), (K), (M) and (O). This Court has

jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. && 157 and 1334.

R.   Good, adequate and sufficient cause has been shown to justify entry of this Final Order. Among other things, granting the relief set forth in this Final Order will permit the Debtor to meet its expenses and to maximize value for the benefit of all creditors and stakeholders.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE FINAL HEARING, AND THE STATEMENTS OF COUNSEL, THEREAT, IT IS HEREBY ORDERED THAT:**

9.   Subject to the terms and conditions of this Final Order, the Court hereby authorizes the Debtor's use of Cash Collateral provided that the Debtor shall at all times maintain $467,280 in unrestricted funds as adequate security for JPMorgan Chase Bank, N.A.'s security interest described in the Motion.

10.   The Debtor is authorized to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Final Order and the transactions contemplated hereby. The stay of Bankruptcy Code section 362 is hereby modified to permit the parties to accomplish the transactions contemplated by this Final Order.

11.   The Provisions of this Final Order Shall be binding upon any trustee appointed during this Case or upon a conversion of this Case to a case under Chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Case to a Chapter 7 case, or dismissing the Case, or any order which may be entered confirming or consummating any plan(s) of reorganization.

12.   The terms of this Final Order shall be valid and binding upon the Debtor, all the creditors of the Debtor and all other parties in interest from and after the entry of this Final Order by this Court. In the events this Court stays, modifies or vacates any of the provisions of this Final Order following any further hearing, such modifications, stays or vacation shall not affect the rights of the Agent/Prepetition Lenders granted pursuant to this Final Order.

13.   This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.

14. The Court shall retain jurisdiction to hear and determine all matters arising from the Implementation of this Order.

April _____, 2020

_____
United States Bankruptcy Judge

**Exhibit C**



**Line of Credit Note**

**$650,000.00**
**Date: January 27, 2019**

**Promise to Pay.** On or before January 27, 2020, for value received, UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD. (the "Borrower") promises to pay to JPMorgan Chase Bank, N.A., whose address is 20 E University Dr, Floor 03, Tempe, AZ 85281 (the "Bank") or order, in lawful money of the United States of America, the sum of Six Hundred Fifty Thousand and 00/100 Dollars ($650,000.00) or so much thereof as may be advanced and outstanding, plus interest on the unpaid principal balance computed on the basis of the actual number of days elapsed in a year of 360 days at the "Adjusted LIBOR Rate" (the "Note Rate") and at the rate of 3.00% Per Annum above the Note Rate, at the Bank's option, upon the occurrence of any default under this Note or any Related Document, whether or not the Bank elects to accelerate the maturity of this Note, from the date such increased rate is imposed by the Bank.

**Definitions.** As used in this Note, the following terms have the following respective meanings:

**"Adjusted LIBOR Rate"** means the sum of the Applicable Margin plus the LIBOR Rate.

**"Applicable Margin"** means 8.856% Per Annum.

**"Business Day"** means a day other than a Saturday, Sunday or any other day on which national banking associations are authorized to be closed.

**"Interest Period"** means each consecutive one month period (the first of which shall commence on the date of this Note) effective as of the first day of each Interest Period and ending on the last day of each Interest Period, provided that if any Interest Period is scheduled to end on a date for which there is no numerical equivalent to the date on which the Interest Period commenced, then it shall end instead on the last day of such calendar month.

**"LIBOR Rate"** means the London interbank offered rate as administered by ICE Benchmark Administration (or any other person or entity that takes over the administration of such rate) for a period of time equal to each Interest Period at approximately 11:00 A.M. City of London, England time two London Business Days prior to the first date of each Interest Period of this Note as such rate is displayed on the Reuters Screen ("Reuters") LIBOR01 or LIBOR02 Page, or such other page or pages as may replace such pages on Reuters for the purpose of displaying such rate. Provided, however, that if such rate is not available on Reuters then such offered rate shall be otherwise independently determined by Bank from an alternate, substantially similar independent source available to Bank or shall be calculated by Bank by a substantially similar methodology as that theretofore used to determine such offered rate in Reuters. If any LIBOR Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Note. "London Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions are generally authorized or obligated by law or executive order to close in the City of London, England. Each change in the rate to be charged on this Note will become effective without notice on the commencement of each Interest Period based upon the LIBOR Rate then in effect.

If any applicable domestic or foreign law, treaty, rule or regulation now or later in effect (whether or not it now applies to the Bank) or the interpretation or administration thereof by a governmental authority charged with such interpretation or administration, or compliance by the Bank with any guideline, request or directive of such an authority (whether or not having the force of law), shall make it unlawful or impossible for the Bank to maintain or fund the advances evidenced by this Note, then, upon notice to the Borrower by the Bank, the outstanding principal amount, together with accrued interest and any other amounts payable to the Bank under this Note or the Related Documents shall be repaid (a) immediately upon the Bank's demand if such change or compliance with such requests, in the Bank's judgment, requires immediate repayment, or (b) at the expiration of the last Interest Period to expire before the effective date of any such change or request.

If the Bank determines that quotations of interest rates for the relevant deposits referred to in the definition of LIBOR Rate are not being provided for purposes of determining the interest rate as provided in this Note, then the Bank shall, at the Bank's option, give notice of such circumstances to the Borrower, whereupon (i) the obligation of the Bank to make advances evidenced by this Note shall be suspended until the Bank notifies the Borrower that the circumstances giving rise to the suspension no longer exists, and (ii) the Borrower shall repay in full the then outstanding principal amount of each advance evidenced by this Note, together with accrued interest, on the last day of the then current Interest Period.

BBHD

In no event shall the interest rate exceed the maximum rate allowed by law. Any interest payment that would for any reason be unlawful under applicable law shall be applied to principal.

The Borrower hereby agrees to pay an effective rate of interest that is the sum of the interest rate provided for in this Note together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with this Note or the Related Documents.

Interest will be computed on the unpaid principal balance from the date of each borrowing.

Until maturity, the Borrower will pay consecutive monthly installments of interest only commencing February 27, 2019. All unpaid principal and accrued and unpaid interest is finally due and payable on January 27, 2020.

The Borrower shall make all payments on this Note and the other Related Documents, without setoff, deduction, or counterclaim, to the Bank at the Bank's address above or at such other place as the Bank may designate in writing. If any payment of principal or interest on this Note shall become due on a day that is not a Business Day, the payment will be made on the next succeeding Business Day. Payments shall be allocated among principal, interest and fees at the discretion of the Bank unless otherwise agreed or required by applicable law. Acceptance by the Bank of any payment that is less than the payment due at that time shall not constitute a waiver of the Bank's right to receive payment in full at that time or any other time.

**Authorization for Direct Payments (ACH Debits).** To effectuate any payment due under this Note or under any other Related Documents, the Borrower hereby authorizes the Bank to initiate debit entries to Account Number 193349246 at the Bank and to debit the same to such account. This authorization to initiate debit entries shall remain in full force and effect until the Bank has received written notification of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. The Borrower represents that the Borrower is and will be the owner of all funds in such account. The Borrower acknowledges: (1) that such debit entries may cause an overdraft of such account which may result in the Bank's refusal to honor items drawn on such account until adequate deposits are made to such account; (2) that the Bank is under no duty or obligation to initiate any debit entry for any purpose; and (3) that if a debit is not made because the above-referenced account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

**Late Fee.** If a payment is 10 days or more late, Borrower will be charged a late fee of 5.00% of the payment due or $25.00, whichever is greater, up to the maximum amount of $250.00 per late fee. Borrower shall pay the late payment charge upon demand by the Bank or, if billed, within the time specified.

**Dishonored Item Fee.** The Borrower will pay a fee to the Bank of $25.00 if the Borrower makes a payment on this Note and the check or preauthorized charge with which the Borrower pays is later dishonored.

**Purpose of Loan.** The Borrower acknowledges and agrees that this Note evidences a loan for a business, commercial, agricultural or similar commercial enterprise purpose, and that no advance shall be used for any personal, family or household purpose. The proceeds of the loan shall be used only for the Borrower's working capital purposes.

**Credit Facility.** The Bank has approved a credit facility to the Borrower in a principal amount not to exceed the face amount of this Note. The credit facility is in the form of advances made from time to time by the Bank to the Borrower. This Note evidences the Borrower's obligation to repay those advances. The aggregate principal amount of debt evidenced by this Note is the amount reflected from time to time in the records of the Bank. Until the earliest to occur of maturity, any default, event of default, or any event that would constitute a default or event of default but for the giving of notice, the lapse of time or both, the Borrower may borrow, pay down and reborrow under this Note subject to the terms of the Related Documents.

**Bank's Discretionary Maturity Extension.** Bank, in its sole discretion, shall have the right, from time to time, to renew and extend the maturity date of this Note (each a "Maturity Extension"). Borrower agrees that Bank has no obligation to extend the original or any subsequent maturity date and may elect not to make a Maturity Extension at any time, even if one or more Maturity Extensions has previously been made. Bank will inform Borrower of any such Maturity Extension by written notice, executed by an officer of Bank, addressed to Borrower pursuant to the notice provisions in the Credit Agreement. Notwithstanding the provision of this Note requiring that any alteration or amendment to this Note shall require the signature of the Borrower, Borrower accepts and agrees to be bound by the Maturity Extension in the event this Note is not paid in full on the maturity date, or after the date of the Maturity Extension notice Borrower requests any advance or otherwise relies upon or utilizes the extension of credit evidenced by this Note for any purpose.

**Periodic Fees.** Not more often than one time in each calendar year, Bank may elect to charge a fee in an amount determined by Bank, in its sole discretion, for the extension of credit evidenced by this Note. The fee may be charged, payable in advance, for each year, or portion of a year, that there remains any unpaid amounts due on this Note or that advances remain available under the line of credit

evidenced by this Note, including as a result of any Maturity Extension. The fee may be charged to the line of credit. No refund of any portion of the fee shall be made in the event of cancellation of the line of credit for any reason.

