**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------- x
   :
In re:           :    Chapter 11
   :
United States of America Rugby Football   :    Case No. 20-10738 (BLS)
Union, Ltd.,           :
   :
         Debtor.    :
----------------------------------------------------- x

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO**
**GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE**
**EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d);**
**(B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND**
**<u>(C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>**

United States of America Rugby Football Union, Ltd. d/b/a USA Rugby, the above-captioned debtor and debtor-in-possession (the "**Debtor**" or "**Borrower**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") pursuant to sections 105(a), 361, 362, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure for the District of Delaware (the "**Local Rules**") for entry of interim and final orders authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $550,000 (the "**DIP Financing**") substantially on the terms set forth in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and World Rugby Limited ("**World Rugby**" or "**DIP Lender**"), annexed hereto as <u>Exhibit A</u> (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP Loan Agreement**" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Financing, the "**DIP Loan Documents**"), (b) modifying the automatic

stay to the extent applicable, (c) granting related relief, and (d) scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules. In support of this Motion, the Debtor respectfully states as follows:

## I.
## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

## II.
## BACKGROUND

### A.      Procedural Background

3.      On March 31, 2020 (the "**Petition Date**"), the Debtor filed for bankruptcy under chapter 11 of the Bankruptcy Code, which was assigned case number 20-10738 (BLS) (the "**Bankruptcy Case**").

4.      The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

### B.      Overview of the Debtor's Business

6.      The Debtor is the national governing body for the sport of rugby in the United States, a "Full Sport Member" of the United States Olympic and Paralympic Committee, and a

full member of World Rugby. The Debtor oversees four national teams, multiple collegiate and high school All-American teams, and an emerging Olympic development pathway for elite athletes, and has over 120,000 active members consisting of players, coaches, referees and other rugby participants. The Debtor organizes tournaments in the United States and fields the U.S. national teams that participate in various international competitions, including the Rugby World Cup and the World Rugby Sevens Series.

7.     The Debtor is organized as a non-profit corporation under the laws of the State of Delaware and is headquartered in Lafayette, Colorado. It is governed by a Board of Directors (the "**Board**"), which in turn is overseen by a Congress, which has oversight and approval authority over the Board. The Board is comprised of nine directors, including six at-large directors, two athlete-representative directors, and one representative from Congress.

8.     The Debtor has one subsidiary, USA Rugby Partners, LLC ("**Partners**"), of which it holds 78% of the equity. Partners is a non-debtor entity that is a for-profit licensee of certain of the Debtor's intellectual property pursuant to a fifteen-year license agreement, dated June 19, 2015.

## C.     The Debtor's Pre-Petition Capital Structure

9.     As of the Petition Date, the Debtor's outstanding secured debt totaled $467,820 due to JPMorgan Chase Bank, N.A. ("**Chase**") pursuant to that Credit Agreement, dated January 27, 2019 (the "**Chase Debt**"). The Chase Debt is secured pursuant to a Continuing Security Agreement, dated January 27, 2019, by all of the Debtor's current and after-acquired Inventory, Chattel Paper, Equipment and General Intangibles, and associated accessions, additions, replacements, substitutions, records, and proceeds (the "**Chase Lien**").

10.     In addition, as of the Petition Date, the Debtor's outstanding non-contingent unsecured debt totaled more than $5.4 million. The majority of the Debtor's unsecured debt

consists of amounts due to the DIP Lender. Specifically, the DIP Lender has provided the Debtor with a $3.6 million in unsecured loans. The remainder of the Debtor's unsecured debt consists of credit cards, legal counsel bills, potential liability for Olympic tickets and various trade and vendor debt.

**D.**     **The Debtor Needs an Infusion of Cash**

11.     As of the Petition Date, the Debtor had more cash in its bank account than the balance of the amount outstanding on its secured debt. As a result, it has sufficient cash to meet its immediate needs and Chase – its prepetition secured lender – is adequately protected. However, the Debtor has significant other debt that far exceeds its available cash, including the amounts owed to World Rugby and expenses and potential liability related to an on-going litigation with United World Sports, LLC. Thus, the Debtor has an urgent need to restructure.

12.     However, worldwide rugby has been indefinitely suspended because of the COVID-19 pandemic. Specifically, on March 13, 2020, the Debtor had to suspend sanctioned competition and rugby activities for a 30-day period, and on March 20, 2020, the Debtor had to suspend rugby indefinitely. As a result of this suspension of rugby, the dues revenue that the Debtor expected dried up, and the tournaments it had planned were cancelled. As a result, currently, the Debtor has no foreseeable opportunities for any incoming capital pending the re-starting of rugby events and it expects to run out of cash in the next 30 days. For these reasons, the Debtor will need the additional funds to preserve the value of the Debtor's business operations in the ordinary course.

13.     Prior to Petition Date, the Debtor, in consultation with its advisors, reviewed and analyzed its projected cash needs and prepared the budget set forth as Exhibit C (the "**Budget**"), outlining the Debtor's postpetition cash need in the initial thirteen weeks of the Bankruptcy Case. The DIP Financing will provide the Debtor with the long-term liquidity necessary to,

among other things, make payroll for its reduced staff and satisfy its other working capital and general corporate purposes, including essential payments to vendors and service providers that are necessary to preserve the value of the Debtor's estate.

**E.** **The Proposed DIP Financing**

14.  The Debtor proposes to enter into the DIP Financing in order to fund the administration of its Bankruptcy Case, its reorganization and/or the sale of its assets, solely in accordance with the Budget.  The DIP Financing will provide the Debtor with up to $550,000 to fund necessary operations of the Debtor and to administer this Bankruptcy Case through a successful reorganization or the closing date of the sale of the Debtor's assets.  Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

15.  Pursuant to Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Rules, the principal terms of the DIP Loan Agreement[1] are as follows:

| | |
|---|---|
| **Borrower:** | United States of America Rugby Football Union, Ltd. d/b/a USA Rugby |
| **DIP Lender:** | World Rugby Limited |
| **DIP Loan Amount:** | A senior credit facility in an aggregate amount not to exceed $550,000, with up to $350,000 available on an interim basis. |
| | DIP Loan Agreement. at § 1.1 (Definition of "Loan Commitment"), § 2.1 |
| **Maturity Date:** | The earliest of: |
| | (a) the date that is ninety (90) days after the date of the DIP Loan Agreement; provided that upon the entry of an order in the |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Loan Agreement.  To the extent there is any inconsistency between the description of the DIP Financing in this Motion and the terms of the DIP Loan Documents themselves, the DIP Loan Documents shall control.

Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, such date shall be July 1, 2022

(b) the date on which a sale of all or substantially all of the assets of the Borrower is consummated;

(c) the effective date of a confirmed plan for the Borrower under chapter 11 of the Bankruptcy Code that does not contain a provision for repayment in full of the Obligations on or before the effective date of such plan or plans or otherwise in four installments as provided in clause (a) above;

(c) the dismissal or termination of the Bankruptcy Case,

(d) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code,

(e) the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code, and

(g) the date of termination of the Loan Commitment Period.

DIP Loan Agreement at § 1.1 (Definition of "Maturity Date").

**Use of Proceeds:**     Proceeds of the DIP Financing will be used:

(i) for working capital and to pay administrative expenses,

(ii) to pay for goods, services and capital expenditures in the ordinary course of business, to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement,

(iii) to pay amounts owing to the DIP Lender under the DIP Loan Agreement, including, without limitation, the payment of professional fees of the DIP Lender,

(iv) to pay the transaction expenses of the DIP Financing,

(v) to pay the claims of certain prepetition creditors, which may include, without limitation, employees and taxing authorities in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the DIP Lender,

(vi) to make any other payments permitted to be made by the Bankruptcy Court, to the extent permitted under the Budget and

not prohibited by the DIP Loan Agreement,

(vii) to pay fees, expenses, and costs incurred in connection with the Bankruptcy Case, including, without limitation, to make any payments of fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the clerk of the Bankruptcy Court, and

(viii) to pay the Administrative Carve-Out (described below).

DIP Loan Agreement at § 2.3(a).

| | |
|---|---|
| **Limitation on Use of Funds:** | No portion of the DIP Financing shall be available (i) for the payment of interest and principal with respect to subordinated debt, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the rights and remedies of the DIP Lender under the DIP Loan Agreement, the DIP Loan Documents, the Interim Order or the Final Order; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; or (iv) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Borrower or their assets to the extent not permitted herein (including so-called "topping fees," "exit fees," and similar amounts) without the prior written consent of the DIP Lender. |

DIP Loan Agreement at § 2.3(b).

| | |
|---|---|
| **Repayment** | The Borrower shall repay to the DIP Lender the aggregate principal amount of all Loans, together with all accrued and unpaid interest, fees and other amounts payable hereunder, on the Maturity Date. Upon the entry of an order in the Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, the Borrower shall repay to the DIP Lender on each such date one quarter of the principal amount of the Loans outstanding on January 1, 2021, together with all accrued and unpaid interest thereon. |

The Borrower may repay the DIP Financing at any time upon notice to the DIP Lender.

DIP Loan Agreement at §§ 2.2, 2.7

| | |
|---|---|
| **Funding Dates:** | The closing of the DIP Financing shall occur on the date that the conditions precedent to the initial extension of credit shall have |

been satisfied (or shall have been waived in the sole discretion of the DIP Lender) (the "**Closing Date**").

Upon the Closing Date, the Borrower will be entitled to an initial extension of credit under the DIP Financing not to exceed $350,000, disbursed in accordance with the Budget.

DIP Loan Agreement at § 1.1 (Definition of "Closing Date," "Loan Commitment")

**Fees:**

The DIP Lender is not charging any fees for the DIP Financing.

**Interest Rate:**

Three percent (3%) per annum plus two percent (2%) PIK, calculated on the basis of a 360-day year and actual days elapsed, and payable on the Maturity Date.

DIP Loan Agreement at § 2.5(a).

**Default Interest Rate:**

Two percent (2%) per annum above the non-default interest rate.

DIP Loan Agreement at § 2.5(c).

**Liens and Priorities:**

Subject to the Administrative Carve-Out (as defined below), all obligations of the Borrower under the DIP Financing (the "**DIP Obligations**") will be secured by a first priority perfected priming lien (the "**DIP Lien**") upon all of the property of the Borrower, whether now owned or hereafter acquired, and all proceeds thereof (the "**Collateral**") pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code.

Subject to the Administrative Carve-Out (as defined below), all DIP Obligations will be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code.

DIP Loan Agreement at §§ 7.1 and 7.6.

