UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                                         :     Chapter 11
    United States of America Rugby Football    :     Case No. 20-10738 (BLS)
    Union, Ltd.,                                :
        Debtor.                             :
EIN: 16-1118870                                                :
---------------------------------------------------------------x

**DECLARATION OF ROSS YOUNG IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF UNITED STATES OF AMERICA RUGBY FOOTBALL UNION, LTD., AND RESPONSE TO OBJECTIONS TO CONFIRMATION**

1. I submit this declaration (the "Declaration") in support of confirmation of the First *Amended Chapter 11 Plan of Reorganization of United States of America Rugby Football Union, Ltd.,* (together with all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time, the "Plan").[1] (Docket No. 186).

2. I am the Debtor's chief executive officer and I understand the Debtor's financial and governance structure. I have been directly involved in the development of the Plan, including its terms and the associated financial projections.

3. I am authorized to submit this Declaration on behalf of the Debtor. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or the personal knowledge of employees who report to me, my review of relevant documents, information provided to me by the Debtor's management or legal advisors, or my opinion based upon my familiarity with the Debtor's business, operations, and financial condition. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan.

**Background**

4. On March 31, 2020 (the "Petition Date"), as a result of the COVID-19 crisis, the Debtor commenced its voluntary case under chapter 11 of the Bankruptcy Code. The Debtor continues to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

*Overview*

5. Rugby union, widely known simply as rugby, is a contact team sport that originated in England in the first half of the 19th century. One of the two codes of rugby football, it is based on running with the ball in hand. In its most common form, a game is played between two teams of 15 players using an oval-shaped ball on a rectangular field with H-shaped goalposts at both ends. There is also a variant known as 7's rugby, which is played by seven rather than 15 players per team.

6. Internationally popular, Rugby is played by more than 6 million people worldwide, of whom 2.36 million were registered players as of July 1, 2020. International matches have taken place since 1871, when the first game was played between Scotland and England at Raeburn Place in Edinburgh. The Rugby World Cup ( "World Cup"), first held in 1987, is contested every four years. This event occurred most recently in 2019 for the 15's teams, and in 2018 for the 7's teams.

7. The World Rugby Sevens Series ("Sevens Series") is an annual series of international rugby 7's tournaments run by the World Rugby Limited ("World Rugby"). These tournaments feature national 7's teams playing in 10 tournaments that generally begin in November and last until May. The venues are the United Arab Emirates, South Africa, Australia, New Zealand, the United States, Canada, Hong Kong, Singapore, France and England.

8. World Rugby has been the governing body for rugby union since 1886, and currently has 105 countries as full members and 22 countries as associate members. Founded in 1975, the Debtor is the national governing body for the sport of rugby in the United States of America, a Full Sport Member of the United States Olympic and Paralympic Committee, and World Rugby. It oversees four national teams, multiple collegiate and high school All-American sides, and an emerging Olympic development pathway for elite athletes. Currently headquartered in Colorado, the Debtor is charged with developing the game on all levels and has more than 120,000 active members.

9. The Debtor enforces World Rugby's rules in U.S. tournaments. It also organizes these tournaments and fields the U.S. national teams that participate in the international competitions highlighted above, as well as other international matches. When organizing rugby games, the Debtor provides services such as training, education, certification and insurance coverage for the participants and organizers. Specifically, it provides liability insurance for every member and optional "Member Accident" insurance that insures against injuries in the course of play; this liability insurance is required by venues hosting rugby events.

*Events Precipitating the Filing*

10. In 2018, the Debtor hosted the World Cup 7's Championship in San Francisco. A series of cost-overruns and revenue shortfalls left the Debtor unable to afford to fund the event or to finance continued preparations. The Debtor contacted World Rugby, which after a series of negotiations, provided $4.4 million in unsecured loan financing to the USAR in an effort to shore up USAR's (and therefore the Championship's) finances. These events resulted in changes to the Debtor's management and board composition.