**Renewal and Extension.** This Note is given in replacement, renewal and/or extension of, but not in extinguishment of the indebtedness evidenced by, that Line of Credit Note dated August 23, 2004 executed by the Borrower in the original principal amount of One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000.00), including previous renewals or modifications thereof, if any (the "Prior Note" and together with all loan agreements, credit agreements, reimbursement agreements, security agreements, mortgages, deeds of trust, pledge agreements, assignments, guaranties, and any other instrument or document executed in connection with the Prior Note, the "Prior Related Documents"), and is not a novation thereof. All interest evidenced by the Prior Note shall continue to be due and payable until paid. The Borrower fully, finally, and forever releases and discharges the Bank and its successors, assigns, directors, officers, employees, agents, and representatives (each a "Bank Party") from any and all causes of action, claims, debts, demands, and liabilities, of whatever kind or nature, in law or equity, of the Borrower, whether now known or unknown to the Borrower (i) in respect of the Liabilities or any indebtedness evidenced by the Prior Note and the Prior Related Documents, or of the actions or omissions of any Bank Party in any manner related to the Liabilities or any indebtedness evidenced by the Prior Note or the Prior Related Documents and (ii) arising from events occurring prior to the date of this Note. If applicable, all Collateral continues to secure the payment of this Note and the Liabilities. The provisions of this Note are effective on the date that this Note has been executed by all of the signers and delivered to the Bank.

**Usury.** To the extent any law other than Federal law or Ohio law is deemed to govern this Note with respect to interest, the following provisions shall apply: The Bank does not intend to charge, collect or receive any interest that would exceed the maximum rate allowed by law. If the effect of any applicable law is to render usurious any amount called for under this Note or the other Related Documents, or if any amount is charged or received with respect to this Note, or if any prepayment by the Borrower results in the payment of any interest in excess of that permitted by law, then all excess amounts collected by the Bank shall be credited on the principal balance of this Note (or, if this Note and all other indebtedness arising under or pursuant to the other Related Documents shall have been paid in full, refunded to the Borrower), and the provisions of this Note and the other Related Documents shall immediately be deemed reformed and the amounts thereafter collectable reduced, without the necessity of the execution of any new document, so as to comply with the then applicable law. All sums paid, or agreed to be paid, by the Borrower for the use, forbearance, or detention of money under this Note or the other Related Documents shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the usury ceiling from time to time in effect and applicable to such indebtedness for so long as such indebtedness is outstanding.

**Per Annum.** In this Note the term "Per Annum" means for a year deemed to be comprised of 360 days.

**[The remainder of the page is intentionally left blank.]**

**Miscellaneous.** A carbon, photographic or other reproduction of this agreement is sufficient as, and can be filed as, a financing statement or similar record. The Borrower authorizes the Bank to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Bank may determine, or the Bank may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Borrower will pay the cost of filing them in all public offices where filing is deemed by the Bank to be necessary or desirable. In addition, the Borrower shall execute and deliver, or cause to be executed and delivered, such other documents as the Bank may from time to time request to perfect or to further evidence the pledge, security interest and assignment created in the Collateral by this agreement. If any provision of this agreement cannot be enforced, the remaining portions of this agreement shall continue in effect. All rights of the Bank benefit the Bank's successors and assigns; and all obligations of the Borrower bind the Borrower's heirs, executors, administrators, successors and assigns. If more than one person or entity signs as the Borrower, their obligations are joint and several and each agreement, representation, warranty and covenant shall be individual, joint and several and the "Collateral" includes any property that is owned by any Borrower individually or jointly with any other. This agreement is in addition to and not in substitution or replacement of any other security agreement executed by the Borrower in favor of the Bank, and the Bank's rights under this agreement and any such other security agreement are cumulative. The provisions of this agreement are severable, and if any one or more of the provisions of this agreement are held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such provision(s) in any other jurisdiction. Time is of the essence under this agreement and in the performance of every term, covenant and obligation contained herein.

Address:    2655 CRESCENT DR STE A
               LAFAYETTE, CO 80026

**Borrower:**

UNITED STATES OF AMERICA RUGBY FOOTBALL
UNION, LTD.

By: _____

Eric Gleason                          CFO
Printed Name                      Title

Date Signed: _1/30/2018_

By: _____

James R Young                      CEO
Printed Name                      Title

Date Signed: _1/30/19_

15CO0402126.18



**Continuing Security Agreement**

Dated as of January 27, 2019

**Grant of Security Interest. UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD.** (whether one or more, the "Borrower", individually and collectively if more than one) grants to JPMorgan Chase Bank, N.A., whose address is 20 E University Dr, Floor 03, Tempe, AZ 85281 (together with its successors and assigns, the "Bank") a continuing security interest in, pledges and assigns to the Bank all of the Collateral (as hereinafter defined) owned by the Borrower, all of the collateral in which the Borrower has rights or power to transfer rights and all Collateral in which the Borrower later acquires ownership, other rights or rights or power to transfer rights to secure the payment and performance of the Liabilities.

"Liabilities" means all obligations, indebtedness and liabilities of the Borrower whether individual, joint and several, absolute or contingent, direct or indirect, liquidated or unliquidated, now or hereafter existing in favor of the Bank, including without limitation, all liabilities, all interest, costs and fees arising under or from any note, open account, overdraft, letter of credit application, endorsement, surety agreement, guaranty, credit card, lease, Rate Management Transaction, acceptance, foreign exchange contract or depository service contract, whether payable to the Bank or to a third party and subsequently acquired by the Bank, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing. "Rate Management Transaction" means any transaction (including an agreement with respect thereto) that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option, derivative transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures. The Borrower and the Bank specifically contemplate that Liabilities include indebtedness hereafter incurred by the Borrower to the Bank.

The term "Collateral" means all of the Borrower's "accounts"; "chattel paper"; "equipment", including any documents and certificates of title issued with respect to any of the equipment; "general intangibles" and any right to a refund of taxes paid at any time to any governmental entity; "instruments"; "inventory", including any documents and certificates of title issued with respect to any of the inventory; all as defined in the UCC, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located. In addition, the term "Collateral" includes all "proceeds", "products" and "supporting obligations" (as such terms are defined in the UCC) of the Collateral, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, accounts, chattel paper, "instruments," "investment property," "financial assets," and "general intangibles" (as such terms are defined in the UCC) arising from the sale, rent, lease, casualty loss or other disposition of the Collateral, and any Collateral returned to, repossessed by or stopped in transit by the Borrower, and all insurance claims relating to any of the Collateral. The term "Collateral" further includes all of the Borrower's right, title and interest in and to all books, records and data relating to the Collateral, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral or to access, retrieve, or process any of such information or data. Where the Collateral is in the possession of the Bank or the Bank's agent, the Borrower agrees to deliver to the Bank any property that represents an increase in the Collateral or profits or proceeds of the Collateral.

The term "UCC" means the Uniform Commercial Code of Arizona, as in effect from time to time.

**Representations, Warranties and Covenants.** The Borrower represents, warrants, and covenants to the Bank that each of the following is true and will remain true until termination of this agreement and payment in full of all Liabilities and agrees with the Bank that:

1.  At its own expense, it shall maintain comprehensive casualty insurance on the Collateral against such risks, in such amounts, with such deductibles and with such companies as may be satisfactory to the Bank. Each insurance policy on the Collateral shall contain a lender's loss payable endorsement satisfactory to the Bank and a prohibition against cancellation or amendment of the policy or removal of the Bank as loss payee without at least thirty (30) days' prior written notice to the Bank. In all events, the amounts of such insurance coverages on the Collateral shall be in such minimum amounts that the Borrower will not be deemed a co-insurer. The policies on the Collateral, or certificates evidencing them, shall, if the Bank so requests, be deposited with the Bank.
2.  It shall permit the Bank, at the Borrower's expense, to inspect and examine the Collateral and to check and test the same as to quality, quantity, value, and condition.

BBHD                                                                                                                    147191024210

3.  It shall maintain the Collateral in good repair; use the Collateral in accordance with law and in compliance with any policy of insurance thereon; and exhibit the Collateral to the Bank on demand.

4.  Until the Bank gives notice to the Borrower to the contrary or until the Borrower is in default, it may use the funds collected in its business. Upon notice from the Bank or upon default, the Borrower agrees that all sums of money it receives on account of or in payment or settlement of the accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles and instruments shall be held by it as trustee for the Bank without commingling with any of the Borrower's other funds, and shall immediately be delivered to the Bank with endorsement to the Bank's order of any check or similar instrument. It is agreed that, at any time the Bank so elects, the Bank shall be entitled, in its own name or in the name of the Borrower or otherwise, but at the expense and cost of the Borrower, to collect, demand, receive, sue for or compromise any and all accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles, and instruments, and to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to the Borrower and, in the Bank's discretion, to file any claims or take any action or proceeding which the Bank may deem necessary or advisable. It is expressly understood and agreed, however, that the Bank shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to the Bank or to which the Bank may be entitled at any time or times. All notices required in this paragraph will be immediately effective when sent. Such notices need not be given prior to the Bank's taking action. The Borrower irrevocably appoints the Bank or the Bank's designee as the Borrower's attorney-in-fact to do all things with reference to the Collateral as provided for in this agreement including without limitation (1) to sign the Borrower's name on any invoice or bill of lading relating to any Collateral, on assignments and verifications of account and on notices to the Borrower's customers, and (2) to do all things necessary to carry out this agreement or to perform any of the Borrower's obligations under this agreement, (3) to notify the post office authorities to change the Borrower's mailing address to one designated by the Bank, and (4) to receive, open and dispose of mail addressed to the Borrower. The Borrower ratifies and approves all acts of the Bank as attorney-in-fact. This power of attorney appointment is irrevocable, coupled with an interest, and shall survive the death or disability of Borrower. The Bank shall not be liable for any act or omission, nor any error of judgment or mistake of fact or law, but only for its gross negligence or willful misconduct. This power being coupled with an interest is irrevocable until all of the Liabilities have been fully satisfied. Immediately upon its receipt of any Collateral evidenced by an agreement, "instrument," "chattel paper," certificated "security" or "document" (as such terms are defined in the UCC) (collectively, "Special Collateral"), it shall mark the Special Collateral to show that it is subject to the Bank's security interest, pledge and assignment and shall deliver the original to the Bank together with appropriate endorsements and other specific evidence of assignment or transfer in form and substance satisfactory to the Bank.