**Carve-Out:**

The term "Administrative Carve-Out" means:

(a) all incurred or accrued professional fees and expenses of professionals for the Borrower and professionals for the Unsecured Creditors Committee to the extent (i) allowed at any time by the Bankruptcy Court (if required), regardless of whether allowed by interim order, procedural order or otherwise, (ii) incurred or accrued through the date of service by the DIP Lender of a Carve-Out Trigger Notice and (iii) up to and as limited by the respective aggregate Budget amounts for each professional for the Borrower (as set forth on page 14 of the Budget) or category of professionals for the Borrower and category of professionals for

the Unsecured Creditors Committee through the date of service of said Carve-Out Trigger Notice, less the amount of any Prepetition retainers received by such professionals and not previously applied to fees and expenses (for clarity, all requirements in the foregoing clauses (i) through (iii) must be satisfied for the inclusion of the fees and expenses covered by this clause (a) in the Administrative Carve-Out);

(b) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Borrower from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $100,000.00 less the remaining amount of Prepetition retainers received by such professionals not previously applied to the fees, disbursements, costs and expenses set forth in clause (a)(iii) above;

(c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Unsecured Creditors Committee from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $10,000; and

(d) allowed administrative expenses (i) for fees payable to the Office of the United States Trustee pursuant to 28 USC §1930(a)(6), as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court and (ii) for fees required to be paid to the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 156(c).

**Adequate Protection:**  Subject to the terms and conditions set forth in the Interim Order, including the Administrative Carve-Out, JPMorgan Chase Bank, NA, shall retain a lien in an amount of $467,820.00 in the unrestricted funds, and the Debtor shall not reduce its unrestricted funds below $467,820.00.

See Interim Order ¶ 13.

**Covenants:**  Affirmative Covenants: Among other things, (i) provide monthly reports, notices of certain material events and other information, (ii) preserve corporate existence and business operations, (iii) pay taxes and other claims, (iv) maintain all material properties used or useful in the operation of the Borrower's business and material intellectual property, (v) maintain Borrower's insurance, (vi) provide the DIP Lender with visitation and inspection rights, (vii) participate in quarterly meetings with the DIP Lender, (viii) comply in all material respects with applicable law, (ix) execute

any further documents that may be required under applicable law to effectuate the transactions contemplated in the DIP Loan Documents, (x) ensure that certain reorganization steps are carried out within a specified timetable and (xi) take certain steps with respect to the Borrower's bankruptcy and auction process.

<u>Negative Covenants</u>: Among other things, the Borrower shall not (i) incur any additional indebtedness (subject to certain enumerated exceptions), (ii) grant any liens upon or security interests in the Borrower's property (subject to certain enumerated exceptions and a requirement to grant equitable liens), (iii) enter into any negative pledge, (iv) make certain restricted junior payments, (v) make certain investments, loans and advances, (vi) fail to comply with certain covenants regarding the Budget, (vii) dispose of the Borrower's property or enter into any merger, consolidation, liquidation or dissolution (subject to certain enumerated exceptions), (viii) enter into any sale-leaseback transactions, (ix) engage in any business other than the business it was engaged in on the closing date, (x) amend its organizational documents, (xi) prepay certain indebtedness (subject to certain enumerated exceptions), (xii) assume, reject, breach or modify any material contract, (xiii) take certain actions with respect to its bankruptcy without the DIP Lender's approval.

DIP Loan Agreement at §§ 5.1-5.11, 6.1-6.14.

**Conditions to Initial Extension of Credit:**

(a)     satisfaction of customary borrowing conditions, including authorizations, documentation, and representations concerning certain contracts; and

(b)     the Bankruptcy Case has commenced, the Bankruptcy Court has approved the funding under the Interim Order, the Budget has been approved by the DIP Lender, and certain first day orders in form and substance satisfactory to the DIP Lender have been entered.

DIP Loan Agreement at § 3.1.

**Conditions to All Extensions of Credit:**

Customary borrowing conditions regarding the continued truth and correctness of all representations of the Borrower, the absence of an Event of Default, and the provision of a valid borrowing request.

DIP Loan Agreement at § 3.2.

**Section 506(c):**

The DIP Loan Agreement waives the Borrower's rights under section 506(c) of the Bankruptcy Code to assert or impose or seek to assert or impose any costs or expenses of administration against

the DIP Lender.

DIP Loan Agreement at § 7.6(d).

**Indemnification:** The DIP Loan Documents shall provide that the Borrower agrees to indemnify and hold the DIP Lender and its affiliates and their respective officers, partners, directors, trustees, employees and agents harmless from and against, any and all liabilities, obligations, losses, damages, penalties, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel in connection with any investigative, administrative or judicial proceeding commenced or threatened by any person, whether or not any indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any indemnitee, in any manner relating to or arising out of (a) the DIP Loan Agreement or the other DIP Loan Documents or the transactions contemplated thereby (including the DIP Lender's agreement to make credit extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the DIP Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral)); or (b) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any indemnitee is a party thereto.

DIP Loan Agreement at § 9.3.

**Events of Default:** Events of Default under the DIP Loan Agreement include:

(a)     the Debtor fails to make any payments of the DIP Obligations when due;

(b)     the Debtor defaults under certain other agreements or any of the other DIP Loan Documents;

(c)     any representation or warranty made in connection with any DIP Loan Document is materially false or the Debtor defaults in the observance or performance of any covenant or condition (in the case of certain covenants, after a 30 day grace period);

(d)     any money judgment, writ or warrant of attachment or similar process is entered or filed against the Debtor or its assets;

(e)     any order, judgment or decree is entered against the Debtor decreeing the dissolution or split up of the Debtor, or there is a Change of Control;

(f)     a Final Order on the Motion is not entered within 35 days of the Petition Date or ceases to be in full force and effect;

(g)     the Debtor brings a motion, takes of any action or files any plan of reorganization or disclosure statement attendant thereto (other than in connection with a proposed refinancing and repayment in full of the DIP Loan Obligations): (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (B) to grant any Lien other than the Senior Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Interim Order or Final Order, as applicable, to use Cash Collateral of the DIP Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender;

(h)     the entry of an order in the Bankruptcy Case confirming a plan of reorganization or liquidation that does not contain a provision for repayment in full in cash of all of the DIP Loan Obligations under the DIP Loan Agreement on or before the effective date of such plan or otherwise in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022;

(i)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order, as applicable, without the written consent of the DIP Lender or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, as applicable;

(j)     other than as provided in the "first day" motions, the payment of, or application for authority to pay prior to the effective date of a confirmed plan, any Prepetition claim without the DIP Lender's prior written consent unless otherwise permitted under DIP Loan Agreement or expressly consented to in writing by the DIP Lender in connection with any plan in the Bankruptcy Case;

(k)     the appointment of a chapter 11 trustee, a receiver or an

examiner in the Bankruptcy Case; or the sale without the DIP Lender's consent, of all or substantially all of the Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Case, or otherwise;

(l)     the dismissal of the Bankruptcy Case, the conversion of the Bankruptcy Case to one under chapter 7 of the Bankruptcy Code, or the filing by the Debtor of a motion seeking the dismissal of its Bankruptcy Case;

(m)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, in either case in excess of $15,000 (the "**Threshold Amount**"), (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, in each case with a value in excess of the Threshold Amount or (z) the approval of any settlement or other stipulation with any creditor of the Debtor, other than the DIP Lender, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(n)     the commencement of a suit or action against the DIP Lender that asserts or seeks (A) a claim in any Bankruptcy Case in excess of the Threshold Amount, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the DIP Lender under the DIP Loan Documents to any other claim, or (C) would otherwise have a Material Adverse Effect, including a Material Adverse Effect on the rights and remedies of the DIP Lender under any Credit Document or the collectability of all or any portion of the Obligations;

(o)     the entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Loan Obligations owing under the DIP Loan Documents;

(p)     the failure of the Debtor to perform any of its material obligations under the Interim Order or Final Order, as applicable;

(q)     the marshalling of any Collateral other than at the request of the DIP Lender;

(r)     the consolidating or combining of the Debtor with any

other Person except (A) as permitted under the DIP Loan Agreement, (B) pursuant to a confirmed plan of reorganization or liquidation which provides or the refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement), or (C) with the prior written consent of the DIP Lender;

(s)      the entry of an order in the Bankruptcy Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the DIP Lender (other than in respect of the Administrative Carve-Out or any Permitted Prior Lien); or

(t)      the period of exclusivity in the Bankruptcy Case terminates or exclusivity is otherwise lifted in the Bankruptcy Case prior to the Obligations being paid, in full.

DIP Loan Agreement at § 8.1.

**Remedies/ Modification of the Automatic Stay:**      Customary remedies, including modification of the automatic stay immediately upon the occurrence of an Event of Default without further action or order of the Bankruptcy Court.

The stay is further modified to the extent necessary to allow for the perfection of the DIP Lien.

DIP Loan Agreement at § 8.2.

## III.
## RELIEF REQUESTED AND BASIS THEREFOR

16.      By this Motion, the Debtor seeks entry of two orders:  First, the Debtor requests entry of an interim order, in substantially the form attached hereto as <u>Exhibit B</u> (the "**Interim Order**"), (a)  authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, and (c) scheduling a final hearing (the "**Final Hearing**") pursuant to Rule 4001 of the Bankruptcy Rules.  Second, the Debtor requests entry of a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") authorizing the relief granted in the Interim Order on a permanent basis.

17.      The Debtor has insufficient cash with which to operate its business long term or to protect its assets.  It has insufficient money to conduct a reorganization or a sale process, and believes that the value of its assets will rapidly diminish if the case does not quickly conclude.  Thus, the Debtor needs the DIP Financing to maintain its business pending the confirmation of a plan of reorganization or the closing of a sale in order to maximize the value of its assets for the benefit of all of its creditors.  The Debtor has negotiated with the DIP Lender to present this Motion on a consensual basis in order to expedite the process and achieve the highest value possible for creditors.

18.      Thus, the Debtor believes that, in its business judgment, entry into the DIP Loan Agreement is in its best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").  As such, this Court should authorize the Debtor to enter into the DIP Financing.

**A.     The DIP Financing Should be Approved
         Under Section 364 of the Bankruptcy Code**

19.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

20.     Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

21.     In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

1. **The Debtor is Unable to Obtain Unsecured Credit**

22. The Debtor urgently requires long-term working capital financing in order to preserve and maintain its business during the Bankruptcy Case. In light of the sudden and indefinite suspension of rugby during the COVID-19 pandemic, the Debtor's exigent financial circumstances have little prospect of improving while the pandemic continues. Moreover, due to the impact of the COVID-19 pandemic on the global economy, the availability of financing is diminishing and the Debtor is not aware of any other lender that would provide it with financing.