11.     Simultaneously, the Debtor faced a $40 million breach of contract suit initiated by United World Sports, LLC ("UWS").  In 2005, UWS claimed to have purchased the rights to host the U.S. portion of the Sevens Series tournament described above. UWS claims it invested in these tournaments and that, but for its efforts, the growth of rugby would have stalled nationwide.  When the tournament became successful, UWS claimed that World Rugby undermined this grant and that the Debtor conspired in World Rugby's alleged efforts.  The Debtor and World Rugby contested these claims, and the Debtor believed that it had valid contractual counter-claims.  The suit cost the Debtor in excess of $480,000.00 prepetition.

12.     As this breach of contract suit  progressed over the summer of 2019, the Debtor incurred substantial shortfalls associated with the Men's 15's preparation for their World Cup event.   Specifically, the Men's team exceeded their $2.1 million budget by an estimated $750,000.00.  At the same time, revenues from donations fell short of expectations by approximately 50%.

13.     As a consequence of the UWS suit, the cost overruns, and the declined philanthropy, the Debtor verged on insolvency.  To remedy the situation, the board initiated discussions with World Rugby, which provided a $1 million loan to USAR to allow USAR to continue operations.

14.     At the same time, the Debtor undertook major cost-cutting measures including credit line freezes, layoffs, and reduced corporate travel.  Assuming the projections in place on February 1, 2020, had held, the Debtor would have been able to operate until May 2020.  The plan was to seek recapitalization at May's World Rugby Executive Committee meeting.

15.     The COVID-19 outbreak frustrated this plan.  USA Rugby suspended sanctioned competition and rugby activities for a 30-day period on March 13 and indefinitely on March 20,

2020. As a result of this suspension, the dues revenue previously forecast failed to materialize and the May solvency timeline shortened to March. Consequentially, the Debtor was unable to operate long enough to secure relief at the meeting.

### The Bankruptcy Process

16. Since filing on March 31, 2020, the Debtor has secured debtor-in-possession financing from World Rugby on favorable negotiated arm's length terms. (Docket No. 89.) It also obtained judicial approval for certain pre-petition insurance and vendor payments that allowed the Debtor to preserve its enterprise value during the pendency of this Chapter 11 Case, and then extracted six-figure concessions from those same insurers at a great benefit to the Debtor and its Estate. (Docket No. 48, 84, 121.) The Debtor also settled the $40 million UWS claim for $200,000.00 and accessed PPP funding.

17. Internally, the Debtor reconsidered all of its operations, overhauling its corporate structure to streamline its decision-making process and updating its accounting systems. The Debtor terminated its office lease and relocated, reducing its overhead, and it rejected other contracts that were no longer in the Debtor's interest after an extensive board-level review. (Docket No. 155.)

18. Finally, it formulated the Plan subject to confirmation.

### General Overview of the Plan

19. The Plan provides for the Debtor to retain its assets and reorganize under subchapter V of Chapter 11 of the United States Bankruptcy Code.

20. It provides for its secured creditor, covering the principal but at a dramatically reduced interest rate (from 15.19% to 2.59%), and secures the eventual lien release upon payment of the amount due per the Plan. This treatment has been consented to by the lender.

21. The Plan does not provide for a distribution to unsecured creditors, generally, but does provide for reimbursement to certain families who purchased Olympic tickets that the Debtor could not provide. It also provides for certain payments to summer help. We believe that these payments are important to make as the failure to do so would create substantial ill-will within the ranks of our membership.

22. The plan initially filed on July 17, 2020, was amended on August 27, 2020 by the Plan. The amendment was necessitated by JPMorgan Chase Bank NA's request that the treatment of the Paycheck Protection Plan loan be clarified to reflect that the loan's repayment is governed by the note in keeping with the requirements and benefits of the PPP. It does not result in any change in distribution.

23. It is my belief that the Plan satisfies all applicable legal requirements for confirmation. I adopt the factual statements set forth in the *Memorandum of Law in Support of Confirmation of the First Amended Chapter 11 Plan of Reorganization of United States of America Rugby Football Union, Ltd., and Response to Objections to Confirmation* filed contemporaneously herewith and state that the Plan represents a feasible means of reorganization.

## The Plan Formulation Process

24. In making this feasibility assessment, the Debtor relied on its forecasted revenues and costs. I oversaw this forecasting process in consultation with a committee comprised of the Debtor's Chief Financial Officer, comptroller, financial resources manager, and its directors of events, human resources and membership.