5.  It will not, sell, lease, license or offer to sell, lease, license, grant as security to anyone other than the Bank, or otherwise transfer the Collateral or any rights in or to the Collateral, without the written consent of the Bank, except for the sale of inventory in the ordinary course of business; or change the location of the Collateral from the locations of the Collateral disclosed to the Bank, without providing at least ten (10) days' prior written notice to the Bank.

6.  No financing statement or similar record covering all or any part of the Collateral or any proceeds is on file in any public office, unless the Bank has approved that filing.

7.  When the Collateral is located at, used in or attached to a facility leased by the Borrower, the Borrower will, at the request of the Bank, obtain from the lessor a consent to the granting of this security interest and a release or subordination of the lessor's interest in any of the Collateral, in form and substance satisfactory to the Bank.

**Remedies Regarding Collateral.** The Bank shall have the right to require the Borrower to assemble the Collateral and make it available to the Bank at a place to be designated by the Bank which is reasonably convenient to both parties, the right to take possession of the Collateral with or without demand and with or without process of law, and the right to sell and dispose of it and distribute the proceeds according to law. The Borrower agrees that upon default the Bank may dispose of any of the Collateral in its then present condition, that the Bank has no duty to repair or clean the Collateral prior to sale, and that the disposal of the Collateral in its present condition or without repair or clean-up shall not affect the commercial reasonableness of such sale or disposition. The Bank's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral. The Bank may disclaim warranties of title, possession, quiet enjoyment, and the like, and the Borrower agrees that any such action shall not affect the commercial reasonableness of the sale. In connection with the right of the Bank to take possession of the Collateral, the Bank may take possession of any other items of property in or on the Collateral at the time of taking possession, and hold them for the Borrower without liability on the part of the Bank. The Borrower expressly agrees that the Bank may enter upon the premises where the Collateral is believed to be located without any obligation of payment to the Borrower, and that the Bank may, without cost, use any and all of the Borrower's "equipment" (as defined in the UCC) in the manufacturing or processing of any "inventory" (as defined in the UCC) or in growing, raising, cultivating, caring for, harvesting, loading and transporting of any of the Collateral that constitutes "farm products" (as defined in the UCC). If there is any statutory requirement for notice, that requirement shall be met if the Bank sends notice to the Borrower at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice, and such notice shall be deemed commercially reasonable. Without limiting any other remedy, the Borrower is liable for any deficiency remaining after disposition of the Collateral. The Bank is authorized to cause all or any part of the Collateral to be transferred to or registered in its name or in the name of any other person or business entity, with or without designating the capacity of that nominee. At its option

the Bank may, but shall be under no duty or obligation to, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for insurance on the Collateral, and pay for the maintenance and preservation of the Collateral, and the Borrower agrees to reimburse the Bank on demand for any such payment made or expense incurred by the Bank with interest at the highest rate at which interest may accrue under any of the instruments evidencing the Liabilities. The Borrower authorizes the Bank to endorse on the Borrower's behalf and to negotiate drafts reflecting proceeds of insurance of the Collateral, provided that the Bank shall remit to the Borrower such surplus, if any, as remains after the proceeds have been applied, at the Bank's option, to the satisfaction of all of the Liabilities (in such order of application as the Bank may elect) or to the establishment of a cash collateral account for the Liabilities.

**[The remainder of the page is intentionally left blank.]**

**Miscellaneous.** This Note binds the Borrower and its successors, and benefits the Bank, its successors and assigns. Any reference to the Bank includes any holder of this Note. This Note is subject to that certain Credit Agreement by and between the Borrower and the Bank, dated January 27, 2019, and all amendments, restatements and replacements thereof (the "Credit Agreement") to which reference is hereby made for a more complete statement of the terms and conditions under which the loan evidenced hereby is made and is to be repaid. The terms and provisions of the Credit Agreement are hereby incorporated and made a part hereof by this reference thereto with the same force and effect as if set forth at length herein. No reference to the Credit Agreement and no provisions of this Note or the Credit Agreement shall alter or impair the absolute and unconditional obligation of the Borrower to pay the principal and interest on this Note as herein prescribed. Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement. If any one or more of the obligations of the Borrower under this Note or any provision hereof is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of the Borrower and the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such obligations or provisions in any other jurisdiction. Time is of the essence under this Note and in the performance of every term, covenant and obligation contained herein.

Address:    2655 CRESCENT DR STE A
            LAFAYETTE, CO 80026

Borrower:

UNITED STATES OF AMERICA RUGBY FOOTBALL
UNION, LTD.

By: _____

Eric Gleason                              CFO
Printed Name                              Title

Date Signed: 1/30/2019

By: _____

James R Young                             CEO
Printed Name                              Title

Date Signed: 1/30/19

15CO0402126.18



**Credit Agreement**

This agreement dated as of January 27, 2019 is between JPMorgan Chase Bank, N.A. (together with its successors and assigns, the **"Bank"**), whose address is 20 E University Dr, Floor 03, Tempe, AZ 85281, and UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD. (individually, the **"Borrower"** and if more than one, collectively, the **"Borrowers"**), whose address is 2655 CRESCENT DR STE A, LAFAYETTE, CO 80026.

1.      **Credit Facility.**

    1.1      **Scope.** This agreement governs only the Credit Facility (hereinafter defined). Advances under the Credit Facility shall be subject to the procedures established from time to time by the Bank. Any procedures agreed to by the Bank with respect to obtaining advances, including automatic loan sweeps, shall not vary the terms or conditions of this agreement or the other Related Documents regarding the Credit Facility.

    1.2      **Credit Facility (Line of Credit).** The Bank has approved a credit facility to the Borrower in the form of a line of credit in the principal sum not to exceed $650,000.00 in the aggregate at any one time outstanding Credit under the Credit Facility shall be repayable as set forth in a Note (hereinafter defined) dated January 27, 2019, and any renewals, modifications, extensions, rearrangements, restatements thereof and replacements or substitutions therefor.

2.      **Definitions and Interpretations.**

    2.1      **Definitions.** As used in this agreement, the following terms have the following respective meanings:

        A.      **"Affiliate"** means any Person which, directly or indirectly Controls or is Controlled by or under common Control with, another Person, and any director or officer thereof. The Bank is under no circumstances to be deemed an Affiliate of the Borrower or any of its Subsidiaries.

        B.      **"Anti-Corruption Laws"** means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

        C.      **"Authorizing Documents"** means certificates of authority to transact business, certificates of good standing, borrowing resolutions, appointments, officer's certificates, certificates of incumbency, and other documents which empower and authorize or evidence the power and authority of all Persons (other than the Bank) executing any Related Document or their representatives to execute and deliver the Related Documents and perform the Person's obligations thereunder.

        D.      **"Collateral"** means all Property, now or in the future subject to any Lien in favor of the Bank, securing or intending to secure, any of the Liabilities.

        E.      **"Control"** as used with respect to any Person, means the power to direct or cause the direction of, the management and policies of that Person, directly or indirectly, whether through the ownership of Equity Interests, by contract, or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

        F.      **"Credit Facility"** means the extension of credit described in Section 1.

        G.      **"Distributions"** means all dividends and other distributions made to any Equity Owners, other than salary, bonuses, and other compensation for services expended in the current accounting period.

        H.      **"Equity Interests"** means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

        I.      **"Equity Owner"** means a shareholder, partner, member, holder of a beneficial interest in a trust or other owner of any Equity Interests.

**J.**     **"GAAP"** means generally accepted accounting principles in effect from time to time in the United States of America, consistently applied.

**K.**     **"Legal Requirement"** means any law, ordinance, decree, requirement, order, judgment, rule, Sanctions, regulation (or interpretation of any of the foregoing) of any foreign governmental authority, the United States of America, any state thereof, any political subdivision of any of the foregoing or any agency, department, commission, board, bureau, court or other tribunal having jurisdiction over the Bank, any Pledgor or any Obligor or any of its Subsidiaries or their respective Properties or any agreement by which any of them is bound.

**L.**     **"Liabilities"** means all indebtedness, liabilities and obligations of every kind and character of the Borrower to the Bank, whether the obligations, indebtedness and liabilities are individual, joint and several, contingent or otherwise, now or hereafter existing, including, without limitation, all liabilities, interest, costs and fees, arising under or from any note, open account, overdraft, credit card, lease, Rate Management Transaction, letter of credit application, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or depository service contract, whether payable to the Bank or to a third party and subsequently acquired by the Bank, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing.

**M.**     **"Lien"** means any mortgage, deed of trust, pledge, charge, encumbrance, security interest, collateral assignment or other lien or restriction of any kind.

**N.**     **"Note"** means the promissory note dated January 27, 2019, and any renewals, modifications, extensions, rearrangements, restatements thereof and replacements or substitutions therefor evidencing the Credit Facility.

**O.**     **"Obligor"** means any Borrower, guarantor, surety, co-signer, endorser, general partner or other Person who may now or in the future be obligated to pay any of the Liabilities.