23. The DIP Lender is not just providing financing -- it is also the governing body of rugby worldwide. As such, it wants rugby to be successful in America and desires to have the Debtor be able to protect its assets during its bankruptcy case. The DIP Lender is the only party that has offered to discuss and negotiate the terms of financing, and is unwilling to provide DIP Financing on an unsecured basis.

24. As such, the Debtor has determined that it is unable to obtain critical post-petition financing on an unsecured basis.

2. **The Transaction Under the DIP Loan Documents is Necessary to Preserve the Estate and is in the Best Interests of Creditors**

25. The Debtor has insufficient cash with which to operate its business long-term or protect its assets. Without access to post-petition financing, the Debtor will be unable to reorganize its business or to conduct an orderly sale, which would significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all creditor constituencies.

26. By obtaining the DIP Financing, the Debtor will be in a position to preserve the value of its assets during the chapter 11 case – specifically, the infusion of capital will prevent the value of the Debtor's assets from plummeting and give the Debtor sufficient time to

reorganize or to conduct an orderly sale process. Moreover, the Debtor is going to run out of cash by the end of April, and the DIP Financing will permit it to continue to pay its bills during the pendency of this Bankruptcy Case.

27. Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the Bankruptcy Case back to a case under chapter 7 without the ability to sell its assets in an orderly manner for the benefit of the Debtor's creditors. *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D.Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates"). Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

### 3. The Terms of the DIP Financing are Fair and Reasonable

28. In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

29. Under the circumstances of this case, including the Debtor's dire financial condition, the indefinite suspension of rugby worldwide, the on-going COVID-19 pandemic, and the lack of readily available financing, the terms of the DIP Financing are fair and reasonable. First, the terms and conditions of the DIP Loan Agreement were negotiated by the parties in good faith and at arms' length and were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11 and preserving the value of the Debtor's

assets. Second, the terms themselves are reasonable and favorable to the Debtor. There is no fee for the DIP Financing, the interest rate is very favorable to the Debtor, and the DIP Loan does not try to convert the DIP Lender's pre-petition unsecured claims into administrative claims.

30. Furthermore, the DIP Financing subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the United States Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of (a) the Debtor or (b) any unsecured creditor's committee in an aggregate amount not to exceed $10,000. Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditor's committees and debtors' estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38. Accordingly, the terms of the DIP Financing are fair and reasonable.

31. As such, the DIP Financing should be approved under section 364(c) of the Bankruptcy Code.

### 4.   Priming of the Chase Debt

32. Generally, in order for a debtor to incur post-petition debt on a senior or "priming" basis, it must provide adequate protection to the lienholder whose lien is being primed. 11 U.S.C. § 364(d)(1). Preservation of value generally constitutes the "adequate protection" needed to prime existing liens. *See, e.g.*, *Bray (In re Snowshoe Co. Inc.)*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (finding that funds from lender given "priming" lien used to improve collateral will be transferred into value "[that] will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996). Consent by

the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

33.     The Debtor has agreed to reserve $467,820.00 in funds from its unrestricted pool of cash to adequately protect Chase. As this provides for sufficient security to protect the entirety of their lien, Chase is at little or no risk that the value of its interest will diminish. At the same time, by allowing the Debtor to use the remaining funds available to operate their organization, the order will permit the Debtor to preserve the value of its estate for all creditors, including Chase.

**B.     The DIP Financing was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

34.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

35.     Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees

and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id*.

36.     The terms of the DIP Financing were negotiated at arm's length and reflect the most advantageous terms available to the Debtor in light of the exigent circumstances it faces. The DIP Financing is being extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to the DIP Loan, other than as set forth herein and in the Interim Order. As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## C.     The Automatic Stay Should Be Modified on a Limited Basis

37.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances.

38.     The Debtor further requests that, upon the occurrence of an Event of Default under the DIP Loan Agreement, the automatic stay be immediately vacated to permit the DIP Lender to exercise all rights and remedies under the DIP Loan Documents or the DIP Orders, as applicable, without further action or order of the Bankruptcy Court. However, the DIP Lender will be entitled to exercise all of its rights and remedies under the DIP Loan Documents only upon three business days' written notice to the Borrower. Such relief is an appropriate balance, providing the DIP Lender with the ability to exercise its rights upon the Debtor's Event of

Default without having to seek further relief from the Court, while simultaneously providing the Debtor with notice and the opportunity to seek reinstatement of the automatic stay.

**D. Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

39. Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2). "Immediate and irreparable harm" exists where loss of the business threatens the ability of the debtor to reorganize. *See In re Ames*, 115 B.R. at 36 n.2. Approval of a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. *See In re Pan Am Corp.*, 1992 WL 154200 *1, *6 (S.D.N.Y. June 18, 1992).

40. Absent authorization from this Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. While the Debtor currently has cash sufficient to meet its immediate cash needs, that cash is expected to run out shortly. The Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of its business, maintain relationships with customers, make payroll and capital expenditures, and satisfy other working capital and operational needs. Thus, the credit provided under the DIP Financing will enable the Debtor to continue to operate its business in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest.

41.     The availability of interim funding under the DIP Loan Agreement will also provide necessary assurance of the Debtor's ability to meet its near-term obligations and encourage creditors, employees, contract counterparties and customers to continue its relationships with the Debtor.  Failure to meet these obligations and to provide these assurances will cause creditors, customers, contract counterparties and employees to lose confidence in the Debtor, thereby causing irreparable harm to the value of the Debtor's business and assets.

42.     Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor's assets for the benefit of all parties.  As such, the Debtor believes that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

**E.     Request for a Final Hearing**

43.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.

**IV.**
**REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(h)**

44.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the 14-day stay under Bankruptcy Rule 6004(h)  so that the Interim Order on this Motion may be effective immediately.  As set forth above, the Debtor needs immediate access to funding under the DIP Financing in order to

prevent irreparable damage to the Debtor's Business and to preserve the value of its assets. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## V.
## NOTICE

45.     Notice of this Motion will be provided to the following parties:  (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the DIP Lender, (iii)  the Debtor's 20 largest creditors, and (iv) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).

## VI.
## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter the Interim Order, substantially in the form attached hereto as Exhibit B, (a)  authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, (c) scheduling the Final Hearing pursuant to Bankruptcy Rule 4001, and (d) granting such other and further relief as this Court deems appropriate.

2 April 2020

_/s/ Mark M. Billion_____
Mark M. Billion (DE Bar No. 5263)
Peter K. Schaeffer (DE Bar No. 5255)
BILLION LAW
1073 S. Governors Ave.
Dover, DE 19904
Tel: 302.428.9400
Fax: 302.674.2099
markbillion@billionlaw.com
peteschaeffer@billionlaw.com

-25-

**Exhibit A**
**DIP Loan Agreement**

**<u>Exhibit B</u>**
**Proposed Interim Order**

------------------------------------------------------ x
                                                       :

In re:                                              :    Chapter 11
                                                       :

United States of America Rugby Football    :    Case No. 20-10738 (BLS)
Union, Ltd.,                                          :
                                                         :

                           Debtor.                           :
------------------------------------------------------ x

### INTERIM ORDER (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (C) SCHEDULING A FINAL HEARING

Upon the motion, dated April 2, 2020 (the **"Motion"**),[1] of United States of America Rugby Football Union, Ltd. d/b/a USA Rugby, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the **"Debtor"**) pursuant to sections 105(a), 361, 362, 364, and 507 of title 11 of the United States Code (the **"Bankruptcy Code"**) and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) for interim and final orders:

    (i)      authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $550,000 (the **"DIP Financing"**) substantially on the terms set forth in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and World Rugby Limited (**"DIP Lender"**), annexed to the Motion as Exhibit A (as amended, supplemented, or otherwise modified and in effect from time to time, the **"DIP Loan Agreement"** and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Financing, the **"DIP Loan Documents"**);

---

[1]  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion and the DIP Loan Agreement.

(ii)     authorizing the Debtor to execute and enter into the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Financing;

(iii)    granting the DIP Lender the liens and super-priority claims described in the DIP Loan Agreement and in the Motion;

(iv)    modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary and applicable; and

(v)     scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules (a "**Final Hearing**") to enter an order approving the DIP Financing on a final basis (the "**Final Order**");

a hearing on the Motion having been held on _____ (the "**Hearing**"), with the appearances of all interested parties noted in the record of the Hearing; the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Hearing and the record of the Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS:**[2]

A.     <u>**Petition**</u>.   On March 31, 2020 (the "**Petition Date**"), the Debtor filed for bankruptcy under chapter 11 of the Bankruptcy Code, which was assigned case number 20-10738 (BLS) (the "**Bankruptcy Case**").   The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim Order to the extent not inconsistent herewith.

B.     **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).  The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, and Rules 2002, 4001, and 9014 of the Bankruptcy Rules.

C.     **Notice**.  Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Hearing was given to (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the DIP Lender, (iii) the Debtor's 20 largest creditors, and (iv) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).  Based on the record made by the Debtor, the Court finds that appropriate notice of the Hearing has been given.

D.     **Necessity of Post-Petition Financing**.  The DIP Financing will allow the Debtor to fund the necessary operations of the Debtor and to administer this Bankruptcy Case through the confirmation of a plan of reorganization or the closing date of a sale of the Debtor's assets.  Without such funding, the Debtor will not be able to make payroll or pay other operating expenses.  The Debtor would have to cease operations and its assets would lose value to the detriment of creditors.  The absence of post-petition financing would immediately and irreparably harm the Debtor, the estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  Entry of this Interim Order (the "**Interim Order**") approving the DIP Loan will benefit the Debtor, its estate and creditors.

E.     **Willingness to Lend**.  The DIP Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan

Agreement, only upon the condition that the DIP Lender is granted, subject to the Administrative Carve-Out as provided in the DIP Loan Agreement, (i) a super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in this chapter 11 case for all obligations under the DIP Financing (the "**DIP Obligations**"), and (ii) a first priority perfected priming lien upon all of the property of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, as fully described in the DIP Loan Documents (the "**Collateral**").

F.    **No Credit Available on Other Terms**. The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents. The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

G.    **Business Judgment**. The terms of the DIP Financing (including as outlined in the DIP Loan Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.    **Good Faith**. Subject to the entry of the Final Order, the terms of the DIP Financing have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Notwithstanding anything to the contrary in this Interim Order, any credit extended under the terms of the DIP Financing pursuant to the Interim Order is being extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code. The DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision therein is vacated, reversed

or modified, on appeal or otherwise. At the final hearing, the court will consider whether the DIP Lender is acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Loan Agreement and in extending any further credit under the terms of the DIP Financing beyond that extended pursuant to the Interim Order.