25. To generate these forecasts, the committee solicited budgets from each of the four national team's managers and coaches, and from each of the Debtor's departments. It compared

these proposed budgets to the Debtor's historical data, and modeled future scenarios predicated on differing assumptions concerning the resumption of play.

26. The modeling was elaborate and was designed to reflect the dues structures' associated revenue streams in light of Covid's complications. It was also designed to account for non-Covid conditions confronting the Debtor. Most notably, the National Collegiate Rugby Organization ("NCRO") is repositioning itself as a competitor. The Debtor is prepared for the competition and understands that NCRO's repositioning may result in a decline in membership. Accordingly, in an effort to remain conservative given the uncertain terrain, the modeling assumed that <u>none</u> of NCRO's estimated 10,000 members would pay dues to the Debtor. Similar conservative assumptions were embedded throughout the modeling process.

27. In any event, the model is predictive, and it allowed the Debtor to test alternative dues regimes in an attempt to maximize current revenue streams despite the break in play. Using this model, the Debtor developed a new dues structure allowing for a limited membership providing insurance for training activities. By testing rate sets for this offering via a sensitivity analysis, the Debtor predicts this new rate structure will recapture much of its otherwise Covid-induced revenue losses.

28. These analyses inform predictions annexed to the Plan, and based on these predictions, I believe that the Debtor can reorganize and can sustain the Plan's cash flow requirements.

**Assumed Contracts**

29. With respect to the contracts to be assumed per Schedule 2.4, I have reviewed the Debtor's books and records and I believe that none require any cure payment, as all are current as of the date of this affidavit. The decision as to which contracts to assume, or correspondingly

reject, was made after an exhaustive review of the Debtor's operations and was based on, what I believe to be, the Debtor's sound business judgment.

**The Liquidation Analysis**

30.     It is my understanding that a chapter 11 plan cannot be confirmed unless a bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. I further understand that the "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires that a bankruptcy court find either that (a) all members of an impaired class of claims or interests have accepted the plan or (b) the plan will provide a member of an impaired class of claims or interests who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date, prior to confirming the plan. 7.

31.     I played a prominent role in the preparation of the Debtor's liquidation analysis (the "Liquidation Analysis"), which was filed as Schedule 4 to the Plan, and which estimates potential cash distributions to holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtor's assets.

32.     The Liquidation Analysis assumes a conversion of the Chapter 11 Case to a chapter 7 liquidation case on or about August 31, 2020 (the "Conversion Date").  It assumes that, on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee ("Trustee") to oversee the liquidation of the Debtor's Estates.[2]

---

[2] Any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor.

33. The Liquidation Analysis assumes an immediate halt to the Debtor's operations with no outstanding payroll obligations. At that time, the Debtor would have an estimated $1,660,722.63, from which outstanding the Trustee's administrative expenses, conservatively valued at $25,000.00 would be deducted. From there, professional Fee Claims, DIP repayment, and secured creditors would collectively deduct another $1,113,710.47 from the Estate. In addition, the restricted funds – which per agreement with the donors cannot be used for non-team support purposes – would further be factored out. This $626,825.87 coupled with $84,458.02 in prepaid expenses consumed in July and August, result in a negative $189,271.73 available to unsecured creditors. As is the case throughout, these assumptions are conservative, and still yield no return.[3] Accordingly, I believe that Schedule 4 to the Plan represents a true and accurate assessment of the Debtor's prospects in the event of a liquidation.

### Conclusion

34. For the foregoing reasons, I believe that the Debtor will be able to successfully reorganize.

*/s/ [signature]*
Mr. Ross Young, CEO
Dated: August 26, 2020

*Signed before me this date 8-27-2020 by Ross Young.*

*Mary Kay Bateman*
*950 S. Birch St*
*Glendale CO 80246.*

MARY KAY BATEMAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19944016216
MY COMMISSION EXPIRES NOVEMBER 12, 2022

---

[3] The Debtor did not factor in any repayment of the $375,000.00 PPP loan referenced in the Plan into its liquidation analysis. Assuming the necessity to repay the same, the Estate would be facing $1,488,710.47 in Chapter 11 administrative expenses and secured claims.