**P.**     **"Organizational Documents"** means, with respect to any Person, certificates of existence or formation, documents establishing or governing the Person or evidencing or certifying that the Person is duly organized and validly existing in accordance with all applicable Legal Requirements, including all amendments, restatements, supplements or modifications to such certificates and documents as of the date of the Related Document referring to the Organizational Document and any and all future modifications thereto approved by the Bank.

**Q.**     **"Permitted Investments"** means (1) readily marketable direct obligations of the United States of America or any agency thereof with maturities of one year or less from the date of acquisition; (2) fully insured (if issued by a bank other than the Bank) certificates of deposit with maturities of one year or less from the date of acquisition issued by any commercial bank operating in the United States of America having capital and surplus in excess of $500,000,000.00; and (3) commercial paper of a domestic issuer if at the time of purchase such paper is rated in one of the two highest rating categories of Standard and Poor's Corporation or Moody's Investors Service.

**R.**     **"Person"** means any individual, corporation, partnership, limited liability company, joint venture, joint stock association, association, bank, business trust, trust, unincorporated organization, any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing or any other form of entity.

**S.**     **"Pledgor"** means any Person providing Collateral.

**T.**     **"Property"** means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

**U.**     **"Rate Management Transaction"** means any transaction (including an agreement with respect thereto) that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option, derivative transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

**V.**     **"Related Documents"** means this agreement, the Note, and any other instrument or document executed in connection with the Credit Facility, including but not limited to, applications for letters of credit, all loan agreements, credit agreements, reimbursement agreements, security agreements, mortgages, deeds of trust, pledge agreements, assignments, and guaranties.

**W.**     **"Sanctions"** means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, and (b) if the Borrower has operations outside of the United States, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

**X.**     **"Sanctioned Country"** means, at any time, a country or territory which is the subject or target of any Sanctions.

**Y.**     **"Sanctioned Person"** means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by (i) the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, and (ii) if the Borrower has operations outside of the United States, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

**Z.**     **"Subsidiary"** means, as to any particular Person (the "parent"), a Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of the date of determination, as well as any other Person of which fifty percent (50%) or more of the Equity Interests is at the time of determination directly or indirectly owned, Controlled or held, by the parent or by any Person or Persons Controlled by the parent, either alone or together with the parent.

**2.2**     **Interpretations.** Whenever possible, each provision of the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements. If any provision of this agreement cannot be enforced, the remaining portions of this agreement shall continue in effect. In the event of any conflict or inconsistency between this agreement and the provisions of any other Related Documents, the provisions of this agreement shall control. Use of the term "including" does not imply any limitation on (but may expand) the antecedent reference. Any reference to a particular document includes all modifications, supplements, replacements, renewals or extensions of that document, but this rule of construction does not authorize amendment of any document without the Bank's consent. Section headings are for convenience of reference only and do not affect the interpretation of this agreement. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP. Whenever the Bank's determination, consent, approval or satisfaction is required under this agreement or the other Related Documents or whenever the Bank may at its option take or refrain from taking any action under this agreement or the other Related Documents, the decision as to whether or not the Bank makes the determination, consents, approves, is satisfied or takes or refrains from taking any action, shall be in the sole and exclusive discretion of the Bank, and the Bank's decision shall be final and conclusive.

**3.**     **Conditions Precedent to Extensions of Credit.**

**3.1**     **Conditions Precedent to Initial Extension of Credit under the Credit Facility.** Before the first extension of credit governed by this agreement and any initial advance under the Credit Facility, whether by disbursement of a loan, issuance of a letter of credit, or otherwise, the Borrower shall deliver to the Bank, in form and substance satisfactory to the Bank:

**A.**     **Loan Documents.** The Note, and as applicable, the letter of credit applications, reimbursement agreements, the security agreements, the pledge agreements, financing statements, mortgages or deeds of trust, the guaranties, the subordination agreements, and any other documents which the Bank may reasonably require to give effect to the transactions described in this agreement or the other Related Documents;

**B.**     **Organizational and Authorizing Documents.** The Organizational Documents and Authorizing Documents of the Borrower and any other Persons (other than the Bank) executing the Related Documents in form and substance satisfactory to the Bank that at a minimum: (i) document the due organization, valid existence and good standing of the Borrower and every other Person (other than the Bank) that is a party to this agreement or any other Related Document; (ii) evidence that each Person (other than the Bank) which is a party to this agreement or

any other Related Document has the power and authority to enter into the transactions described therein; and (iii) evidence that the Person signing on behalf of each Person that is a party to the Related Documents (other than the Bank) is duly authorized to do so;

**C.      Liens.** The termination, assignment or subordination, as determined by the Bank, of all Liens on the Collateral in favor of any secured party (other than the Bank); and

**D.      Fees.** Payment of the following fees, all of which the Borrower acknowledges have been earned by the Bank: a commitment fee in the amount of $1,000.00.

**3.2      Conditions Precedent to Each Extension of Credit.** Before any extension of credit governed by this agreement, whether by disbursement of a loan, issuance of a letter of credit or otherwise, the following conditions must be satisfied:

**A.      Representations.** The representations of the Borrower and any other parties, other than the Bank, in the Related Documents are true on and as of the date of the request for and funding of the extension of credit;

**B.      No Event of Default.** No default, event of default or event that would constitute a default or event of default but for the giving of notice, the lapse of time or both, has occurred in any provision of this agreement, the Note or any other Related Documents and is continuing or would result from the extension of credit;

**C.      Additional Approvals, Opinions, and Documents.** The Bank has received any other approvals, opinions and documents as it may reasonably request; and

**D.      No Prohibition or Onerous Conditions.** The making of the extension of credit is not prohibited by and does not subject the Bank, any Obligor, or any Subsidiary of the Borrower to any penalty or onerous condition under, any Legal Requirement.

**4.      Affirmative Covenants.** The Borrower agrees to do, and cause each of its Subsidiaries to do, each of the following:

**4.1      Insurance.** Maintain insurance with financially sound and reputable insurers, with such insurance and insurers to be satisfactory to the Bank, covering its Property and business against those casualties and contingencies and in the types and amounts as are in accordance with sound business and industry practices, and furnish to the Bank, upon request of the Bank, reports on each existing insurance policy showing such information as the Bank may reasonably request.

**4.2      Existence.** Maintain its operations as presently in effect in accordance with all applicable Legal Requirements, pay its debts and obligations when due under normal terms, pay on or before their due date, all taxes, assessments, fees and other governmental monetary obligations, except as they may be contested in good faith if they have been properly reflected on its books and, at the Bank's request, adequate funds or security has been pledged to insure payment and preserve or cause to be done all things necessary to preserve and keep in full force and effect its existence as a non profit corporation in accordance with all applicable Legal Requirements, its status as an organization exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of the United States and all rights, licenses, permits and accreditation pertaining to its non profit status.

**4.3      Financial Records.** Maintain proper books and records of account, in accordance with GAAP, and consistent with financial statements previously submitted to the Bank.

**4.4      Inspection.** Permit the Bank, its agents and designees to: (a) inspect and photograph its Property, to examine and copy files, books and records, and to discuss its business, operations, prospects, assets, affairs and financial condition with the Borrower's or its Subsidiaries' officers and accountants, at times and intervals as the Bank reasonably determines; (b) perform audits or other inspections of the Collateral, including the records and documents related to the Collateral; and (c) confirm with any Person any obligations and liabilities of the Person to the Borrower or its Subsidiaries. The Borrower will, and will cause its Subsidiaries to cooperate with any inspection or audit. The Borrower will pay the Bank the reasonable costs and expenses of any audit or inspection of the Collateral (including fees and expenses charged internally by the Bank for asset reviews) promptly after receiving the invoice.

**4.5      Financial Reports.** Furnish to the Bank whatever information, statements, books and records the Bank may from time to time reasonably request.

**4.6**    **Notices of Claims, Litigation, Defaults, etc.** Promptly inform the Bank in writing of: (1) all existing and all threatened litigation, claims, investigations, administrative proceedings and similar actions or changes in Legal Requirements affecting it which could materially affect its business, assets, affairs, prospects or financial condition, including, without limitation, any such action existing or threatened which could affect its status as an organization exempt from federal income taxation or any rights, licenses, permits and accreditation pertaining to its non profit status; (2) the occurrence of any event which gives rise to the Bank's option to terminate the Credit Facility; (3) the institution of steps by it to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which it may have liability; (4) any reportable event or any prohibited transaction in connection with any employee benefit plan; (5) any additions to or changes in the locations of its businesses; and (6) any alleged breach by the Bank of any provision of this agreement or of any other Related Document.

**4.7**    **Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between it and any other Person.

**4.8**    **Title to Assets and Property.** Maintain good and marketable title to all of its Properties, and defend them against all claims and demands of all Persons at any time claiming any interest in them.

**4.9**    **Additional Assurances.** Promptly make, execute and deliver any and all agreements, documents, instruments and other records that the Bank may request to evidence the Credit Facility, cure any defect in the execution and delivery of any of the Related Documents, perfect any Lien, comply with any Legal Requirement applicable to the Bank or the Credit Facility or describe more fully particular aspects of the agreements set forth or intended to be set forth in any of the Related Documents.

**4.10**    **Employee Benefit Plans.** Maintain each employee benefit plan as to which it may have any liability, in compliance with all Legal Requirements.

**4.11**    **Banking Relationship.** Establish and maintain its primary banking depository and disbursement relationship with the Bank.

**4.12**    **Compliance with Anti-Corruption Laws and Sanctions.** Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**5.**    **Negative Covenants.**

**5.1**    Unless otherwise noted, the financial requirements set forth in this section will be computed in accordance with GAAP applied on a basis consistent with financial statements previously submitted by the Borrower to the Bank.