I. **Good Cause**. The DIP Financing and the relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its estate, as its implementation will, among other effects, provide the Debtor with the necessary liquidity to (i) minimize disruption to Debtor's business and on-going operations; (ii) preserve and maximize the value of the estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, business, remaining employees and assets. Good cause has been shown for the entry of this Interim Order and for the relief requested in the Motion.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is granted in accordance with the terms of this Interim Order.

2. Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

**Approval of DIP Loan Agreement**

3. The Debtor is hereby authorized to (i) be bound by and perform under the terms of the DIP Loan Agreement, (ii) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Loan Documents, and (iii) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all the DIP Obligations. Each officer of the Debtor, and each such other individual as may be so authorized

by the Board of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Loan Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

**Authority To Borrow**

4.      The Debtor is immediately authorized and empowered to borrow funds pursuant to the terms and conditions of the DIP Loan Agreement, in such amount or amounts as may be available to or for the benefit of the Debtor from the DIP Lender, which shall not exceed $350,000 upon entry of this Interim Order, in accordance with and for the purposes permitted under the DIP Loan Agreement and the Interim Order or the Final Order, as applicable; *provided however*, that the Debtor shall use the proceeds of the DIP Financing solely for the purposes permitted under the DIP Loan Agreement and in compliance with the budget attached hereto as Exhibit A and incorporated herein by reference (as it may be amended from time to time with the consent of the DIP Lender, the "**Budget**").

5.      The Debtor shall use the proceeds of the DIP Financing (either under this Interim Order or under the Final Order) solely, to the extent set forth in the Budget (subject to certain permitted variances):

(a)      for working capital and to pay administrative expenses,

(b)      to pay for goods, services and capital expenditures in the ordinary course of business, to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement,

(c)      to pay amounts owing to the DIP Lender under the DIP Loan Agreement, including, without limitation, the payment of professional fees of the DIP Lender,

(d)      to pay the transaction expenses of the DIP Financing,

(e)    to pay the claims of certain prepetition creditors, which may include, without limitation, employees and taxing authorities in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the DIP Lender,

(f)    to make any other payments permitted to be made by the Bankruptcy Court, to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement,

(g)    to pay fees, expenses, and costs incurred in connection with the Bankruptcy Case, including, without limitation, to make any payments of fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the Clerk of the Bankruptcy Court, and

(h)    to pay the Administrative Carve-Out.

6.    Use of the DIP Financing other than as described herein and in the DIP Loan Agreement shall be strictly prohibited.  In particular, no portion of the DIP Financing shall be available (i) for the payment of interest and principal with respect to subordinated debt, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the rights and remedies of the DIP Lender under the DIP Loan Agreement, the DIP Loan Documents, the Interim Order or the Final Order; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; or (iv) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Borrower or their assets to the extent not permitted herein (including so-called "topping fees," "exit fees," and similar amounts) without the prior written consent of the DIP Lender.

7.     The funding of the initial extension of credit is conditioned on the satisfaction of the following:

(a)     satisfaction of customary borrowing conditions, including authorizations, documentation, and representations concerning certain contracts; and

(b)     the Bankruptcy Case has commenced, the Bankruptcy Court has approved the funding under the Interim Order, the Budget has been approved by the DIP Lender, and certain first day orders in form and substance satisfactory to the DIP Lender have been entered.

8.     As a condition to funding each subsequent extension of credit, the Debtor shall deliver a Funding Notice (as defined in the DIP Loan Agreement), and the representations and warranties in the DIP Loan Documents must be true and correct in all material respects and no Event of Default shall have occurred and be continuing or would result from such extension of credit.

**Repayment; Maturity; Events of Default**

9.     The Debtor shall repay the DIP Obligations under the DIP Loan Agreement on the Maturity Date, which will occur on the earliest to occur of: (a) the date that is ninety (90) days after the date of the DIP Loan Agreement, provided that upon the entry of an order in the Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, such date shall be July 1, 2022; (b) the date on which a sale of all or substantially all of the assets of the Borrower is consummated; (c) the effective date of a plan confirmation in the Bankruptcy Case that does not contain a provision for repayment in full of the Obligations on or before the effective date of such plan or plans or otherwise in four installments as provided in clause (a) above; (d) the conversion of the Bankruptcy Case to a case

under Chapter 7 of the Bankruptcy Code; (e) the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (f) the dismissal or termination of the Bankruptcy Case; and (g) the date of any termination of the Loan Commitment Period. Upon the entry of an order in the Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, the Borrower shall repay to the DIP Lender on each such date one quarter of the principal amount of the Loans outstanding on January 1, 2021, together with all accrued and unpaid interest thereon.

10.    The Debtor may repay the DIP Financing at any time upon notice to the DIP Lender.

11.    Each of the following shall be considered an Event of Default under the DIP Financing, the Interim Order and the DIP Loan Documents:

(a)    the Debtor fails to make any payments of the DIP Obligations when due;

(b)    the Debtor defaults under certain other agreements or any of the other DIP Loan Documents;

(c)    any representation or warranty made in connection with any DIP Loan Document is materially false or the Debtor defaults in the observance or performance of any covenant or condition (in the case of certain covenants, after a 30 day grace period);

(d)    any money judgment, writ or warrant of attachment or similar process is entered or filed against the Debtor or its assets;

(e)    any order, judgment or decree is entered against the Debtor decreeing the dissolution or split up of the Debtor, or there is a Change of Control;

(f)    a Final Order on the Motion is not entered within 35 days of the Petition Date or ceases to be in full force and effect;

(g)    the Debtor brings a motion, takes of any action or files any plan of reorganization or disclosure statement attendant thereto (other than in connection with a proposed refinancing and repayment in full of the DIP Loan Obligations): (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (B) to grant any Lien other than the Senior Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Interim Order or Final Order, as applicable, to use Cash Collateral of the DIP Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender;

(h)    the entry of an order in the Bankruptcy Case confirming a plan of reorganization or liquidation that does not contain a provision for repayment in full in cash of all of the DIP Loan Obligations under the DIP Loan Agreement on or before the effective date of such plan or otherwise in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022;

(i)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order, as applicable, without the written consent of the DIP Lender or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, as applicable;

(j)    other than as provided in the "first day" motions, the payment of, or application for authority to pay prior to the effective date of a confirmed plan, any Prepetition claim without the DIP Lender's prior written consent unless otherwise

permitted under DIP Loan Agreement or expressly consented to in writing by the DIP Lender in connection with any plan in the Bankruptcy Case;

(k)     the appointment of a chapter 11 trustee, a receiver or an examiner in the Bankruptcy Case; or the sale without the DIP Lender's consent, of all or substantially all of the Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Case, or otherwise;

(l)     the dismissal of the Bankruptcy Case, the conversion of the Bankruptcy Case to one under chapter 7 of the Bankruptcy Code, or the filing by the Debtor of a motion seeking the dismissal of its Bankruptcy Case;

(m)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, in either case in excess of the Threshold Amount, (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, in each case with a value in excess of the Threshold Amount or (z) the approval of any settlement or other stipulation with any creditor of the Debtor, other than the DIP Lender, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(n)     the commencement of a suit or action against the DIP Lender that asserts or seeks (A) a claim in any Bankruptcy Case in excess of the Threshold Amount, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the DIP Lender under the DIP Loan Documents to any other claim, or (C) would otherwise have a Material Adverse Effect, including a Material

Adverse Effect on the rights and remedies of the DIP Lender under any Credit Document or the collectability of all or any portion of the Obligations;

(o)  the entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Loan Obligations owing under the DIP Loan Documents;

(p)  the failure of the Debtor to perform any of its material obligations under the Interim Order or Final Order, as applicable;

(q)  the marshalling of any Collateral other than at the request of the DIP Lender;

(r)  the consolidating or combining of the Debtor with any other Person except (A) as permitted under the DIP Loan Agreement, (B) pursuant to a confirmed plan of reorganization or liquidation which provides or the refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement), or (C) with the prior written consent of the DIP Lender;

(s)  the entry of an order in the Bankruptcy Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the DIP Lender (other than in respect of the Administrative Carve-Out or any Permitted Prior Lien); or

(t)  the period of exclusivity in the Bankruptcy Case terminates or exclusivity is otherwise lifted in the Bankruptcy Case prior to the Obligations being paid, in full.

12.  The DIP Lien set forth herein shall survive any exercise of remedies by the DIP Lender until the DIP Financing is satisfied, in full, in case and the proceeds of such exercise of

remedies must satisfy, and must be immediately used to satisfy, in full, in cash, the outstanding amount of the DIP Financing.

**Liens and Priority**

13.     Pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, as security for the repayment of the DIP Obligations under the DIP Loan Documents, the DIP Lender is hereby granted a valid, binding, enforceable and perfected first priority priming lien (the "**DIP Lien**") upon the Collateral. The DIP Lien is senior and superior to the Chase Lien, but subject and subordinate to the Administrative Carve-Out (as defined below). Notwithstanding the foregoing, and subject to the terms and conditions set forth in this Interim Order, Chase shall retain a lien in an amount of $467,820.00 in the unrestricted funds, and the Debtor shall not reduce its unrestricted funds below $467,820.00.

14.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim, subject to payment of the Administrative Carve-Out, as defined below (the "**Super-priority Claim**") against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Super-priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment of the Administrative Carve-Out.

15.     Until such time as the DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Documents, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the DIP Lender under the Interim Order by providing a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the DIP Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

16.     Until such time as the DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Documents, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral.

17.     Notwithstanding the foregoing provisions of this Interim Order, the liens and claims granted to the DIP Lender in the Interim Order shall be subject to the payment of:

(a)     all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the Clerk of the Bankruptcy Court, and

(b)     the reasonable fees and expenses of attorneys retained by the Debtor pursuant to a final order of the Bankruptcy Court under sections 327, 330 and 331 of the Bankruptcy Code; and the reasonable fees and expenses of attorneys retained by any committee of unsecured creditors pursuant to a final order of the Bankruptcy Court under sections 327, 330 and 331 of the Bankruptcy Code, provided that such amounts shall be consistent with the Budget, and subject to the caps spelled out in the DIP Loan Agreement (collectively, the "**Administrative Carve-Out**").

18.     The Administrative Carve-Out does not include, and the Debtor shall not be permitted under any circumstance to pay, from the Administrative Carve-Out or otherwise, any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of

action, adversary proceedings or other litigation (i) against the DIP Lender, or (ii) in connection with challenging, invalidating, disallowing, re-characterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the liens, claims, interests and adequate protection of the DIP Lender.

19.     No DIP Obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

20.     The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Lien on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Lien on and its security interests in the Collateral or to entitle the DIP Lender to the priorities granted herein.   The DIP Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to the Interim Order or the DIP Loan Documents.