**5.2**    Without the written consent of the Bank, the Borrower will not and no Subsidiary of the Borrower will:

**A.**    **Distributions.** Redeem, retire, purchase or otherwise acquire, directly or indirectly, any of its Equity Interests, return any contribution to an Equity Owner or, other than stock dividends and dividends paid to the Borrower, declare or pay any Distributions; provided, however, that if there is no existing default under this agreement or any other Related Document and to do so will not cause a default under this agreement or any other Related Document, Borrower may pay Distributions to its Equity Owners sufficient in amount to pay their income tax obligations attributable to the Borrower's taxable income if the Borrower is a sub S corporation, limited liability company or partnership.

**B.**    **Debt.** Incur, contract for, assume, or permit to remain outstanding, indebtedness for borrowed money, installment obligations, or obligations under capital leases or operating leases, other than (1) unsecured trade debt incurred in the ordinary course of business, (2) indebtedness owing to the Bank, (3) indebtedness reflected in its latest financial statement furnished to the Bank prior to execution of this agreement and that is not to be paid with proceeds of borrowings under the Credit Facility, and (4) indebtedness outstanding as of the date hereof that has been disclosed to the Bank in writing and that is not to be paid with proceeds of borrowings under the Credit Facility.

**C.**    **Guaranties.** Guarantee or otherwise become or remain secondarily liable on the undertaking of another, except for endorsement of drafts for deposit and collection in the ordinary course of business.

**D.    Liens.** Create or permit to exist any Lien on any of its Property except: existing Liens known to and approved by the Bank; Liens to the Bank; Liens incurred in the ordinary course of business securing current non-delinquent liabilities for taxes, worker's compensation, unemployment insurance, social security and pension liabilities.

**E.    Use of Proceeds.** Use, or permit any proceeds of the Credit Facility to be used, directly or indirectly, for: (1) any personal, family or household purpose; or (2) the purpose of "purchasing or carrying any margin stock" within the meaning of Federal Reserve Board Regulation U. At the Bank's request, it will furnish a completed Federal Reserve Board Form U-1. Furthermore, the Borrower will not and no Subsidiary of the Borrower will request any Credit Facility or use, or permit any proceeds of the Credit Facilities to be used, directly or indirectly, by the Borrower or any of its Subsidiaries or its or their respective directors, officers, employees and agents: (1) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws; (2) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States; or (3) in any manner that would result in the violation of any Sanctions applicable to any party hereto .

**F.    Continuity of Operations.** (1) Engage in any business activities substantially different from those in which it is presently engaged; (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other Person, change its name, dissolve, or sell any assets out of the ordinary course of business; (3) enter into any arrangement with any Person providing for the leasing by it of Property which has been sold or transferred by it to such Person; (4) change its business organization, the jurisdiction under which its business organization is formed or organized, or its chief executive office, or any places of its businesses; or (5) if the Borrower is an individual, change the name on his/her driver's license or state issued identification card, as applicable, without notifying the Bank within thirty (30) days of the change, or change the state of his/her principal residence, without notifying the Bank within thirty (30) days of the change.

**G.    Limitation on Negative Pledge Clauses.** Enter into any agreement with any Person other than the Bank which prohibits or limits its ability to create or permit to exist any Lien on any of its Property, whether now owned or hereafter acquired.

**H.    Conflicting Agreements.** Enter into any agreement containing any provision which would be violated or breached by the performance of its obligations under this agreement or any of the other Related Documents.

**I.    Transfer of Ownership.** Permit any pledge of any Equity Interest in it or any sale or other transfer of any Equity Interest in it in excess of 25% in the aggregate.

**J.    Limitation on Loans, Advances to and Investments in Others and Receivables from Others.** Without the written consent of the Bank, the Borrower will not and no Subsidiary of the Borrower will: Purchase, hold or acquire any Equity Interest or evidence of indebtedness of, make or permit to exist any loans or advances to, permit to exist any receivable from, or make or permit to exist any investment or acquire any interest whatsoever in, any Person, except: (1) extensions of trade credit to customers in the ordinary course of business on ordinary terms; (2) Permitted Investments; and (3) loans, advances, investments and receivables existing as of the date of this agreement that have been disclosed to and approved by the Bank in writing and that are not to be paid with proceeds of borrowings under the Credit Facility.

**K.    Loans to Affiliates.** Without the written consent of the Bank, the Borrower will not and no Subsidiary of the Borrower will permit loans or advances to, or receivables from any Affiliate.

**L.    Organizational Documents.** Alter, amend or modify any of its Organizational Documents.

**M.    Government Regulation.** (1) Be or become subject at any time to any Legal Requirement or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits the Bank from making any advance or extension of credit to it or from otherwise conducting business with it, or (2) fail to provide documentary and other evidence of its identity as may be requested by the Bank at any time to enable the Bank to verify its identity or to comply with any applicable Legal Requirement, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

**N.    Subsidiaries.** Form, create or acquire any Subsidiary.

**6.    Representations.**

**6.1    Representations and Warranties by the Borrower.** To induce the Bank to enter into this agreement and to extend credit or other financial accommodations under the Credit Facility, the Borrower represents and warrants as of the date of this agreement and as of the date of each request for credit under the Credit Facility that each of the following statements is and shall remain true and correct throughout the term of this agreement and until the Credit Facility and all Liabilities under the Note and other Related Documents are paid in full: (a) its principal residence or chief executive office is at the address shown above, (b) its name as it appears in this agreement is its exact name as it appears in its most recently filed public organic record and other Organizational Documents and if the Borrower is an individual, its name as it appears in this agreement is its exact name as is indicated on his/her most recently issued, valid driver's license or identification card issued by such Borrower's principal state of residence stated above, (c) the execution and delivery of this agreement and the other Related Documents to which it is a party, and the performance of the obligations they impose, do not violate any Legal Requirement, conflict with any agreement by which it is bound, or require the consent or approval of any other Person, (d) this agreement and the other Related Documents have been duly authorized, executed and delivered by all parties thereto (other than the Bank) and are valid and binding agreements of those Persons, enforceable according to their terms, except as may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally and by general principles of equity, (e) all balance sheets, profit and loss statements, and other financial statements and other information furnished to the Bank in connection with the Liabilities are accurate and fairly reflect the financial condition of the Persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates, (f) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) is pending or threatened against it, and no other event has occurred which may in any one case or in the aggregate materially adversely affect it or any of its Subsidiaries' financial condition, properties, business, affairs or operations, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by the Bank in writing, (g) all of its tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being contested by it in good faith and for which adequate reserves have been provided, (h) it is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended, (i) there are no defenses or counterclaims, offsets or adverse claims, demands or actions of any kind, personal or otherwise, that it could assert with respect to this agreement or the Credit Facility, (j) it owns, or is licensed to use, all trademarks, trade names, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted, and (k) the execution and delivery of this agreement and the other Related Documents to which it is a party and the performance of the obligations they impose, if the Borrower is other than a natural Person (i) are within its powers, (ii) have been duly authorized by all necessary action of its governing body, and (iii) do not contravene the terms of its Organizational Documents or other agreement or document governing its affairs.

**6.2    Representations and Warranties Regarding Anti-Corruption Laws and Sanctions.** The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or to the knowledge of the Borrower or such Subsidiary any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No advance, letter of credit, use of proceeds or other transaction contemplated by the Credit Facilities will violate Anti-Corruption Laws or applicable Sanctions.

**7.    Default/Remedies.**

**7.1    Events of Default/Acceleration.** If any of the following events occurs, the Note shall become due immediately, without notice, at the Bank's option:

**A.**    Any Obligor fails to pay when due any of the Liabilities or any other debt to any Person, or any amount payable with respect to any of the Liabilities, or under the Note, any other Related Document, or any agreement or instrument evidencing debt to any Person.

**B.**    Any Obligor or any Pledgor: (i) fails to observe or perform or otherwise violates any other term, covenant, condition or agreement of any of the Related Documents; (ii) makes any materially incorrect or misleading

representation, warranty, or certificate to the Bank; (iii) makes any materially incorrect or misleading representation in any financial statement or other information delivered to the Bank; or (iv) defaults under the terms of any agreement or instrument relating to any debt for borrowed money (other than the debt evidenced by the Related Documents) and the effect of such default will allow the creditor to declare the debt due before its stated maturity.

**C.**      In the event (i) there is a default under the terms of any Related Document, (ii) any Obligor terminates or revokes or purports to terminate or revoke its guaranty or any Obligor's guaranty becomes unenforceable in whole or in part, (iii) any Obligor fails to perform promptly under its guaranty, or (iv) any Obligor fails to comply with, or perform under any agreement, now or hereafter in effect, between the Obligor and the Bank, or any Affiliate of the Bank or their respective successors and assigns.

**D.**      There is any loss, theft, damage, or destruction of any Collateral not covered by insurance.

**E.**      Any event occurs that would permit the Pension Benefit Guaranty Corporation to terminate any employee benefit plan of any Obligor or any Subsidiary of any Obligor.

**F.**      Any Obligor or any of its Subsidiaries or any Pledgor: (i) becomes insolvent or unable to pay its debts as they become due; (ii) makes an assignment for the benefit of creditors; (iii) consents to the appointment of a custodian, receiver, or trustee for itself or for a substantial part of its Property; (iv) commences any proceeding under any bankruptcy, reorganization, liquidation, insolvency or similar laws; (v) conceals or removes any of its Property, with intent to hinder, delay or defraud any of its creditors; (vi) makes or permits a transfer of any of its Property, which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or (vii) makes a transfer of any of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid.

**G.**      A custodian, receiver, or trustee is appointed for any Obligor or any of its Subsidiaries or any Pledgor or for a substantial part of their respective Property.