21.     Subject to the entry of the Final Order, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no

force and effect with respect to the transactions granting the DIP Lender a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents and the Interim Order; *provided however*, for the avoidance of doubt, that this paragraph shall not provide for the subordination of any governmental property, employment or franchise tax claims against the Debtor that are entitled to seniority as a matter of non-bankruptcy law.

22.     Should the DIP Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the DIP Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of the Interim Order.

23.     The DIP Lender may, in its discretion, file a copy of the Interim Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of the Interim Order.

24.     The DIP Lender is hereby relieved of the requirement to file proofs of claim in this chapter 11 case with respect to any DIP Obligations and any other claims or liens described herein or granted hereunder or created hereby.

**Automatic Stay**

25.     The automatic stay imposed under section 362(a) of the Bankruptcy Code shall be and is hereby modified to the extent necessary to (i) grant the liens and security interests in favor of the DIP Lender on the Collateral, as contemplated by the DIP Loan Documents and the Interim Order, and (ii) permit the DIP Lender, after the occurrence and during the continuance of any Event of Default under the DIP Loan Agreement, to exercise all of its respective rights and remedies under the DIP Loan Documents, including all rights and remedies with respect to the Collateral, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court.

**Good Faith**

26.     The DIP Lender shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all the DIP Obligations incurred by the Debtor under the Interim Order.

27.     If any provision of the Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under the Interim Order and the DIP Loan Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the original provisions of the Interim Order, and the DIP Lender shall be entitled to all the rights, privileges and benefits granted therein.  The DIP Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of the Interim Order.

**Miscellaneous Provisions**

28.     In connection with the DIP Financing, each of the Debtor and the DIP Lender acknowledges, stipulates and agrees that, in entering into the DIP Loan Documents, and as

consideration therefor, the Debtor has obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which the Debtor is party.

29.     Nothing in the Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of the business.  So long as the DIP Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

30.     The DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "managing agent" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).

31.     The liens, security interests, administrative priorities and other rights and remedies granted to the DIP Lender by the provisions of the Interim Order and any actions taken

pursuant hereto shall continue beyond and survive the expiration of the Interim Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (i) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Loan Documents), or (ii) the entry of an order converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case.

32.     The terms and provisions of the Interim Order and the DIP Loan Documents, and the DIP Lien and security interests granted to the DIP Lender and the super-priority status of the administrative claims and payment provisions contained in the Interim Order and the DIP Loan Documents, shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash and/or otherwise satisfied as contemplated under the DIP Loan Documents.

33.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, the terms and provisions of the Interim Order shall govern.

34.     The Interim Order, including all findings herein, and DIP Loan Documents shall be valid, binding and enforceable by the DIP Lender against the Debtor, its successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's estate; *provided however*, that the DIP Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

35.     The Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

36.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of the Interim Order.

37.     The Final Hearing on the Motion shall be heard before this Court on _____, 2020 at __:__ _.m. EST at _____. Any party-in-interest objecting to the relief sought in the Final Order shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection no later than _____, 2020 by 5:00 p.m. EST (the **"Objection Deadline"**), on (i) counsel to the Debtor; (ii) counsel to the DIP Lender; and (iii) the United States Trustee for the District of Delaware.

38.     The Debtor shall mail copies of this Interim Order and notice of the Final Hearing (including the Objection Deadline) to the United States Trustee for the District of Delaware, counsel for the DIP Lender, any counsel chosen to represent any official committee appointed in the Bankruptcy Case, if any, and any other parties in interest.

39.     Notwithstanding Rules 6004(h) of the Bankruptcy Rules, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

**<u>Exhibit A</u>**
**DIP Budget**

```
------------------------------------------------------   x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
United States of America Rugby Football                  :   Case No. 20-10738 (BLS)
Union, Ltd.,                                             :
                                                         :
                  Debtor.                                :
------------------------------------------------------   x
```

**INTERIM ORDER (A) AUTHORIZING DEBTOR TO OBTAIN POST-
PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND
SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO
11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362; AND (C) SCHEDULING A FINAL HEARING**

Upon the motion, dated April 2, 2020 (the **"Motion"**),[1] of United States of America

Rugby Football Union, Ltd. d/b/a USA Rugby, as debtor and debtor-in-possession in the above-

captioned chapter 11 case (the **"Debtor"**) pursuant to sections 105(a), 361, 362, 364, and 507 of

title 11 of the United States Code (the **"Bankruptcy Code"**) and Rules 2002, 4001, and 9014 of

the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) for interim and final

orders:

    (i)    authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $550,000 (the **"DIP Financing"**) substantially on the terms set forth in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and World Rugby Limited (**"DIP Lender"**), annexed to the Motion as Exhibit A (as amended, supplemented, or otherwise modified and in effect from time to time, the **"DIP Loan Agreement"** and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Financing, the **"DIP Loan Documents"**);

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion and the DIP Loan Agreement.

(ii)      authorizing the Debtor to execute and enter into the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Financing;

(iii)      granting the DIP Lender the liens and super-priority claims described in the DIP Loan Agreement and in the Motion;

(iv)      modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary and applicable; and

(v)      scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules (a "**Final Hearing**") to enter an order approving the DIP Financing on a final basis (the "**Final Order**");

a hearing on the Motion having been held on _____ (the "**Hearing**"), with the appearances of all interested parties noted in the record of the Hearing; the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Hearing and the record of the Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS:**[2]

A.      <u>**Petition**</u>. On March 31, 2020 (the "**Petition Date**"), the Debtor filed for bankruptcy under chapter 11 of the Bankruptcy Code, which was assigned case number 20-10738 (BLS) (the "**Bankruptcy Case**"). The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052. Any statements of the Court from the bench at the Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim Order to the extent not inconsistent herewith.

B.     **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).  The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, and Rules 2002, 4001, and 9014 of the Bankruptcy Rules.

C.     **Notice**. Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Hearing was given to (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the DIP Lender, (iii) the Debtor's 20 largest creditors, and (iv) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).  Based on the record made by the Debtor, the Court finds that appropriate notice of the Hearing has been given.

D.     **Necessity of Post-Petition Financing**.  The DIP Financing will allow the Debtor to fund the necessary operations of the Debtor and to administer this Bankruptcy Case through the confirmation of a plan of reorganization or the closing date of a sale of the Debtor's assets.  Without such funding, the Debtor will not be able to make payroll or pay other operating expenses.  The Debtor would have to cease operations and its assets would lose value to the detriment of creditors.   The absence of post-petition financing would immediately and irreparably harm the Debtor, the estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  Entry of this Interim Order (the "**Interim Order**") approving the DIP Loan will benefit the Debtor, its estate and creditors.

E.     **Willingness to Lend**.  The DIP Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan

Agreement, only upon the condition that the DIP Lender is granted, subject to the Administrative Carve-Out as provided in the DIP Loan Agreement, (i) a super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in this chapter 11 case for all obligations under the DIP Financing (the "**DIP Obligations**"), and (ii) a first priority perfected priming lien upon all of the property of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, as fully described in the DIP Loan Documents (the "**Collateral**").

F. <u>**No Credit Available on Other Terms**</u>. The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents. The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

G. <u>**Business Judgment**</u>. The terms of the DIP Financing (including as outlined in the DIP Loan Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H. <u>**Good Faith**</u>. Subject to the entry of the Final Order, the terms of the DIP Financing have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Notwithstanding anything to the contrary in this Interim Order, any credit extended under the terms of the DIP Financing pursuant to the Interim Order is being extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code. The DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision therein is vacated, reversed

or modified, on appeal or otherwise. At the final hearing, the court will consider whether the DIP Lender is acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Loan Agreement and in extending any further credit under the terms of the DIP Financing beyond that extended pursuant to the Interim Order.

I.     **Good Cause**.  The DIP Financing and the relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its estate, as its implementation will, among other effects, provide the Debtor with the necessary liquidity to (i) minimize disruption to Debtor's business and on-going operations; (ii) preserve and maximize the value of the estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, business, remaining employees and assets.  Good cause has been shown for the entry of this Interim Order and for the relief requested in the Motion.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is granted in accordance with the terms of this Interim Order.

2.     Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

**Approval of DIP Loan Agreement**

3.     The Debtor is hereby authorized to (i) be bound by and perform under the terms of the DIP Loan Agreement, (ii) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Loan Documents, and (iii) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all the DIP Obligations.  Each officer of the Debtor, and each such other individual as may be so authorized

by the Board of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Loan Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

**Authority To Borrow**

4.     The Debtor is immediately authorized and empowered to borrow funds pursuant to the terms and conditions of the DIP Loan Agreement, in such amount or amounts as may be available to or for the benefit of the Debtor from the DIP Lender, which shall not exceed $350,000 upon entry of this Interim Order, in accordance with and for the purposes permitted under the DIP Loan Agreement and the Interim Order or the Final Order, as applicable; *provided however*, that the Debtor shall use the proceeds of the DIP Financing solely for the purposes permitted under the DIP Loan Agreement and in compliance with the budget attached hereto as Exhibit A and incorporated herein by reference (as it may be amended from time to time with the consent of the DIP Lender, the "**Budget**").

5.     The Debtor shall use the proceeds of the DIP Financing (either under this Interim Order or under the Final Order) solely, to the extent set forth in the Budget (subject to certain permitted variances):

      (a)     for working capital and to pay administrative expenses,

      (b)     to pay for goods, services and capital expenditures in the ordinary course of business, to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement,

      (c)     to pay amounts owing to the DIP Lender under the DIP Loan Agreement, including, without limitation, the payment of professional fees of the DIP Lender,

      (d)     to pay the transaction expenses of the DIP Financing,

(e)     to pay the claims of certain prepetition creditors, which may include, without limitation, employees and taxing authorities in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the DIP Lender,

(f)     to make any other payments permitted to be made by the Bankruptcy Court, to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement,

(g)     to pay fees, expenses, and costs incurred in connection with the Bankruptcy Case, including, without limitation, to make any payments of fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the Clerk of the Bankruptcy Court, and

(h)     to pay the Administrative Carve-Out.

6.     Use of the DIP Financing other than as described herein and in the DIP Loan Agreement shall be strictly prohibited.  In particular, no portion of the DIP Financing shall be available (i) for the payment of interest and principal with respect to subordinated debt, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the rights and remedies of the DIP Lender under the DIP Loan Agreement, the DIP Loan Documents, the Interim Order or the Final Order; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; or (iv) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Borrower or their assets to the extent not permitted herein (including so-called "topping fees," "exit fees," and similar amounts) without the prior written consent of the DIP Lender.