**H.**      Any Obligor or any of its Subsidiaries, without the Bank's written consent: (i) liquidates or is dissolved; (ii) merges or consolidates with any other Person; (iii) leases, sells or otherwise conveys a material part of its assets or business outside the ordinary course of its business; (iv) leases, purchases, or otherwise acquires a material part of the assets of any other Person, except in the ordinary course of its business; or (v) agrees to do any of the foregoing; provided, however, that any Subsidiary of an Obligor may merge or consolidate with any other Subsidiary of that Obligor, or with the Obligor, so long as the Obligor is the survivor.

**I.**      Proceedings are commenced under any bankruptcy, reorganization, liquidation, or similar laws against any Obligor or any of its Subsidiaries or any Pledgor and remain undismissed for thirty (30) days after commencement; or any Obligor or any of its Subsidiaries or any Pledgor consents to the commencement of those proceedings.

**J.**      Any judgment is entered against any Obligor or any of its Subsidiaries, or any attachment, seizure, sequestration, levy, or garnishment is issued against any Property of any Obligor or any of its Subsidiaries or of any Pledgor or any Collateral.

**K.**      Any individual Obligor or Pledgor dies, or a guardian or conservator is appointed for any individual Obligor or Pledgor or all or any portion of their respective Property, or the Collateral.

**L.**      Any material adverse change occurs in: (i) the reputation, Property, financial condition, business, assets, affairs, prospects, liabilities, or operations of any Obligor or any of its Subsidiaries; (ii) any Obligor's or Pledgor's ability to perform its obligations under the Related Documents; or (iii) the Collateral.

**7.2**   **Remedies.** At any time after the occurrence of a default, the Bank may do one or more of the following: (a) cease permitting the Borrower to incur any Liabilities; (b) terminate any commitment of the Bank evidenced by the Note; (c) declare the Note or of the Related Documents to be immediately due and payable, without notice of acceleration, presentment and demand or protest or notice of any kind, all of which are hereby expressly waived; (d) exercise all rights of setoff that the Bank may have contractually, by law, in equity or otherwise; and (e) exercise any and all other rights pursuant to any of the Related Documents, at law, in equity or otherwise.

**A.      Generally.** The rights of the Bank under this agreement and the other Related Documents are in addition to other rights (including without limitation, other rights of setoff) the Bank may have contractually, by law, in equity or otherwise, all of which are cumulative and hereby retained by the Bank. Each Obligor agrees to stand still with

regard to the Bank's enforcement of its rights, including taking no action to delay, impede or otherwise interfere with the Bank's rights to realize on any Collateral.

**B.        Bank's Right of Setoff.** The Borrower grants to the Bank a security interest in the Deposits, and the Bank is authorized to setoff and apply, all Deposits, Securities and Other Property, and Bank Debt against any and all Liabilities. This right of setoff may be exercised at any time from time to time after the occurrence of any default, without prior notice to or demand on the Borrower and regardless of whether any Liabilities are contingent, unmatured or unliquidated. In this paragraph: (a) the term **"Deposits"** means any and all accounts and deposits of the Borrower (whether general, special, time, demand, provisional or final) at any time held by the Bank (including all Deposits held jointly with another, but excluding any IRA or Keogh Deposits, or any trust Deposits in which a security interest would be prohibited by any Legal Requirement); (b) the term **"Securities and Other Property"** means any and all securities and other personal Property of the Borrower in the custody, possession or control of the Bank, JPMorgan Chase & Co. or their respective Subsidiaries and Affiliates (other than Property held by the Bank in a fiduciary capacity); and (c) the term **"Bank Debt"** means all indebtedness at any time owing by the Bank, to or for the credit or account of the Borrower and any claim of the Borrower (whether individual, joint and several or otherwise) against the Bank now or hereafter existing.

**8.        Miscellaneous.**

8.1        **Notice.** Any notices and demands under or related to this agreement shall be in writing and delivered to the intended party at its address stated in this agreement, and if to the Bank, at its main office if no other address of the Bank is specified in this agreement, by one of the following means: (a) by hand; (b) by a nationally recognized overnight courier service; or (c) by certified mail, postage prepaid, with return receipt requested. Notice shall be deemed given: (a) upon receipt if delivered by hand; (b) on the Delivery Day after the day of deposit with a nationally recognized courier service; or (c) on the third Delivery Day after the notice is deposited in the mail. **"Delivery Day"** means a day other than a Saturday, a Sunday or any other day on which national banking associations are authorized to be closed. Any party may change its address for purposes of the receipt of notices and demands by giving notice of the change in the manner provided in this provision.

8.2        **Statements.** The Bank may from time to time provide the Borrower with account statements or invoices with respect to any of the Liabilities ("Statements"). The Bank is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Liabilities. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Bank of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Bank's right to receive payment in full at another time.

8.3        **No Waiver.** No delay on the part of the Bank in the exercise of any right or remedy waives that right or remedy. No single or partial exercise by the Bank of any right or remedy precludes any other future exercise of it or the exercise of any other right or remedy. The making of an advance during the existence of any default or subsequent to the occurrence of a default or when all conditions precedent have not been met shall not constitute a waiver of the default or condition precedent. No waiver or indulgence by the Bank of any default is effective unless it is in writing and signed by the Bank, nor shall a waiver on one occasion bar or waive that right on any future occasion.

8.4        **Integration; Severability.** This agreement, the Note, and the other Related Documents embody the entire agreement and understanding between the Borrower and the Bank and supersede all prior agreements and understandings relating to their subject matter. If any one or more of the obligations of the Borrower under this agreement, the Note, or the other Related Documents or any provision thereof is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of the Borrower and the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such obligations or provisions in any other jurisdiction.

8.5        **Joint and Several Liability.** Each party executing this agreement as the Borrower is individually, jointly and severally liable under this agreement.

8.6        **Governing Law and Venue.** This agreement shall be governed by and construed in accordance with the laws of the State of Arizona; EXCEPT THAT, NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE

CONTRARY, MATTERS REGARDING INTEREST TO BE CHARGED BY THE BANK AND THE EXPORTATION OF INTEREST SHALL BE GOVERNED BY FEDERAL LAW (INCLUDING WITHOUT LIMITATION 12 U.S.C. SECTIONS 85 AND 1831u) AND THE LAW OF THE STATE OF OHIO, WHERE THE MAIN OFFICE OF THE BANK IS LOCATED. The Borrower agrees that any legal action or proceeding with respect to any of its obligations under this agreement may be brought by the Bank in any state or federal court located in the State of Arizona, as the Bank in its sole discretion may elect. By the execution and delivery of this agreement, the Borrower submits to and accepts, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of those courts. The Borrower waives any claim that the State of Arizona is not a convenient forum or the proper venue for any such suit, action or proceeding. The extension of credit that is the subject of this agreement is being made by the Bank in Ohio.

8.7    **Survival of Representations and Warranties.** The Borrower understands and agrees that in extending the Credit Facility, the Bank is relying on all representations, warranties, and covenants made by the Borrower in this agreement or in any certificate or other instrument delivered by the Borrower to the Bank under this agreement or in any of the other Related Documents. The Borrower further agrees that regardless of any investigation made by the Bank, all such representations, warranties and covenants will survive the making of the Credit Facility and delivery to the Bank of this agreement, shall be continuing in nature, and shall remain in full force and effect until such time as the Liabilities shall be paid in full.

8.8    **Non-Liability of the Bank.** The relationship between the Borrower on one hand and the Bank on the other hand shall be solely that of borrower and lender. The Bank shall have no fiduciary responsibilities to the Borrower. The Bank undertakes no responsibility to the Borrower to review or inform the Borrower of any matter in connection with any phase of the Borrower's business or operations.

8.9    **Indemnification of the Bank.** The Borrower agrees to indemnify, defend and hold the Bank, its parent companies, Subsidiaries, Affiliates, their respective successors and assigns and each of their respective shareholders, directors, officers, employees and agents (collectively, the **"Indemnified Persons"**) harmless from any and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency, expense, interest, penalties, attorneys' fees (including the fees and expenses of any attorneys engaged by the Indemnified Person) and amounts paid in settlement (**"Claims"**) to which any Indemnified Person may become subject arising out of or relating to the Credit Facility, the Liabilities under this agreement or any other Related Documents or the Collateral, except to the limited extent that the Claims are proximately caused by the Indemnified Person's gross negligence or willful misconduct. The indemnification provided for in this paragraph shall survive the termination of this agreement and shall not be affected by the presence, absence or amount of or the payment or nonpayment of any claim under, any insurance.

8.10   **Counterparts.** This agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same agreement.

8.11   **Advice of Counsel.** The Borrower acknowledges that it has been advised by counsel, or had the opportunity to be advised by counsel, in the negotiation, execution and delivery of this agreement and the Related Documents.

8.12   **Recovery of Additional Costs.** If the imposition of or any change in any Legal Requirement, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify, or make applicable any taxes (except federal, state, or local income or franchise taxes imposed on the Bank), reserve requirements, liquidity requirements, capital adequacy requirements, Federal Deposit Insurance Corporation (FDIC) deposit insurance premiums or assessments, or other obligations which would (A) increase the cost to the Bank for extending, maintaining or funding the Credit Facility, (B) reduce the amounts payable to the Bank under the Credit Facility, or (C) reduce the rate of return on the Bank's capital as a consequence of the Bank's obligations with respect to the Credit Facility, then the Borrower agrees to pay the Bank such additional amounts as will compensate the Bank therefor, within five (5) days after the Bank's written demand for such payment. The Bank's demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by the Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

8.13   **Expenses.** To the extent not prohibited by applicable Legal Requirements and whether or not the transactions contemplated by this agreement are consummated, the Borrower is liable to the Bank and agrees to pay on demand all reasonable costs and expenses of every kind incurred (or charged by internal allocation) in connection with the negotiation, preparation, execution, filing, recording, amendment, modification, supplementing and waiver of this agreement and the Related Documents, the making, servicing and collection of the Credit Facility and the realization on any Collateral and any other amounts owed under this agreement or the Related Documents, including without

limitation reasonable attorneys' fees (including the fees of in-house counsel for the Bank that are employees of the Bank or its Affiliates) and court costs. These costs and expenses include without limitation any costs or expenses incurred by the Bank in any bankruptcy, reorganization, insolvency or other similar proceeding involving any Obligor, Pledgor, or Borrower, or Property of any Obligor, Pledgor, or Collateral. The obligations of the Borrower under this section shall survive the termination of this agreement.