7.     The funding of the initial extension of credit is conditioned on the satisfaction of the following:

(a)     satisfaction of customary borrowing conditions, including authorizations, documentation, and representations concerning certain contracts; and

(b)     the Bankruptcy Case has commenced, the Bankruptcy Court has approved the funding under the Interim Order, the Budget has been approved by the DIP Lender, and certain first day orders in form and substance satisfactory to the DIP Lender have been entered.

8.     As a condition to funding each subsequent extension of credit, the Debtor shall deliver a Funding Notice (as defined in the DIP Loan Agreement), and the representations and warranties in the DIP Loan Documents must be true and correct in all material respects and no Event of Default shall have occurred and be continuing or would result from such extension of credit.

**Repayment; Maturity; Events of Default**

9.     The Debtor shall repay the DIP Obligations under the DIP Loan Agreement on the Maturity Date, which will occur on the earliest to occur of: (a) the date that is ninety (90) days after the date of the DIP Loan Agreement, provided that upon the entry of an order in the Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, such date shall be July 1, 2022; (b) the date on which a sale of all or substantially all of the assets of the Borrower is consummated; (c) the effective date of a plan confirmation in the Bankruptcy Case that does not contain a provision for repayment in full of the Obligations on or before the effective date of such plan or plans or otherwise in four installments as provided in clause (a) above; (d) the conversion of the Bankruptcy Case to a case

under Chapter 7 of the Bankruptcy Code; (e) the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (f) the dismissal or termination of the Bankruptcy Case; and (g) the date of any termination of the Loan Commitment Period. Upon the entry of an order in the Bankruptcy Case confirming a plan of reorganization that contains a provision for repayment in full of the DIP Obligations in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022, the Borrower shall repay to the DIP Lender on each such date one quarter of the principal amount of the Loans outstanding on January 1, 2021, together with all accrued and unpaid interest thereon.

10.    The Debtor may repay the DIP Financing at any time upon notice to the DIP Lender.

11.    Each of the following shall be considered an Event of Default under the DIP Financing, the Interim Order and the DIP Loan Documents:

(a)    the Debtor fails to make any payments of the DIP Obligations when due;

(b)    the Debtor defaults under certain other agreements or any of the other DIP Loan Documents;

(c)    any representation or warranty made in connection with any DIP Loan Document is materially false or the Debtor defaults in the observance or performance of any covenant or condition (in the case of certain covenants, after a 30 day grace period);

(d)    any money judgment, writ or warrant of attachment or similar process is entered or filed against the Debtor or its assets;

(e)    any order, judgment or decree is entered against the Debtor decreeing the dissolution or split up of the Debtor, or there is a Change of Control;

(f)     a Final Order on the Motion is not entered within 35 days of the Petition Date or ceases to be in full force and effect;

(g)     the Debtor brings a motion, takes of any action or files any plan of reorganization or disclosure statement attendant thereto (other than in connection with a proposed refinancing and repayment in full of the DIP Loan Obligations): (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (B) to grant any Lien other than the Senior Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Interim Order or Final Order, as applicable, to use Cash Collateral of the DIP Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender;

(h)     the entry of an order in the Bankruptcy Case confirming a plan of reorganization or liquidation that does not contain a provision for repayment in full in cash of all of the DIP Loan Obligations under the DIP Loan Agreement on or before the effective date of such plan or otherwise in four (4) equal installments on January 1, 2021, July 1, 2021, January 1, 2022 and July 1, 2022;

(i)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order, as applicable, without the written consent of the DIP Lender or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, as applicable;

(j)     other than as provided in the "first day" motions, the payment of, or application for authority to pay prior to the effective date of a confirmed plan, any Prepetition claim without the DIP Lender's prior written consent unless otherwise

permitted under DIP Loan Agreement or expressly consented to in writing by the DIP Lender in connection with any plan in the Bankruptcy Case;

(k)     the appointment of a chapter 11 trustee, a receiver or an examiner in the Bankruptcy Case; or the sale without the DIP Lender's consent, of all or substantially all of the Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Case, or otherwise;

(l)     the dismissal of the Bankruptcy Case, the conversion of the Bankruptcy Case to one under chapter 7 of the Bankruptcy Code, or the filing by the Debtor of a motion seeking the dismissal of its Bankruptcy Case;

(m)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, in either case in excess of the Threshold Amount, (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, in each case with a value in excess of the Threshold Amount or (z) the approval of any settlement or other stipulation with any creditor of the Debtor, other than the DIP Lender, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(n)     the commencement of a suit or action against the DIP Lender that asserts or seeks (A) a claim in any Bankruptcy Case in excess of the Threshold Amount, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the DIP Lender under the DIP Loan Documents to any other claim, or (C) would otherwise have a Material Adverse Effect, including a Material

Adverse Effect on the rights and remedies of the DIP Lender under any Credit Document or the collectability of all or any portion of the Obligations;

(o)     the entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Loan Obligations owing under the DIP Loan Documents;

(p)     the failure of the Debtor to perform any of its material obligations under the Interim Order or Final Order, as applicable;

(q)     the marshalling of any Collateral other than at the request of the DIP Lender;

(r)     the consolidating or combining of the Debtor with any other Person except (A) as permitted under the DIP Loan Agreement, (B) pursuant to a confirmed plan of reorganization or liquidation which provides or the refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement), or (C) with the prior written consent of the DIP Lender;

(s)     the entry of an order in the Bankruptcy Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the DIP Lender (other than in respect of the Administrative Carve-Out or any Permitted Prior Lien); or

(t)     the period of exclusivity in the Bankruptcy Case terminates or exclusivity is otherwise lifted in the Bankruptcy Case prior to the Obligations being paid, in full.

12.     The DIP Lien set forth herein shall survive any exercise of remedies by the DIP Lender until the DIP Financing is satisfied, in full, in case and the proceeds of such exercise of

remedies must satisfy, and must be immediately used to satisfy, in full, in cash, the outstanding amount of the DIP Financing.

**Liens and Priority**

13.     Pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, as security for the repayment of the DIP Obligations under the DIP Loan Documents, the DIP Lender is hereby granted a valid, binding, enforceable and perfected first priority priming lien (the "**DIP Lien**") upon the Collateral.  The DIP Lien is senior and superior to the Chase Lien, but subject and subordinate to the Administrative Carve-Out (as defined below).  Notwithstanding the foregoing, and subject to the terms and conditions set forth in this Interim Order, Chase shall retain a lien in an amount of $467,820.00 in the unrestricted funds, and the Debtor shall not reduce its unrestricted funds below $467,820.00.

14.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim, subject to payment of the Administrative Carve-Out, as defined below (the "**Super-priority Claim**") against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Super-priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment of the Administrative Carve-Out.

15.     Until such time as the DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Documents, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the DIP Lender under the Interim Order by providing a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the DIP Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

16.     Until such time as the DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Documents, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral.

17.     Notwithstanding the foregoing provisions of this Interim Order, the liens and claims granted to the DIP Lender in the Interim Order shall be subject to the payment of:

(a)     all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the Clerk of the Bankruptcy Court, and

(b)     the reasonable fees and expenses of attorneys retained by the Debtor pursuant to a final order of the Bankruptcy Court under sections 327, 330 and 331 of the Bankruptcy Code; and the reasonable fees and expenses of attorneys retained by any committee of unsecured creditors pursuant to a final order of the Bankruptcy Court under sections 327, 330 and 331 of the Bankruptcy Code, provided that such amounts shall be consistent with the Budget, and subject to the caps spelled out in the DIP Loan Agreement (collectively, the "**Administrative Carve-Out**").

18.     The Administrative Carve-Out does not include, and the Debtor shall not be permitted under any circumstance to pay, from the Administrative Carve-Out or otherwise, any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of

action, adversary proceedings or other litigation (i) against the DIP Lender, or (ii) in connection with challenging, invalidating, disallowing, re-characterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the liens, claims, interests and adequate protection of the DIP Lender.

19.     No DIP Obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

20.     The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Lien on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Lien on and its security interests in the Collateral or to entitle the DIP Lender to the priorities granted herein.  The DIP Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to the Interim Order or the DIP Loan Documents.

21.     Subject to the entry of the Final Order, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no

force and effect with respect to the transactions granting the DIP Lender a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents and the Interim Order; *provided however*, for the avoidance of doubt, that this paragraph shall not provide for the subordination of any governmental property, employment or franchise tax claims against the Debtor that are entitled to seniority as a matter of non-bankruptcy law.

22.     Should the DIP Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the DIP Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of the Interim Order.

23.     The DIP Lender may, in its discretion, file a copy of the Interim Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of the Interim Order.

24.     The DIP Lender is hereby relieved of the requirement to file proofs of claim in this chapter 11 case with respect to any DIP Obligations and any other claims or liens described herein or granted hereunder or created hereby.

**Automatic Stay**

25. The automatic stay imposed under section 362(a) of the Bankruptcy Code shall be and is hereby modified to the extent necessary to (i) grant the liens and security interests in favor of the DIP Lender on the Collateral, as contemplated by the DIP Loan Documents and the Interim Order, and (ii) permit the DIP Lender, after the occurrence and during the continuance of any Event of Default under the DIP Loan Agreement, to exercise all of its respective rights and remedies under the DIP Loan Documents, including all rights and remedies with respect to the Collateral, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court.

**Good Faith**

26. The DIP Lender shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all the DIP Obligations incurred by the Debtor under the Interim Order.

27. If any provision of the Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under the Interim Order and the DIP Loan Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the original provisions of the Interim Order, and the DIP Lender shall be entitled to all the rights, privileges and benefits granted therein. The DIP Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of the Interim Order.

**Miscellaneous Provisions**

28. In connection with the DIP Financing, each of the Debtor and the DIP Lender acknowledges, stipulates and agrees that, in entering into the DIP Loan Documents, and as

consideration therefor, the Debtor has obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which the Debtor is party.

29.     Nothing in the Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of the business.  So long as the DIP Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

30.     The DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "managing agent" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute).

31.     The liens, security interests, administrative priorities and other rights and remedies granted to the DIP Lender by the provisions of the Interim Order and any actions taken

pursuant hereto shall continue beyond and survive the expiration of the Interim Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (i) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Loan Documents), or (ii) the entry of an order converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case.

32.     The terms and provisions of the Interim Order and the DIP Loan Documents, and the DIP Lien and security interests granted to the DIP Lender and the super-priority status of the administrative claims and payment provisions contained in the Interim Order and the DIP Loan Documents, shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash and/or otherwise satisfied as contemplated under the DIP Loan Documents.

33.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, the terms and provisions of the Interim Order shall govern.