If any action or proceeding is commenced that would materially affect the Bank's interest in the Collateral, if the Borrower fails to comply with any provision of this agreement, or if the Borrower or any third party fails to comply with any provision of the Related Documents, including but not limited to failure to discharge or pay when due any amounts the Borrower or such third party is required to discharge or pay under this agreement or any of the Related Documents, the Bank on the Borrower's or such third party's behalf may (but shall not be obligated to) take any action that the Bank deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. Any amounts disbursed or advanced by the Bank related to the foregoing (including without limitation reasonable attorneys' fees) shall become additional Liabilities and shall bear interest at the highest rate permitted under any of the instruments evidencing any of the Credit Facilities and, at the Bank's option, shall (a) be immediately due and payable upon notice from the Bank to the Borrower, or (b) be added to the balance of any of the instruments evidencing any of the Credit Facilities and be apportioned among and be payable with any installment payments to become due during either, at the Bank's option (i) the term of any applicable insurance policy, (ii) the remaining term of such instrument, or (iii) be treated as a balloon payment which will be due and payable at such instrument's maturity.

8.14    **Reinstatement.** The Borrower agrees that to the extent any payment or transfer is received by the Bank in connection with the Liabilities, and all or any part of the payment or transfer is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid or transferred by the Bank or paid or transferred over to a trustee, receiver or any other entity, whether under any proceeding or otherwise (any of those payments or transfers is hereinafter referred to as a **"Preferential Payment"**), then this agreement and the Note shall continue to be effective or shall be reinstated, as the case may be, even if all those Liabilities have been paid in full and whether or not the Bank is in possession of the Note and whether any of the Note has been marked, paid, released or cancelled, or returned to the Borrower and, to the extent of the payment, repayment or other transfer by the Bank, the Liabilities or part intended to be satisfied by the Preferential Payment shall be revived and continued in full force and effect as if the Preferential Payment had not been made. The obligations of the Borrower under this section shall survive the termination of this agreement.

8.15    **Assignments.** The Borrower agrees that the Bank and its Affiliates may at any time work together and share any information about the Borrower and its Affiliates and their relationships with the Bank or any of its Affiliates or their successors, with and among the Bank or any of its Affiliates or their successors, or any purchaser or potential purchaser of any of the Note or the other Liabilities, or any representative of any of the parties described in this sentence. The Borrower agrees that the Bank may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights and obligations in the Note to one or more purchasers whether or not related to the Bank.

8.16    **Waivers.** To the maximum extent not prohibited by applicable Legal Requirements, each Obligor waives (a) any right to receive notice of the following matters before the Bank enforces any of its rights: (i) any demand, diligence, presentment, dishonor and protest, or (ii) any action that the Bank takes regarding any Person, any Collateral, or any of the Liabilities, that it might be entitled to by law or under any other agreement; (b) any right to require the Bank to proceed against the Borrower, any other Obligor or any Collateral, or pursue any remedy in the Bank's power to pursue; (c) any defense based on any claim that any Obligor's obligations exceed or are more burdensome than those of the Borrower; (d) the benefit of any statute of limitations affecting liability of any Obligor or the enforcement hereof; (e) any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation from any cause whatsoever (other than payment in full) of the obligation of the Borrower for the Liabilities; and (f) any defense based on or arising out of any defense that the Borrower may have to the payment or performance of the Liabilities or any portion thereof. Each Obligor consents to any extension or postponement of time of its payment without limit as to the number or period, to any substitution, exchange or release of all or any part of any Collateral, to the addition of any other party, and to the release or discharge of, or suspension of any rights and remedies against, any Obligor. The Bank may waive or delay enforcing any of its rights without losing them. Any waiver affects only the specific terms and time period stated in the waiver. No modification or waiver of any provision of the Note is effective unless it is in writing and signed by the Person against whom it is being enforced. Without limiting any foregoing waiver, consent or agreement, each Obligor further waives any and all

benefits under Arizona Revised Statutes Sections 12-1641 through 12-1646, inclusive, and Rule 17(f) of the Arizona Rules of Civil Procedure, including any revision or replacement of such statutes or rules hereafter enacted.

8.17    **Rights of Subrogation.** Each Obligor waives and agrees not to enforce any rights of subrogation, contribution or indemnification that it may have against any other Obligor, or any Collateral, until each Obligor has fully performed all their obligations to the Bank, even if those obligations are not evidenced by the Note.

8.18    **Creditors Proceedings.** In any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other Legal Requirement affecting the rights of creditors generally, if the obligations of a Borrower under this agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Borrower's liability under this agreement, then, notwithstanding any other provision of this agreement to the contrary, the amount of such liability shall, without any further action by such Borrower or the Bank, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding.

8.19    **Time is of the Essence.** Time is of the essence under this agreement and in the performance of every term, covenant and obligation contained herein.

8.20    **Confidentiality.** The Bank agrees that it will treat information provided by the Borrower or its representatives to the Bank (the "**Information**") as confidential; provided, however, that the Bank may disclose the Information (a) to its Affiliates and its Affiliates' directors, employees, officers, auditors, consultants, agents, counsel and advisors (such Affiliates and such Persons collectively, "**Representatives**"), it being understood that its Representatives shall be informed by the Bank of the confidential nature of such Information and be instructed to comply with the terms of this section to the same extent as is required of the Bank hereunder; (b) in response to a subpoena or other legal process, or as may otherwise be required by law, order or regulation, or upon the request or demand of any governmental or regulatory agency or authority having jurisdiction over the Bank or its Representatives or to defend or prosecute a claim brought against or by the Bank and/or its Representatives; (c) to actual and prospective assignees, actual and prospective participants, and actual and prospective swap counterparties, provided that all such participants, assignees or swap counterparties execute an agreement with the Bank containing provisions substantially the same as those contained in this section; (d) to holders of Equity Interests in the Borrower, other than holders of any Equity Interest in a publicly traded company; (e) to any Obligor; and (f) with the Borrower's consent. The restrictions contained in this section shall not apply to Information which (a) is or becomes generally available to the public other than as a result of a disclosure by the Bank or its Representatives in breach of this section, or (b) becomes available to the Bank or its Representatives from a source, other than the Borrower or one of its agents, who is not known to the Bank or its Representatives to be bound by any obligations of confidentiality to the Borrower, or (c) was known to the Bank or its Representatives prior to its disclosure to the Bank or its Representatives by the Borrower or one of its agents or was independently developed by the Bank or its Representatives, or (d) was or is, after the date hereof, disclosed (or required to be disclosed) by the Borrower to the Bank or any of its Representatives under or in connection with any existing financing relationship between the Borrower and the Bank or any of its Representatives, the disclosure of which shall be governed by the agreements executed in connection with such financing relationship. Any Person required to maintain the confidentiality of the Information as provided in this section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

8.21    **Electronic Signatures.** The Bank and the Borrower agree that the electronic signature of a party to this agreement or any Related Documents shall have the same force and effect as an original signature and shall be binding on such party. All electronically signed documents shall be deemed (i) to be "written" or "in writing" or an "electronic record", (ii) to have been signed and (iii) to constitute a record established and maintained in the ordinary course of business and an original written record when printed from electronic files. Such paper copies or "printouts," if introduced as evidence in any judicial, arbitral, mediation or administrative proceeding, will be admissible as between the parties to the same extent and under the same conditions as other original business records created and maintained in documentary form. Neither party shall contest the admissibility of true and accurate copies of electronically signed documents on the basis of the best evidence rule or as not satisfying the business records exception to the hearsay rule.

9.    **USA PATRIOT ACT NOTIFICATION.** The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for the Borrower: When the Borrower opens an account, if it is an individual the Bank will ask for its name, taxpayer identification number, residential address, date of birth, and other information that will allow the Bank to identify it, and, if it is not an individual the Bank will ask for its name, taxpayer identification number, business address, and other information that will allow the Bank to identify it. The Bank may also ask, if the Borrower is an individual, to see its driver's license or other identifying documents, and if it is not an individual, to see its Organizational Documents or other identifying documents.

10.     **WAIVER OF SPECIAL DAMAGES.** THE BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THE UNDERSIGNED MAY HAVE TO CLAIM OR RECOVER FROM THE BANK IN ANY LEGAL ACTION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

**[The remainder of the page is intentionally left blank.]**

11. **JURY WAIVER.** TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE BORROWER AND THE BANK (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) BETWEEN THE BORROWER AND THE BANK ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE OTHER RELATED DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE BANK TO PROVIDE THE FINANCING DESCRIBED HEREIN.

**Address(es) for Notices:**

Address:  2655 CRESCENT DR STE A
          LAFAYETTE, CO 80026

**Borrower:**

UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD.

By: _____

Eric Gleason                                    CFO
Printed Name                                    Title

Date Signed: ____1/30/2019____

By: _____

James R Young                                   CEO
Printed Name                                    Title

Date Signed: ____1/30/2019____

**Address for Notices:**

20 E University Dr, Floor 03
Tempe, AZ 85281

Attn: Business Banking

**Bank:**

JPMorgan Chase Bank, N.A.

By: _____

Amy Smith                                    VP
Printed Name                                    Title

Date Signed: ____1/30/19____

15CO0402126.18

 **CHASE**    **Resolution of Non-Profit Corporation**

By

## UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD.,

A Delaware non-profit corporation (the "**Corporation**").