34.     The Interim Order, including all findings herein, and DIP Loan Documents shall be valid, binding and enforceable by the DIP Lender against the Debtor, its successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's estate; *provided however*, that the DIP Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

35.     The Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

36.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of the Interim Order.

37.     The Final Hearing on the Motion shall be heard before this Court on _____, 2020 at __:__ _.m. EST at _____.  Any party-in-interest objecting to the relief sought in the Final Order shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection no later than _____, 2020 by 5:00 p.m. EST (the **"Objection Deadline"**), on (i) counsel to the Debtor; (ii) counsel to the DIP Lender; and (iii) the United States Trustee for the District of Delaware.

38.     The Debtor shall mail copies of this Interim Order and notice of the Final Hearing (including the Objection Deadline) to the United States Trustee for the District of Delaware, counsel for the DIP Lender, any counsel chosen to represent any official committee appointed in the Bankruptcy Case, if any, and any other parties in interest.

39.     Notwithstanding Rules 6004(h) of the Bankruptcy Rules, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

**<u>Exhibit A</u>**
**DIP Budget**

**USAR Cash Flow**
**Week ending April 3, 2020**

| | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating accounts | 40,000 | 239,950 | 85,518 | 3,125 | 40,745 |
| Membership account | 2,500 | - | - | - | - |
| ML Fund (savings account) | 180,000 | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| USARP Licensing Fee Inflow Q2 | | 25,000 | 50,000 | 37,500 | 37,500 |
| WR Cash Inflow (Apr) | 275,000 | - | - | - | - |
| | **497,500** | **265,000** | **182,000** | **45,500** | **157,500** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 49,450 | - | - | - | - |
| HP FT Staff | - | - | - | - | 10,839 |
| Indep Contractors | - | - | - | - | - |
| | 49,450 | - | - | - | 10,839 |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Insurance member accident | 100,000 | - | - | - | - |
| D&O tail & new policy | 62,000 | - | - | - | - |
| Other Insurance premiums | 50,000 | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 249,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Retainer | 35,000 | | | | |
| MacDonald Retainer | 30,000 | | | | |
| UWS Retainer | - | | | | |
| | 65,000 | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **363,450** | **5,000** | **5,000** | **5,000** | **15,839** |
| | | | | | |
| **Net Cash Activity** | **134,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 10, 2020**

| | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 134,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | - | - | - | - | - |
| **Restricted Donations - Existing** | - | 50 | 46,482 | 4,875 | 79,255 |
| **Restricted Donations - New** | - | - | - | - | - |
| WR Cash Inflow (Apr) | - | - | - | - | - |
| | **134,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| | | | | | |
| **Expense Items** | | | | | |
| Staffing / Benefits | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net Cash Activity** | **124,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 17, 2020**

| | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 124,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **174,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **141,303** | **255,000** | **172,000** | **35,500** | **131,245** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 24, 2020**

| | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 141,303 | 254,950 | 125,518 | 30,625 | 51,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (Apr) | 25,000 | - | - | - | - |
| | **166,303** | **255,000** | **172,000** | **35,500** | **131,245** |
| | | | | | |
| **Expense Items** | | | | | |
| Staffing / Benefits | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 30,000 | 17,500 | 5,000 | 10,000 | 10,000 |
| Other Payables | 10,000 | - | - | - | - |
| | 62,000 | 17,500 | 5,000 | 10,000 | 10,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **75,000** | **26,665** | **8,960** | **16,885** | **10,000** |
| | | | | | |
| **Net Cash Activity** | **91,303** | **228,335** | **163,040** | **18,615** | **121,245** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 1, 2020**

| | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 91,303 | 228,285 | 116,558 | 13,740 | 41,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (May) | 75,000 | - | - | - | - |
| | **166,303** | **228,335** | **163,040** | **18,615** | **121,245** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | 15,000 | | | | |
| MacDonald Legal fees | 10,000 | | | | |
| UWS Retainer | - | | | | |
| | 25,000 | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **62,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **103,556** | **223,335** | **158,040** | **13,615** | **110,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 8, 2020**

| | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 103,556 | 223,285 | 111,558 | 8,740 | 31,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (May) | **-** | - | - | - | - |
| | **103,556** | **223,335** | **158,040** | **13,615** | **110,828** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | | | | |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net Cash Activity** | **93,556** | **223,335** | **158,040** | **13,615** | **110,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 15, 2020**

| | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 93,556 | 223,285 | 111,558 | 8,740 | 31,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (May) | 50,000 | - | - | - | - |
| | **143,556** | **223,335** | **158,040** | **13,615** | **110,828** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **110,809** | **218,335** | **153,040** | **8,615** | **100,412** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 22, 2020**

| | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 110,809 | 218,285 | 106,558 | 3,740 | 21,157 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow (May) | 25,000 | - | - | - | - |
| | **135,809** | **218,335** | **153,040** | **8,615** | **100,412** |
| | | | | | |
| **Expense Items** | | | | | |
| Staffing / Benefits | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| **Net Cash Activity** | **125,809** | **218,335** | **153,040** | **8,615** | **100,412** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 29, 2020**

| | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 125,809 | 218,285 | 106,558 | 3,740 | 21,157 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| **Restricted Donations - New** | **-** | **500** | **5,000** | **25,000** | **5,000** |
| WR Cash Inflow (May) | 50,000 | - | - | - | - |
| | **175,809** | **218,835** | **158,040** | **33,615** | **105,412** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 35,747 | 9,165 | 3,960 | 6,885 | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 2,500 | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 12,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | 10,000 | | | | |
| UWS Retainer | - | | | | |
| | 10,000 | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **58,247** | **14,165** | **8,960** | **11,885** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **117,562** | **204,670** | **149,080** | **21,730** | **94,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 5, 2020**

| | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 117,562 | 204,120 | 97,598 | (8,145) | 10,740 |
| Membership Inflow | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | **-** | **550** | **51,482** | **29,875** | **84,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow | **-** | - | - | - | - |
| | **127,562** | **204,670** | **149,080** | **21,730** | **94,995** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 32,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **32,000** | **5,000** | **5,000** | **5,000** | **5,000** |
| **Net Cash Activity** | **95,562** | **199,670** | **144,080** | **16,730** | **89,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 12, 2020**

|  | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 |
|---|---|---|---|---|---|
|  | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** |  |  |  |  |  |
| Operating account | 95,562 | 199,120 | 92,598 | (13,145) | 5,740 |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) |  |  |  |  |  |
| **Restricted Donations - Existing** | **-** | **550** | **51,482** | **29,875** | **84,255** |
| **Restricted Donations - New** | **-** | **-** | **-** | **-** | **-** |
| WR Cash Inflow | **-** | - | - | - | - |
|  | **105,562** | **199,670** | **144,080** | **16,730** | **89,995** |
| **Expense Items** |  |  |  |  |  |
| **Staffing / Benefits** |  |  |  |  |  |
| Office FT Staff | 27,000 | - | - | - | - |
| HP FT Staff | - | - | - | - | 15,000 |
| Indep Contractors | - | - | - | - | - |
|  | 27,000 | - | - | - | 15,000 |
|  |  |  |  |  |  |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
|  | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
|  |  |  |  |  |  |
| Bankruptcy Legal fees | - |  |  |  |  |
| MacDonald Legal fees | - |  |  |  |  |
| UWS Retainer | - |  |  |  |  |
|  | - | - | - | - | - |
| **Total Expense Outflow** | **37,000** | **5,000** | **5,000** | **5,000** | **20,000** |
| **Net Cash Activity** | **68,562** | **194,670** | **139,080** | **11,730** | **69,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 19, 2020**

| | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 68,562 | 194,120 | 87,598 | (18,145) | (14,260) |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | - | 550 | 51,482 | 29,875 | 84,255 |
| **Restricted Donations - New** | | 500 | 5,000 | 25,000 | 10,000 |
| WR Cash Inflow | - | - | - | - | - |
| | **78,562** | **195,170** | **144,080** | **36,730** | **79,995** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **10,000** | **5,000** | **5,000** | **5,000** | **5,000** |
| | | | | | |
| **Net Cash Activity** | **68,562** | **190,170** | **139,080** | **31,730** | **74,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 26, 2020**

| | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 68,562 | 189,120 | 82,598 | (23,145) | (19,260) |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations - Existing** | - | **1,050** | **56,482** | **54,875** | **94,255** |
| **Restricted Donations - New** | | | | | |
| WR Cash Inflow | - | - | - | - | - |
| | **78,562** | **190,170** | **139,080** | **31,730** | **74,995** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 27,000 | - | - | - | - |
| HP FT Staff | - | - | - | - | 15,000 |
| Indep Contractors | 13,000 | 30,000 | 12,000 | 20,000 | - |
| | 40,000 | 30,000 | 12,000 | 20,000 | 15,000 |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 2,500 | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 34,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **74,500** | **35,000** | **17,000** | **25,000** | **20,000** |
| | | | | | |
| **Net Cash Activity** | **4,062** | **155,170** | **122,080** | **6,730** | **54,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Total April - June 2020**

| | | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | National Office | M15 | W15 | M7 | W7 | Donor Account | TOTAL |
| **Cash Funds** | | | | | | | | | |
| | Operating account | 40,000 | 239,950 | 85,518 | 3,125 | 40,745 | - | 409,338 |
| | Membership Inflow | 42,500 | - | - | - | - | - | 42,500 |
| | ML Fund (savings account) | 180,000 | | | | | | 180,000 |
| | **Restricted Donations** | - | 1,050 | 56,482 | 54,875 | 94,255 | 118,045 | 324,707 |
| | USARP Licensing Fee Inflow Q2 | - | 25,000 | 50,000 | 37,500 | 37,500 | - | 150,000 |
| | WR Cash Inflow | 550,000 | - | - | - | - | - | 550,000 |
| | | **812,500** | **266,000** | **192,000** | **95,500** | **172,500** | **118,045** | **1,656,545** |
| **Expense Items** | | | | | | | | | |
| **Staffing / Benefits** | | | | | | | | | |
| | Office FT Staff | 194,438 | - | - | - | - | - | 194,438 |
| | HP FT Staff | - | - | - | - | 62,505 | - | 62,505 |
| | Indep Contractors | 39,000 | 48,330 | 19,920 | 33,770 | - | - | 141,020 |
| | | **233,438** | **48,330** | **19,920** | **33,770** | **62,505** | **-** | **397,963** |
| | Rent | 88,000 | - | - | - | - | - | 88,000 |
| | Member Accident | 100,000 | - | - | - | - | - | 100,000 |
| | D&O tail & new policy | 62,000 | - | - | - | - | - | 62,000 |
| | Other Insurance premiums | 85,000 | 17,500 | 5,000 | 10,000 | 10,000 | - | 127,500 |
| | Other Payables | 140,000 | 45,000 | 45,000 | 45,000 | 45,000 | - | 320,000 |
| | | **475,000** | **62,500** | **50,000** | **55,000** | **55,000** | **-** | **697,500** |
| | Bankruptcy Legal fees | 50,000 | - | - | - | - | - | 50,000 |
| | MacDonald Legal fees | 50,000 | - | - | - | - | - | 50,000 |
| | UWS Retainer | - | - | - | - | - | - | - |
| | | **100,000** | **-** | **-** | **-** | **-** | **-** | **100,000** |
| | **Total Expense Outflow** | **808,438** | **110,830** | **69,920** | **88,770** | **117,505** | **-** | **1,195,463** |
| | **Net Cash Activity** | **4,062** | **155,170** | **122,080** | **6,730** | **54,995** | **118,045** | **461,082** |