Dated: January 11, 2019

The Corporation desires to engage in financial transactions from time to time with JPMorgan Chase Bank, N.A. (together with its successors and assigns, the "**Bank**"); and

The Corporation desires to authorize certain of its representatives to engage in these transactions for the Corporation; and

The Corporation desires to authorize any all acts performed prior to the signing of this Resolution and eliminate the necessity of presenting separate individual resolutions to the Bank in the future; and

The Corporation has found that the transactions authorized by this resolution are or will be in the Corporation's interest and to its financial benefit.

## Section A. Authorized Persons

**EACH REPRESENTATIVE SIGNING BELOW CERTIFIES** the accuracy of this document and acknowledges and agrees to the terms set forth in this document.

| Title, if any | Printed Name | Signature |
|---|---|---|
| Controller | Jerry Girkin | |
| CFO | Eric Gleason | |
| CSO | James Ross Young | |
| | | |
| | | |

## Section B. Resolutions

**RESOLVED:** That any====== [*if this blank is not completed then those authorized above can act singly on behalf of the Corporation*]

That any two (2) of the authorized persons can act on behalf of the Corporation.

The Bank is released from any liability and shall be indemnified against any loss, liability or expense arising from the Corporation's consideration or ratification of this resolution or the Bank's reliance on this resolution.

**FURTHER RESOLVED:** The authority given is retroactive, and any acts referred that were performed prior to the adoption of these resolutions are ratified and affirmed. This resolution shall be continuing, and shall remain in full force and effect, and the Bank may rely on it until written notice of its revocation shall have been delivered to and received by the Bank. Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given. The Corporation indemnifies and holds the Bank harmless from any loss or damage incurred by the Bank, both before and after judgment, arising from the Corporation's consideration or ratification of this resolution or the Bank's acting in reliance upon this resolution.

**FURTHER RESOLVED:** The Corporation will notify the Bank prior to any (i) change in the Corporation's name; (ii) change in the Corporation's assumed business name(s); (iii) change in the management of the Corporation; (iv) change in the authorized signers; (v) change in the Corporation's chief executive office address; (vi) change in the jurisdiction under which the Corporation's business organization is formed or organized; (vii) conversion of the Corporation to a new or different type of business entity; or (viii) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and the Bank. No change in the Corporation's name will take effect until after the Bank has been notified.

## Section C. Certifications

*[A person authorized in Section A may also make the certifications below and sign in this Section.]*

**I CERTIFY** that I am: (i) *the duly elected and qualified Secretary, Assistant Secretary, President or other officer or director of the Corporation authorized to provide this certification*; and (ii) familiar with the books and records of the Corporation.

**I FURTHER CERTIFY** that the above is a true and correct copy of resolutions duly adopted at a meeting of the Board of the Corporation held in accordance with its by-laws, or by a legally effective instrument of action in lieu of a meeting, and that they are in full force and effect. This resolution now stands of record on the books of the Corporation and has not been modified or revoked in any manner whatsoever.

**I FURTHER CERTIFY** that the individuals whose signatures appear above have been duly elected and are presently the incumbents of the offices (if any) set next to their respective signatures, and that the signatures are the genuine original signatures of each respectively.

**I FURTHER CERTIFY** that all statements and representations made in this document are true and correct.

_____
(Signature)

James Ross Young
(Printed Name)

☐ Secretary     ☐ Assistant Secretary     ☐ President

☒ Other (please specify): CEO
(Title)

1/8/2019
(Date Signed)

[THE REMAINDER OF THE PAGE IS INTENTIONALLY LEFT BLANK]

3

601181022010

## Section D. Additional Acknowledgment (if applicable)

*[**Do not complete the box below if**: (1) there is more than one person authorized in Section A; or
(2) there is only one person authorized in Section A, but a different person is signing in Section C.]*

Complete this section if there is *only* one person authorized to act on behalf of the Corporation (i.e., there is only one person authorized in Section A and that person is also signing in Section C), *but* the Corporation has other officers or directors. In such case, complete this section by the signature of a different officer or director of the Corporation.

The undersigned as an officer or director of the Corporation hereby acknowledges the authority of the person certifying this document by the signature and title stated above in Section C to act alone for and on behalf of the Corporation as described in this document.

(Signature)

(Printed Name)

(Title)

(Date Signed)

BBHD 15CO0402126.18

4

147191024210

**Exhibit D**

**USAR Cash Flow**
**Week ending April 3, 2020**

| | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 |
|---|---|---|---|---|---|
| | National Office | M15 | W15 | M7 | W7 |
| **Cash Funds** | | | | | |
| Operating accounts | 40,000 | 239,950 | 85,518 | 3,125 | 40,745 |
| Membership account | 2,500 | - | - | - | - |
| ML Fund (savings account) | 180,000 | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| USARP Licensing Fee Inflow Q2 | | 25,000 | 50,000 | 37,500 | 37,500 |
| WR Cash Inflow (Apr) | 275,000 | - | - | - | - |
| | **497,500** | **265,000** | **182,000** | **45,500** | **157,500** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff (3/13-3/27) | 49,450 | - | - | - | - |
| HP FT Staff | - | - | - | - | 10,839 |
| Indep Contractors | - | - | - | - | - |
| | 49,450 | - | - | - | 10,839 |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Insurance member accident | 218,000 | - | - | - | - |
| D&O tail & new policy | 62,000 | - | - | - | - |
| Other Insurance premiums | 50,000 | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 367,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Retainer | 35,000 | | | | |
| MacDonald Retainer | 30,000 | | | | |
| UWS Retainer | - | | | | |
| | 65,000 | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **481,450** | **5,000** | **5,000** | **5,000** | **15,839** |
| | | | | | |
| **Net Cash Activity** | **16,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 10, 2020**

|  | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 |
|---|---|---|---|---|---|
|  | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** |  |  |  |  |  |
| Operating account | 16,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | - | - | - | - | - |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | - | - | - | - | - |
|  | **16,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| **Expense Items** |  |  |  |  |  |
| **Staffing / Benefits** |  |  |  |  |  |
| April Office Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
|  | - | - | - | - | - |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
|  | 10,000 | - | - | - | - |
| Bankruptcy Retainer | - |  |  |  |  |
| MacDonald Retainer | - |  |  |  |  |
| UWS Retainer | - |  |  |  |  |
|  | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| **Net Cash Activity** | **6,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 17, 2020**

| | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 6,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **56,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **23,303** | **255,000** | **172,000** | **35,500** | **131,245** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 24, 2020**

| | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 |
|---|---|---|---|---|---|
| | National Office | M15 | W15 | M7 | W7 |
| **Cash Funds** | | | | | |
| Operating account | 23,303 | 254,950 | 125,518 | 30,625 | 51,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 25,000 | - | - | - | - |
| | 48,303 | 255,000 | 172,000 | 35,500 | 131,245 |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 32,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | 45,000 | 9,165 | 3,960 | 6,885 | - |
| | | | | | |
| **Net Cash Activity** | 3,303 | 245,835 | 168,040 | 28,615 | 131,245 |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 1, 2020**

|  | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 |
|---|---|---|---|---|---|
|  | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** |  |  |  |  |  |
| Operating account | 3,303 | 245,785 | 121,558 | 23,740 | 51,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) |  |  |  |  |  |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
|  | **53,303** | **245,835** | **168,040** | **28,615** | **131,245** |
|  |  |  |  |  |  |
| **Expense Items** |  |  |  |  |  |
| **Staffing / Benefits** |  |  |  |  |  |
| April Office Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
|  | 22,747 | - | - | - | 5,417 |
|  |  |  |  |  |  |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
|  | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
|  |  |  |  |  |  |
| Bankruptcy Retainer | - |  |  |  |  |
| MacDonald Retainer | - |  |  |  |  |
| UWS Retainer | - |  |  |  |  |
|  | - | - | - | - | - |
|  |  |  |  |  |  |
| **Total Expense Outflow** | **37,747** | **5,000** | **5,000** | **5,000** | **10,417** |
|  |  |  |  |  |  |
| **Net Cash Activity** | **15,556** | **240,835** | **163,040** | **23,615** | **120,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 8, 2020**

| | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 15,556 | 240,785 | 116,558 | 18,740 | 41,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **65,556** | **240,835** | **163,040** | **23,615** | **120,828** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| **Net Cash Activity** | **55,556** | **240,835** | **163,040** | **23,615** | **120,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 15, 2020**

| | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 55,556 | 240,785 | 116,558 | 18,740 | 41,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **105,556** | **240,835** | **163,040** | **23,615** | **120,828** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **72,809** | **235,835** | **158,040** | **18,615** | **110,412** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 22, 2020**

| | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 |
|---|---|---|---|---|---|
| | National Office | M15 | W15 | M7 | W7 |
| **Cash Funds** | | | | | |
| Operating account | 72,809 | 235,785 | 111,558 | 13,740 | 31,157 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | - | - | - | - | - |
| | 72,809 | 235,835 | 158,040 | 18,615 | 110,412 |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | 10,000 | - | - | - | - |
| | | | | | |
| **Net Cash Activity** | 62,809 | 235,835 | 158,040 | 18,615 | 110,412 |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 29, 2020**

| | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 62,809 | 235,785 | 111,558 | 13,740 | 31,157 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | **-** | **50** | **46,482** | **4,875** | **79,255** |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **112,809** | **235,835** | **158,040** | **18,615** | **110,412** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| April Office Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 35,747 | 9,165 | 3,960 | 6,885 | 5,417 |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail | - | - | - | - | - |
| D&O 4.1.20 policy | - | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Retainer | - | | | | |
| MacDonald Retainer | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **50,747** | **14,165** | **8,960** | **11,885** | **10,417** |
| **Net Cash Activity** | **62,062** | **221,670** | **149,080** | **6,730** | **99,995** |

*Does not contemplate funds in donor account