**<u>Exhibit C</u>**
**DIP Budget**

**USAR Cash Flow**
**Week ending April 3, 2020**

| | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 | Week ending 4/3/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating accounts | 40,000 | 239,950 | 85,518 | 3,125 | 40,745 |
| Membership account | 2,500 | - | - | - | - |
| ML Fund (savings account) | 180,000 | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| USARP Licensing Fee Inflow Q2 | | 25,000 | 50,000 | 37,500 | 37,500 |
| WR Cash Inflow (Apr) | 275,000 | - | - | - | - |
| | **497,500** | **265,000** | **182,000** | **45,500** | **157,500** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 49,450 | - | - | - | - |
| HP FT Staff | - | - | - | - | 10,839 |
| Indep Contractors | - | - | - | - | - |
| | 49,450 | - | - | - | 10,839 |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Insurance member accident | 100,000 | - | - | - | - |
| D&O tail & new policy | 62,000 | - | - | - | - |
| Other Insurance premiums | 50,000 | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 249,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Retainer | 35,000 | | | | |
| MacDonald Retainer | 30,000 | | | | |
| UWS Retainer | - | | | | |
| | 65,000 | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **363,450** | **5,000** | **5,000** | **5,000** | **15,839** |
| | | | | | |
| **Net Cash Activity** | **134,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 10, 2020**

| | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 | Week ending 4/10/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 134,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | - | - | - | - | - |
| **Restricted Donations** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| WR Cash Inflow (Apr) | - | - | - | - | - |
| | **134,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net Cash Activity** | **124,050** | **260,000** | **177,000** | **40,500** | **141,661** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 17, 2020**

| | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 | Week ending 4/17/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 124,050 | 259,950 | 130,518 | 35,625 | 62,406 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 50,000 | - | - | - | - |
| | **174,050** | **260,000** | **177,000** | **40,500** | **141,661** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| **Net Cash Activity** | **141,303** | **255,000** | **172,000** | **35,500** | **131,245** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending April 24, 2020**

| | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 | Week ending 4/24/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 141,303 | 254,950 | 125,518 | 30,625 | 51,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (Apr) | 25,000 | - | - | - | - |
| | **166,303** | **255,000** | **172,000** | **35,500** | **131,245** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | | - | - |
| HP FT Staff | - | - | | - | - |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 30,000 | 17,500 | 5,000 | 10,000 | 10,000 |
| Other Payables | 10,000 | - | - | - | - |
| | 62,000 | 17,500 | 5,000 | 10,000 | 10,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **75,000** | **26,665** | **8,960** | **16,885** | **10,000** |
| **Net Cash Activity** | **91,303** | **228,335** | **163,040** | **18,615** | **121,245** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 1, 2020**

| | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 | Week ending 5/1/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 91,303 | 228,285 | 116,558 | 13,740 | 41,990 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (May) | 75,000 | - | - | - | - |
| | **166,303** | **228,335** | **163,040** | **18,615** | **121,245** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | 15,000 | | | | |
| MacDonald Legal fees | 10,000 | | | | |
| UWS Retainer | - | | | | |
| | 25,000 | - | - | - | - |
| **Total Expense Outflow** | **62,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| **Net Cash Activity** | **103,556** | **223,335** | **158,040** | **13,615** | **110,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 8, 2020**

| | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 | Week ending 5/8/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 103,556 | 223,285 | 111,558 | 8,740 | 31,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations** | **-** | **50** | **46,482** | **4,875** | **79,255** |
| WR Cash Inflow (May) | - | - | - | - | - |
| | **103,556** | **223,335** | **158,040** | **13,615** | **110,828** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| **Net Cash Activity** | **93,556** | **223,335** | **158,040** | **13,615** | **110,828** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 15, 2020**

| | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 | Week ending 5/15/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 93,556 | 223,285 | 111,558 | 8,740 | 31,573 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (May) | 50,000 | - | - | - | - |
| | **143,556** | **223,335** | **158,040** | **13,615** | **110,828** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | - | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | - | - | - | - | - |
| | 22,747 | - | - | - | 5,417 |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **32,747** | **5,000** | **5,000** | **5,000** | **10,417** |
| | | | | | |
| **Net Cash Activity** | **110,809** | **218,335** | **153,040** | **8,615** | **100,412** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 22, 2020**

| | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 | Week ending 5/22/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 110,809 | 218,285 | 106,558 | 3,740 | 21,157 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 50 | 46,482 | 4,875 | 79,255 |
| WR Cash Inflow (May) | 25,000 | - | - | - | - |
| | **135,809** | **218,335** | **153,040** | **8,615** | **100,412** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | - | - | - | - |
| | 10,000 | - | - | - | - |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **10,000** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net Cash Activity** | **125,809** | **218,335** | **153,040** | **8,615** | **100,412** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending May 29, 2020**

| | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 | Week ending 5/29/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 125,809 | 218,285 | 107,040 | 3,740 | 21,412 |
| Membership account | - | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | **-** | **500** | **50,000** | **15,000** | **85,000** |
| WR Cash Inflow (May) | 50,000 | - | - | - | - |
| | **175,809** | **218,785** | **157,040** | **18,740** | **106,412** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 22,747 | - | | - | - |
| HP FT Staff | - | - | - | - | 5,417 |
| Indep Contractors | 13,000 | 9,165 | 3,960 | 6,885 | - |
| | 35,747 | 9,165 | 3,960 | 6,885 | 5,417 |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 2,500 | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 12,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | 10,000 | | | | |
| UWS Retainer | - | | | | |
| | 10,000 | - | - | - | - |
| **Total Expense Outflow** | **58,247** | **14,165** | **8,960** | **11,885** | **10,417** |
| **Net Cash Activity** | **117,562** | **204,620** | **148,080** | **6,855** | **95,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 5, 2020**

| | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 | Week ending 6/5/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 117,562 | 204,620 | 103,080 | 1,855 | 20,995 |
| Membership Inflow | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 500 | 50,000 | 15,000 | 85,000 |
| WR Cash Inflow | - | - | - | - | - |
| | **127,562** | **205,120** | **153,080** | **16,855** | **105,995** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 32,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **32,000** | **5,000** | **5,000** | **5,000** | **5,000** |
| | | | | | |
| **Net Cash Activity** | **95,562** | **200,120** | **148,080** | **11,855** | **100,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 12, 2020**

| | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 | Week ending 6/12/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 95,562 | 200,120 | 103,080 | 6,855 | 25,995 |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 500 | 50,000 | 15,000 | 85,000 |
| WR Cash Inflow | - | - | - | - | - |
| | **105,562** | **200,620** | **153,080** | **21,855** | **110,995** |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 27,000 | - | - | - | - |
| HP FT Staff | - | - | - | - | 15,000 |
| Indep Contractors | - | - | - | - | - |
| | 27,000 | - | - | - | 15,000 |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | **37,000** | **5,000** | **5,000** | **5,000** | **20,000** |
| **Net Cash Activity** | **68,562** | **195,620** | **148,080** | **16,855** | **90,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 19, 2020**

| | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 | Week ending 6/19/2020 |
|---|---|---|---|---|---|
| | **National Office** | **M15** | **W15** | **M7** | **W7** |
| **Cash Funds** | | | | | |
| Operating account | 68,562 | 195,620 | 103,080 | 11,855 | 15,995 |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| **Restricted Donations** | **-** | **1,000** | **50,000** | **25,000** | **85,000** |
| WR Cash Inflow | - | - | - | - | - |
| | **78,562** | **196,620** | **153,080** | **36,855** | **100,995** |
| | | | | | |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | - | - | - | - | - |
| HP FT Staff | - | - | - | - | - |
| Indep Contractors | - | - | - | - | - |
| | - | - | - | - | - |
| | | | | | |
| Rent | - | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | - | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| | | | | | |
| **Total Expense Outflow** | **10,000** | **5,000** | **5,000** | **5,000** | **5,000** |
| | | | | | |
| **Net Cash Activity** | **68,562** | **191,620** | **148,080** | **31,855** | **95,995** |

*Does not contemplate funds in donor account

**USAR Cash Flow**
**Week ending June 26, 2020**

| | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 | Week ending 6/26/2020 |
|---|---|---|---|---|---|
| | National Office | M15 | W15 | M7 | W7 |
| **Cash Funds** | | | | | |
| Operating account | 68,562 | 191,620 | 103,080 | 26,855 | 20,995 |
| Membership account | 10,000 | - | - | - | - |
| ML Fund (savings account) | | | | | |
| Restricted Donations | - | 1,000 | 50,000 | 25,000 | 85,000 |
| WR Cash Inflow | - | - | - | - | - |
| | 78,562 | 192,620 | 153,080 | 51,855 | 105,995 |
| **Expense Items** | | | | | |
| **Staffing / Benefits** | | | | | |
| Office FT Staff | 27,000 | - | - | - | - |
| HP FT Staff | - | - | - | - | 15,000 |
| Indep Contractors | 13,000 | 30,000 | 12,000 | 20,000 | - |
| | 40,000 | 30,000 | 12,000 | 20,000 | 15,000 |
| Rent | 22,000 | - | - | - | - |
| Member Accident | - | - | - | - | - |
| D&O tail & new policy | - | - | - | - | - |
| Other Insurance premiums | 2,500 | - | - | - | - |
| Other Payables | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 34,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| Bankruptcy Legal fees | - | | | | |
| MacDonald Legal fees | - | | | | |
| UWS Retainer | - | | | | |
| | - | - | - | - | - |
| **Total Expense Outflow** | 74,500 | 35,000 | 17,000 | 25,000 | 20,000 |
| **Net Cash Activity** | 4,062 | 157,620 | 136,080 | 26,855 | 85,995 |

*Does not contemplate funds in donor account