**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| United States of America Rugby Football | ) | Case No. 20-10738 (BLS) |
| Union, Ltd., | ) | |
| Debtor. | ) | **Obj. Deadline: August 24, 2020 at 4:00 p.m.** |
| | ) | **Hearing Date: August 31, 2020 at 10:00 a.m.** |
| | ) | |
| | ) | **Re: Docket Nos. 166, 184** |

## SUPPLEMENTAL LIMITED OBJECTION AND
## RESERVATION OF RIGHTS TO DEBTOR'S
## <u>SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION</u>

National Collegiate Rugby Organization Inc., (formerly known as National Small College Rugby Organization or NSCRO) ("<u>NCR</u>"), by and through its undersigned counsel, hereby files this amended limited objection and reservation of rights (the "<u>Objection</u>") to the *Small Business Debtor's Plan of Reorganization* (the "<u>Plan</u>" ) [D.I. 166]. In support hereof, NCR respectfully states as follows:

## <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.

2.      The venue of the Debtor's chapter 11 case and this Objection in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for the relief requested herein are 11 U.S.C. §§ 1125 and 1129.

## <u>BACKGROUND</u>

4.      On March 31, 2020 (the "<u>Petition Date</u>"), United States of America Rugby Football Union, Ltd. (the "<u>Debtor</u>") filed a voluntary petition for relief under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code").  The Subchapter V election was made on April 19, 2020.

5.      Since the Petition Date, the Debtor has remained in possession of its assets and continues in the management of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. On July 17, 2020, the Debtor filed the Plan.  The Plan, as currently drafted, provides for a 0% distribution to Class III, the general unsecured creditors. According to the Claims Register, general unsecured claims total approximately $10,381,247.86.

6.      The Debtor and NCR are parties to a memorandum of understanding whereby each party performed certain services for NCR's members which were historically small colleges and universities ("MOU").  The MOU and previous memorandums between the Debtor and NCR are described in more detail below.  The Debtor filed it is *First Omnibus Motion for Entry of an Order (I) Authorizing the Debtor to Reject Certain Contracts and (II) Granting Certain Related Relief* [D.I. 138] on June 13, 2020.  The *First Omnibus Order (I) Authorizing the Debtor to Reject Certain Contracts and (II) Granting Certain Related* [D.I. 155] approved the rejection of the MOU effective as of June 13, 2020.  Pursuant to the MOU, support payments of $4,584 were due to NCR on the 10th of month each year for a term of September 1, 2019 to August 31, 2023. *See* Proof of Claim No. 19. On June 22, 2020, NCR timely filed its unsecured claim (POC #19) in the amount of $197,088.00.

7.      The Debtor did not make required post-petition payments prior to the rejection and owe NCR $13,752 for unpaid post-petition payments due under the MOU for April, May, and June, 2020 prior to the rejection of the MOU.  NCR reserves its right to move for payment of this administrative expense claim.  NCR will likely waive the amounts owed as a gesture of goodwill and so that both sides can avoid the costs of, respectively pursuing or objecting to the

claim.[1]  More important to NCR is that USA Rugby preserves records and cooperates in the event any third party or NCR requires information for its auditors or any request or subpoena related to an internal investigation or legal process related to member dues. As detailed below, NCR member dues were collected as part of the registration services that USA Rugby provided to NCR schools separate from USA Rugby dues which paid for insurance, overhead at the national office, and registration services, among other things.  As further detailed below, USA Rugby misappropriated NCR dues, though those amounts were eventually repaid.  Repayment, however, does not address various compliance requirements that either NCR or its member schools may have to meet, and which have been delayed due to the pandemic.

8.     In 2002, Steve Cohen established an "East Coast Collegiate Division 3" playoff system for the individual unions (unions in rugby are akin to conferences for other sports but mostly organized geographically) for teams participating in division three leagues within each local area union. Over the coming years, the success of both the men's and women's competitions organized by Mr. Cohen encouraged other unions from coast-to-coast to offer a division three competition for their colleges and express interest and eventually in taking part of the competition he had organized.

9.     In late 2007, USA Rugby advised Mr. Cohen that they had no interest in creating a division 3 national competition. Mr. Cohen began planning the development of a new group to be called the "National Small College Rugby Organization" in 2007 to fill this need. In early 2008, NSCRO began in earnest and the first official NSCRO men's national championship was held in April 2008 at Hamilton College. In November 2008, the Philadelphia Women's RFC hosted the first official NSCRO women's national championship.

---

[1] The deadline to file administrative expense claims is thirty days after the effective date which has not yet passed.  USA Rugby is already on notice that it should preserve documents related to this incident, but NCR is certain that the USA Rugby has membership and accounting records it preserved in preparation for this bankruptcy.

10.     From a total number of men's and women's clubs of 160 in 2007-08, NSCRO grew to over 350 clubs in just ten years.  In October 2012, USA Rugby invited Mr. Cohen to its national office in Boulder, Colorado to discuss ways to help NSCRO, which was highly regarded in the rugby community.   Mr. Cohen and the officials at USA Rugby at that time both understood that the future growth in the sport would be through small colleges where rugby clubs could be more easily formed and grow into respected rugby programs. Additionally, most collegiate rugby clubs began and remained as part of the vibrant collegiate club sports community, which was booming on most colleges as an alternative to other intercollegiate competitions.[2]

11.     The result of the meeting was a memorandum of understanding establishing a partnership between the two entities which recognized NSCRO as an independent organization. The agreement was publicly announced by USA Rugby in March 2013. *See* **Exhibit A**. NSCRO expanded its services to develop rugby at colleges for the as well helping existing rugby clubs to improve. In October 2016, Mr. Cohen met with the newly appointed USA Rugby CEO Dan Payne and presented a plan to further grow college rugby. It was well received by Mr. Payne, but USA Rugby was unable to provide the funding necessary to implement the plan. Nonetheless, NSCRO, despite limited resources, continued to successfully develop college rugby.

12.     NCR today is an independent Delaware non-stock non-profit corporation operating under section 220526 of the Ted Stevens Act as an amateur sports organization with the exclusive jurisdiction over its constituent college players, coaches, and teams.  *See* 11 USC

---

[2] Bill Pennington, *Rise of College Club Teams Creates a Whole New Level of Success,* The New York Times (December 1, 2008)("An estimated two million college students play competitive club sports compared with about 430,000 involved in athletics governed by the National Collegiate Athletic Association and the National Association of Intercollegiate Athletics."); see also, *Playing Sports in College: Your Options*, College Board last accessed at https://bigfuture.collegeboard.org/find-colleges/campus-life/playing-sports-in-college-your-options                  ("Several associations oversee varsity-level competition in various sports for men and women at different colleges. These include the National Collegiate Athletic Association (NCAA), the National Junior College Athletic Association (NJCAA) and the National Association of Intercollegiate Athletics (NAIA), among others.").

2205, section 220526(a) and 220523(a)(5). The Ted Stevens Olympic and Amateur Sports Act, which established the United States Olympic & Paralympic Committee, and the authority for national governing bodies, like USA Gymnastics, USA Rugby, or USA Hockey, definitively states that a national governing body has no authority to regulate competitions restricted to a certain distinct group or category which includes collegiate athletics. *See* 36 USC §220526(a) (2020). This status remains unchanged from NCR's inception which is evidenced by the multiple memorandums of understanding between USA Rugby and NCR over the years that have recognized NCR and its predecessor's independence from USA Rugby.

13. Under the Ted Stevens Act, national governing bodies have jurisdiction over international amateur sports competition but not "Restricted Amateur Athletic Competitions" listed in section 220526 of the Act.[3] Armed services, high school, and collegiate athletic competitions are specifically mentioned in the Act as exempt independent amateur competitions.[4] The Ted Stevens Act, Title 36 of the United States Code, Chapter 2205, in relevant part, states:

§220526. Restricted amateur athletic competitions

(a) Exclusive Jurisdiction.—An amateur sports organization that conducts amateur athletic competition shall have exclusive jurisdiction over that competition if participation is restricted to **a specific class of amateur athletes**, such as high school students, **college students**, members of the Armed Forces, or similar groups or categories.
(b) Sanctions for International Competition.—An amateur sports organization under subsection (a) of this section **shall obtain a sanction from the appropriate national governing body if the organization wishes to—**

(1) conduct **international amateur athletic competition** in the United States; or
(2) sponsor **international amateur athletic competition** to be held outside the United States.

---

[3] 36 USC §220523(a)(5) (2020).
[4] *Id*. at §220526.

(Pub. L. 105–225, Aug. 12, 1998, 112 Stat. 1475)(emphasis added).

14.     *In The Memorandum Of Law In Support Of Confirmation Of The First Amended Chapter 11 Plan Of Reorganization Of United States Of America Rugby Football Union, Ltd.* (D.I. 189) ("Memo of Law") the Debtors state that they enforce "World Rugby's rules in U.S. tournaments …. [and that] the Debtor is the official sanctioning organization for rugby in the United States . . . . "   *See Id.* at paras. 12 and 47.  This is not accurate, as NCR and its member institutions and, particularly, its conferences, would govern NCR events, including but not limited to matches, championships, and tournaments and USA Rugby has a very limited sanctioning power under U.S. law in regard to collegiate rugby. "International amateur athletic competition" is defined as: "an amateur athletic competition between one or more athletes representing the United States, individually or as a team, and one or more athletes representing a foreign country." *See* 36 USC §§ 220526 and 220523(a)(5) (2020).   There is no other sanctioning power for USA Rugby under Ted Stevens for college rugby and there is no other power granted under United States law to USA Rugby over college rugby.  Collegiate amateur sports organizations do not typically (and likely do not ever) engage in competition between athletes *representing* the United States and athletes *representing* a foreign country, which is the definition of "international amateur athletic competition." The powers under Ted Stevens granted to  the USOPC,[5] NGBs, and §220526 Restricted Amateur Athletic Competitions by Ted Stevens are limited and exceeding the limits of these powers could subject an entity to liability under

---

[5] The USOPC has exclusive jurisdiction over "international amateur athletic competition," under Ted Stevens which is an important but narrowly defined competition.   "International amateur athletic competition" is defined as: "an amateur athletic competition between one or more athletes representing the United States, individually or as a team, and one or more athletes representing a foreign country."  36 USC §220501(b)(7) (2020).

U.S. antitrust law, violations of which are subject to treble damages.[6]  Without the jurisdiction

over the amateur athletics granted by Ted Stevens to the USOPC, NGBs, and Restricted Amateur

Athletic Competitions, like the NCAA and NCR,[7] all of these institutions are guilty of U.S.

antitrust violations.[8]

15.     The antitrust exemption granted to the USOPC, NGBs, Restricted Amateur

Athletic Competitions are very limited, and Courts will not expand the exemption.  The United

States Federal District Court for the Northern District of Illinois found as a matter of law that the

Ted Stevens Act does not grant an NGB, in that case, U.S. Soccer, authority to govern

professional soccer in United States, "except to the extent necessary for USSF to govern the

participation of professional players in the Olympic Games and related events.... USSF is not

entitled to an exemption from the antitrust laws regarding professional soccer, except to [that

extent]." *See ChampionsWorld LLC v. U.S. Soccer Federation*, 726 F.Supp.2d 961, 975 (N.D.

Ill. 2010).  The *ChampionsWorld* Court also held that an international federation, like FIFA,

cannot increase the limited antitrust exemption of a NGB through international federation

regulations that the NGB must follow.  *ChampionsWorld, LLC v. U.S. Soccer Federation, Inc.*,

---

[6] *See* Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1890).

[7] Courts have routinely addressed the issue of antitrust violations with Restricted Amateur Athletic Competitions such as the NCAA and found that internal rules of the NCAA do not restrain trade because they are not set to maintain competition in the commercial market; they in fact serve a completely different purpose related directly to the educational mission of its member institutions.  See *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1089 (7th Cir. 1992) ("The NCAA Rules seek to promote fair competition, encourage the educational pursuits of student-athletes and prevent commercialism.").

[8] The *ChampionsWorld* Court notes that Ted Stevens does not expressly state that NGBs have an "exemption in the governing of amateur sports, but courts have consistently found that Congress implicitly exempted NGBs, in the oversight of amateur sports, from the antitrust laws." *ChampionsWorld LLC v. U.S. Soccer Federation*, 726 F.Supp.2d 961, 967 (N.D. Ill. 2010)(citing *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 529-30 (10th Cir. 1988); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 203-04 (5th Cir. 2000); *JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1230-31 (11th Cir. 2006).

726 F. Supp. 2d 961, 969 (N.D. Ill. 2010).[9]  Sanctioning of amateur competition is provided for in Ted Stevens for "international athletic competition," for the limited purposes in the Act related to Olympic and other international competition,[10] consistent with the fact that U.S. antitrust laws are not broadly swept aside for any industry or party and exemptions are narrowly tailored.[11]

16.    The Debtor is also required under the Ted Stevens Act to coordinate with amateur sports organizations, including NCR, to avoid scheduling conflicts, provide technical information relevant to the sport, and encourage sports safety and developments in sports medicine, among various other duties.  36 USC §220524 (2020).  International amateur athletic competition is the only exception to the exclusive jurisdiction granted by Ted Stevens to Restricted Amateur Athletic Competitions under section 220526.  NCR on its website and in all relevant communications with its members has indicated that if a conference, college, or

---

[9] U.S. Soccer argued that FIFA required all games played in the U.S. by foreign teams to be approved by U.S. Soccer and argued, therefore, that it is "legally obligated to exercise authority over professional soccer matches or risk discipline or expulsion from FIFA, which could result in the exclusion of U.S. teams from the Olympics and other international events." *See ChampionsWorld, LLC v. U.S. Soccer Federation, Inc.*, 726 F. Supp. 2d 961, 969 (N.D. Ill. 2010). U.S. Soccer cited to FIFA regulations that gave it authority to "sanction" professional soccer matches in the United States; to charge sanctioning fees and require the posting of a bond securing those fees; and the right to report any entity to FIFA for any failure to pay the fee or post a bond. *Id.*

The Court held that the exercise of the FIFA sanctioning rights given to the U.S Soccer would violate the antitrust laws and constitute unreasonable restraints of trade under the Sherman Act, thus making them illegal. *Id.* (citing *Silver v. N.Y. Stock Exchange*, 373 U.S. 341, 359-60 (1963) ("antitrust laws serve to protect freedom to compete unhindered by group actions of others")).

Furthermore, the Court stated that "Indeed, it is clear that FIFA has no power to grant USSF an exemption, either express or implied, from the antitrust laws. Only Congress may do this. Similarly, FIFA does not have, or claim to have, authority to interpret acts of Congress. Furthermore, it seems far-fetched to believe that FIFA would discipline USSF for obeying the antitrust laws of the United States." *Id*.
[10] See 36 USC §220503 (2020).

[11] The Court stated that "Indeed, it is clear that FIFA has no power to grant USSF an exemption, either express or implied, from the antitrust laws. Only Congress may do this. Similarly, FIFA does not have, or claim to have, authority to interpret acts of Congress. Furthermore, it seems far-fetched to believe that FIFA would discipline USSF for obeying the antitrust laws of the United States." *Id*.

university wants to send players to the U.S. National Teams, or the U.S. Olympic Teams, they are directed to USA Rugby.

17.     NCR was a signatory to a Memorandum of Understanding with the Debtor whereby the Debtor would provide insurance and registration services for NCR ("MOU"). The MOU also promised increased financial support for college rugby in the United States for the NCR members. NCR members paid $45 per player and $160 per team annually to USA Rugby (approximately 9,000 players from 350 teams paid a total of approximately $460,000) and NCR was scheduled to receive $55,000 in support each year. The Debtor also handled collecting NCR membership dues through its registration system.

18.     NCR membership dues payments were diverted and misappropriated to pay salaries and other overhead at the Debtor's operations. NCR has requested and the Debtor will not provide access to the information to audit whether or not all NCR membership dues payments were sent to NCR despite there being a requirement to provide a report of the previous month's registrations to be "reviewed and discussed if [sic] any issues." *See* Proof of Claim No. 19. NCR was alerted to the misappropriation through its own verification. NCR discovered that the Debtor mistakenly charged non-NCR college and universities NCR membership dues and remitted those dues to NCR. After advising the Debtor of its mistake and after weeks of trying to find out where NCR's September and October payments (approx. $80,000) from NCR members went, NCR was directed to Eric Gleason, the Debtor's CFO. Through conversation with Mr. Gleason on November 12, 2020, NCR learned that the funds were misappropriated.[12]

---

[12] Embezzlement in Colorado is defined as an act whereby a person "knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception . . . . and

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;
(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

*See* **Exhibit B**.  The Debtor, through the CFO, delayed payment, and when pressed to return the funds, admitted to using it to pay for the Debtor's administrative costs and overhead, including salaries.  *See Id.*

19.    NCR understands that these funds may have been commingled by USA Rugby and that it might be very difficult to trace such funds.  NCRs primary concern over the misappropriation is not recovery, but rather cooperation and access to information as required by either its compliance requirements and auditors or those of its member schools.  This request has been made through counsel and directly to USA Rugby and NCR hopes that it can get a resolution to this issue.  In addition, NCR has tried to negotiate a new agreement with USA Rugby hoping it could provide some support to the NGB, but it could not let USA Rugby ever handle funds for NCR again without dramatic changes.  NCR's concerns were met with some hope after it was contacted by the Golden Eagles and several individuals who promised to restructure USA Rugby.

20.    On January 5, 2020, in an email from USA Rugby and the Golden Eagles, a non-profit group which provides significant funding to the U.S. national teams, NCR was updated on the restructuring efforts of USA Rugby.  In that email, NCR was told that under USA Rugby's restructuring it would run autonomously, retaining its status as an independent organization and that NCR would set its own dues rates, collect its own dues, and remit a small percentage to USA

---

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;
(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or
(e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement." (1.5)  For the purposes of this section, a thing of value is that of "another" if anyone other than the defendant has a possessory or proprietary interest therein. Colorado Revised Statutes Title 18. Criminal Code § 18-4-401 and 403. Theft.
 Embezzlement is usually associated with the misappropriation of money, and regardless of whether you keep the money for yourself or transfer it to another party, you can still be accused of embezzling.  While embezzlement is essentially theft, it is considered a white collar crime because for embezzlement to occur, the person committing the theft has to hold a position of trust or authority over the property.

Rugby so the national governing body could carry out its duties.  *See* **Exhibit C**.  Significantly, USA Rugby reported, through a report from its newly installed Crisis Restructuring Officer, who was also affiliated with the Golden Eagles, that: "Each of the separate GB's [governing bodies such as NCR] will be responsible for their own liability insurance policies and for fund raising beyond what dues provide." *Id.*  Furthermore, the letter indicated that a registration platform would be provided to NCR for free.  *Id.*  Significantly, the email indicated that:

> The NGB will have a fixed budget which will be a fraction of the current USAR National Office budget.  The NGB will be required to reserve 20% of their annual revenue for unforeseen circumstances.  The NGB will not be allowed to spend more than the remaining 80% of their annual revenue in any given year.  It is anticipated that the NGB membership fee to the GB's will be in the $10 - $20 per person range, **depending on what services the NGB will end up providing.**  The goal is to keep that fee as low as possible, with $10 per member as the target amount.

*Id.* (emphasis added).

21.     In light of the restructuring efforts and relying on this email from USA Rugby, the admitted misappropriation of funds, and the fact that the bankruptcy filing of USA Rugby was inevitable, the NCR board and officers began the process of getting its own insurance and registration platform as it could no longer trust USA Rugby with any member funds and did not know if USA would retain insurance coverage for its members.    Registration for the season is done at least a semester in advance as many NCR teams submit budgets to their schools with long lead times and NCR moved quickly to get a plan in place as USA Rugby was not just an uncertainty but had informed NCR it would not provide registration or insurance services.  NCR now has its own license for the registration software platform and has secured insurance, both at significant cost and investment, including hiring a member relations officer to input and manage the data of its members.  NCR provides personal accident, general, and excess liability insurance coverage for all of its members (players, referees, volunteers, and coaches).

22.     On March 6, 2020, Ross Young, the Debtor's CEO, stated in a call with NCR CEO Steve Cohen and NCR's Men's Assistant Director Jeremy Treece that he understood that NCR would be providing insurance coverage for its members and he had no issue with it as long as the coverage was in line with the Debtor's typical coverage. Mr. Young also stated that the Debtor was expecting $45 per member from NCR's members (approx. $700,000 annually). When asked what services NCR members could expect from the Debtor in return, Mr. Young said "none" as it is solely for support of the "National Governing Body" for their general use.

23.     USA Rugby sent a letter to NCR which ignored that NCR is and had been an independent organization since its formation. This was a particularly disrespectful letter in that it ignored the fact that USA Rugby had entered into a series of MOUs in which it had been a partner with NCR and recognized NCR's independent status from USA Rugby. The letter demanded a $32 a member fee for "membership" or a $250 per match fee or USA Rugby would not "sanction" matches between NCR collegiate teams and teams that became USA Rugby members. *See* **Exhibit D**. Another alternative was presented whereby each player would be assessed a $17.98 per player fee without insurance. *Id.* The target of $10 per player and any discernible services per player from the January 5, 2020 email were forgotten. NCR reviewed the letter and offered to provide an option for NCR members to donate on its registration site to USA Rugby but told USA Rugby's counsel, Mr. MacDonald that NCR could not in good conscience request its members to pay fees without services being provided. Of particular concern were the sanctioning fees, which NCR found directly analogous to the sanctioning fee prohibited by *ChampionsWorld* and a gross overreach under the limited powers granted under Ted Stevens to the NGB.

24.     More troubling was the concern that college rugby is not run by NCR or USA Rugby and that USA Rugby was now intruding on the educational missions of NCR's member institutions.  Much of collegiate rugby is club rugby and fees are paid through a student's activity fee and governed directly by a school administrator with students running the day to day activities.  NCR sees the illegitimate sanctioning fee proposed to be levied by USA Rugby as a direct threat to the growth of the sport and is directly at odds with its duties under the Ted Stevens Act.  In short, all of these measures seem to be directly at odds with the mission of a national governing body under the United States Olympic Committee to grow and steward the game, especially at the collegiate level where the sport, like many other sports during this pandemic are vulnerable to being eliminated from college life. In the current collegiate rugby landscape, without regard to whether or not a team plays in the equivalent of division 1, 2, or 3, some teams in the Western United States might remain with a collegiate organization that uses USA Rugby's registration or insurance and many others in the Mid-West, South and Northeastern United States have elected to join NCR due to the geographic advantages of playing teams near to each other.  Certain colleges might decide to remain to move or remain with NCR or choose another group that uses USA Rugby's insurance and registration system. The threat of sanctions by USA Rugby when an NCR team plays an USA Rugby team will only limit growth of the sport.  For example, larger division one schools often have their younger "junior varsity" squads play the "varsity" squads of smaller schools in order to fill out their season.  USA Rugby's unilateral decision to impose fees when these teams play will only restrict opportunity for matches and development of players.

25.     An especially damning example of the potential disruption and interference are the service academies who have traditional rivalries in many sports, including rugby, but are not

in close proximity to the Air Force Academy. Due to concerns under the shadow of the pandemic over travel many collegiate teams in all sports are retreating to playing teams near a school and avoiding long distances. The service academies have a unique mission and it is expected that once play resumes that each will play each other despite a decision to join one collegiate organization or another because rugby matches against each other central to the overall mission of each school. Any activity at a service academy is not dictated by USA Rugby, NCR, or anyone but the Department of Defense and the administration of these schools. Neither USA Rugby nor NCR have the right or power to charge a fee which approves, or "sanctions" play between the schools or punishes a school that refuses to pay. Attempts to impose such a sanction will simply create backlash against the sport.

26. While the service academies matches are an excellent example of the issues with having any outside organization intrude on the educational mission of a school, it is no less an issue for any educational institution whose mission might be to simply afford its athletes well run, safe opportunities for recreation and exercise. NCR works with its member institutions and students closely and based upon information and belief, NCR member institutions have rejected the notion of either paying mandatory fees to an NGB which has no right to impose such a fee or paying fees without receiving services. Simply put, USA Rugby does not have an absolute monopoly over rugby in the U.S. particularly in collegiate rugby. Frankly, as NCR does not limit or charge a sanctioning fee for playing other schools as it doesn't interfere in its member conferences' and schools' educational missions. USA Rugby's practice, if it is enforced as noted in the letter, will simply push more schools to join NCR. If NCR was a "competitor" to USA Rugby it would not be alerting the NGB to the issues, it would just let the process play itself out, but NCR wants the NGB to emerge from bankruptcy.

27.     On April 17, 2020, Johnathan Atkeison, the Debtor's Scholastic Manager, discussed with Mr. Cohen how the Debtor and NCR could work together as a start to a new partnership.  On April 18, 2020, Mr. Atkeison indicated that he would send a summary that could become a basis for the new partnership with a goal of establishing it by May 1, 2020.  NCR never heard further from him in this regard. Counsel for NCR and counsel for the Debtor also worked to find a middle ground in terms of a fee structure or path forward but were unable to overcome the issue of payment without any needed services, as insurance and membership registration services were no longer needed.

28.     Mr. Atkeison forwarded a further letter on August 6, 2020 from Mr. Young outlining further membership options.  **Exhibit E**.  The letter did not change dramatically from earlier options and offered a reduction in fees acknowledging that NCR has its own insurance, but neither letter acknowledged that NCR no longer needed registration services. The letter ends with a paragraph that states:

> We understand that many of your programs have been impacted by COVID related cancellations of their season. Unfortunately, this is a shared concern amongst the entire rugby community, and we are working with our members to develop registration options that suit their needs in the current environment.
>
> As always, we remain committed to the success of the collegiate game, and we hope that this proposal can assist in moving our discussions forward.

*See* **Exhibit E**.

29.     Unfortunately, it appears that USA Rugby is tone deaf to the needs of collegiate players and teams as its primary focus is collection of dues revenue.  In reviewing the Plan, the fiscal responsibility and austerity measures detailed in the January 5, 2020 letter were absent from the information provided, as did the recognition that USA Rugby's members are more than just a source of revenue to pay for USA Rugby national office overhead and salaries which do

not directly benefit NCR's collegiate members. However, since the filing of the original limited objection by NCR, USA Rugby has forwarded some information responsive to its earlier filed limited objection and reservation of rights to NCR, though that information is missing from the Plan. On August 26, 2020, USA Rugby provided an updated proposal to NCR which they had offered to other college organizations. The proposal included information on USA Rugby's fiscal reserves which were to be funded with membership dues and the allocation of dues from colleges and universities with the services to be provided on a go forward basis. *See* **Exhibit F**.

30.    This information was helpful and showed membership options with and without insurance costs and addresses some concerns regarding the feasibility of the Debtor's Plan. However, the options for membership still would not work for NCR member schools as many of the services do not benefit NCR or can be provided through alternative less expensive channels. The requirements for SafeSport certification, for example, can be purchased on a case by case basis at a much reduced cost directly from SafeSport or alternative providers of background checks. The overwhelming majority of NCR's players are not minors.[13] Furthermore, individual universities and colleges directly govern any issues related to athlete abuse.[14] Additionally, NCR

---

[13] NCR does not allow minors to compete in its events without a waiver from NCR and requires a further waiver from a parent or guardian to participate in NCR events if such a waiver allowing participation is granted. NCR also has limited parties who engage directly with minors and those parties are subject to background checks and a reporting system exists within NCR as well as a strict athlete abuse program with confidential reporting to the NCR compliance officer. There are maybe one or two waivers requested every year, and some years there are no minors playing in NCR member schools.

[14] Significantly, there is no direct jurisdiction by a NGB or USOPC over eligibility and prevention of abuse of athletes for independent amateur sports competitions like the NCAA, as discussed below, or NCAA member conferences and schools, as individual collegiate institutions, for example, have direct jurisdiction over these areas (in addition to federal and state courts where both civil and criminal remedies are readily available). 36 USC §220523(a)(5) (2020).
On its website SafeSport indicates that it has no authority over colleges. While NCR uses SafeSport as a source for best practices and potentially for training, it is not required to use the center while Olympic entities are required to do so. See, US Center for SafeSport, https://uscenterforsafesport.org/response-and-resolution/faqs-and-helpful-links/ (FAQ "Does the U.S. Center for SafeSport have authority over sport organizations like the NFL, NCAA, and college athletics? No. At this time, the Center's authority only extends to the USOPC."). Each member institution has its own rules and regulations and thus, unlike high school or youth programs, NCR teams get no benefit from

has its own registration platform which makes the proposed membership of $17.98 per player unjustifiable, presumably in comparison to other collegiate groups which did not get their own registration platform and rely on USA Rugby for registration.

31.     USA Rugby's current Plan reveals an unrealistic and unsustainable dependence on player membership as revenue stream.  USA Rugby provides no discernible services for NCR's collegiate members that justifies forcing teams to pay $17.98 per player.  Should a team or an individual athlete wish to become part of the national or Olympic team pathway, NCR puts no restriction and encourages players to become members of USA Rugby to those ends.  Should players wish to pay that fee voluntarily, they can also become members independently.  As NCR has stated in the past, it is willing to promote the national governing body to all its players who want to pursue Olympic or National team pathways, but it cannot in good conscience pass along a mandatory USA Rugby fee to its members without USA Rugby providing any relevant services.

32.     NCR does not want the national governing body to fail but NCR has been threatened by the Debtor with blocking play between its member teams and those that remain with USA Rugby unless NCR teams pay a game by game mandatory sanctioning fee of $250 or pays mandatory membership fees which do not take into account that insurance and registration are already handled by NCR.  NCR believes that it is beneficial for the sport to have a national governing body, but a national governing body that shows fiscal discipline and refrains from trying to dominate and govern parts of the sport, such as collegiate athletics that USA Rugby's enabling legislation *specifically exempts it from governing*.  Its latest threats of sanctions, for

---

*(cont'd)* SafeSport services provided by USA Rugby.  In addition, when SafeSport and its contractors who provide background checks were independently contacted by NCR and member schools, they found going to the contractor directly was approximately $10 less per certification than going through USA Rugby.

which it has no authority, will likely limit growth of the sport or push the demise of the sport on more and more campuses where rugby and, frankly, all athletic endeavors are very vulnerable.

33.     The issue with sanctioning and the methods being used by USA Rugby are endemic to their current financial circumstances. Their prior operations were described by their Crisis Restructuring Officer as a bloated bureaucracy that at the same time provided little or no services to constituencies like college and high school rugby, while demanding payment and dues that they have no power to require. This approach has made them vulnerable to the pandemic, but their financial issues are deeper than just the stop of play. The COVID-19 pandemic has exposed the lack of feasibility of the business plan under which USA Rugby has been operating for some time and which NCR does not believe has been remedied in the projections and assumptions embodied in their bankruptcy plan.

34.     NCR will continue to work with USA Rugby and potentially withdraw its objections though it will reserve it rights to operate independently. NCR doesn't believe it will ever recover fees USA Rugby collected on NCR's behalf. NCR is also likely going to waive its administrative claims because the amounts just don't justify the time and effort it would take to recover the administrative claim. However, the information on membership fees that were diverted could be required for an NCR audit or internal audits of its member schools. USA Rugby has indicated through its CEO that they do not believe the relationship between NCR and USA Rugby benefitted the USA Rugby estate so that it qualifies as an administrative claim. NCR takes serious issue with that statement.

35.     Starting in 2013, USA Rugby annually sent funds back down to NCR to support championships and development of small college rugby, but the funds were a fraction of the money sent up from small colleges to support the NGB. Promises of significant increases in

such support were never kept.  Since 2013, members of NCR have annually paid USA Rugby $400,000 to $500,000 in membership dues.  NCR started receiving yearly payments in 2013. From 2013 to 2014, NCR received $20,000 annually.  This changed to $25,000 in 2015 through 2018.  In 2019, this changed to $30,000.  For 2020, this was to be $55,000 but only $32,088 was paid.

36.     The Debtor has since filed an amended plan and now tries to say that NCR is a competitor to USA Rugby and "wants to compete with the Debtor, sponsoring its own events.  It would like the Debtor to permit its teams to participate in NCR events without paying the Debtor's contractually-mandated dues."  *See* Memo of Law at p. 72.  Nothing could be further from the truth as the black letter of law indicates that both organizations are supposed to "swim in their own lanes," and NCR has been running its own events since 2007 and continues to this day to support its member schools and conferences.  As noted in detail above the "events" to which USA Rugby refers are simply teams trying to fill out their schedule outside of their division or conference often as there are often not enough matches for certain schools and players.  This sanctioning threat does not affect NCR's bottom line, it just hurts the colleges and universities access to games.

37.     NCR runs the playoffs and national championships for its Small College division, Open Division, Men's 7s, Small College Women's 15s, Open Women's 15s, Women's 7s, and runs a Weekly Top 25 Coaches poll (15s) with live streaming and communications support at events.  It runs both men's and women's all-star team championships and recognizes its best players with an All-American recognition program.  It runs its own eligibility policies and coaching development and its members can purchase uniforms at half the cost from its official apparel sponsor.  There are multiple recognition programs for student leaders, players and

coaches of the month, with awards provided by a title sponsor. If USA Rugby wishes to place impediments to growth of the college game by restricting play, then it should own that position and stop acting as if NCR hasn't been operating for over a decade as "The Home of College Rugby." The type of information that NCR requested be included in the Debtor's Plan is not unreasonable, nor should this information be a secret as USA Rugby is a Debtor in bankruptcy who wishes to confirm a Plan. Furthermore, because it is a non-profit and a National Governing Body, its projections and its path forward have to present a viable exit strategy, especially if the plan funding relies on donations and dues.

## RELIEF REQUESTED

**A.      The Debtor's Plan Cannot Be Confirmed Because There is not Adequate Information for the Creditors to Review in the Plan, the Plan Appears to Be Infeasible and thus, the Plan is Not Filed in Good Faith.**

38.      As amended, the Bankruptcy Code provides that a chapter 11 plan of reorganization provides, in pertinent part, as follows:

> (a)  The court shall confirm a plan only if all of the following requirements are met:
>
> > (1)   The plan complies with the applicable provisions of this title.
> > (2)   The proponent of the plan complies with the applicable provisions of this title.
> > (3)   The plan has been proposed in good faith and not by any means forbidden by law.
> >
> > *   *   *
> >
> > (11)  Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(l)-(3), (11).

39.     In addition, in chapter 11 cases, plan proponents are required to provide "adequate information," which means:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . .

> 11 U.S.C. § 1125(a)(l).

> In connection therewith, the Bankruptcy Code requires that: acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

> 11 U.S.C. § 1125(b).

When evaluating a small business plan, the court may determine that the plan itself provides "adequate information" and that a separate disclosure statement is not necessary. 11 U.S.C. § 1125(f)(1). To confirm the plan, the court must find (1) the debtor will be able to make all payments under the plan or (2) there is a reasonable likelihood that the debtor will be able to make all payments under the plan and the plan contains appropriate remedies to protect creditors if payments are not made as proposed. Subchapter V debtors are not required to file a disclosure statement, but subchapter V plans are required to include historical and projected financial information. 11 U.S.C. § 1190(1).[15]

---

[15] Though no disclosure statement is required in a subchapter V bankruptcy, the plan itself must include certain information normally found in disclosure statements, including: "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization . . . ." 11 U.S.C. § 1190(1).

40.     The disclosures required in the plan are necessary for determining the plan's compliance with the requirements of section 1129(a) subchapter V cases (with the exception of 11 U.S.C. § 1129(a)(15), which requires the debtor's disposable income over a five year period to be devoted to the plan).  For the liquidation analysis, the court may only confirm a plan if each impaired class of creditors has either accepted the plan or would receive, as of the effective date of the plan, property of a value that is not less than the amount that would be paid on their claims if the estate of the debtor were liquidated under chapter 7. 11 U.S.C. § 1129(a)(7). The plan's proposed payments must also be feasible, meaning that the debtor is not likely to default and require liquidation or further financial reorganization. 11 U.S.C. § 1129(a)(11). In order to confirm the Plan, section 1129(a)(7) requires that each impaired class of claims shall have either accepted the plan or will receive at least as much under the plan as they would if the debtor were to liquidate under chapter 7.  *See* § 11 U.S.C. l 129(a)(7).  *See also*, *Corestates Bank, N.A.,  v. United Chemical Technologies, Inc.*, 202 B.R. 33, 56 (E.D. Pa. 1996); *In re The Leslie Fa v Companies, Inc.*, 207 B.R. 764, 787 (Banta. S.D.N.Y. 1997); *In re Drexel  Burnham Lambert  Group, Inc.*, 138 B.R. 723, 770 (Bankr. S.D.N.Y. 1992).

41.     Further, while Section 1129(a)(11) does not require a success of a plan to be guaranteed,  *see In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996), the plan must nevertheless propose "a realistic and workable framework[.]"  *In re Am. Capital Equip., LLC*, 688 F.3d at 156 (citation omitted).   The *In re Save Our Springs (S.O.S.) Alliance Inc.*, 632 F.3d 168 (5th Cir. 2011), court affirmed a decision below denying confirmation of a chapter 11 plan for a non-profit, ruling that "voluntary pledges [from donors] alone are too speculative to provide evidence of [plan] feasibility."  To put it another way, the plan must be "reasonably likely [to]  succeed[] on its own terms without a need for further reorganization on the debtor's part."  *In re Applied Safety*, 200 B.R. at 584; *see also In re Quigley Co., Inc.*, 437 B.R. 102, 142

(Bankr. S.D.N.Y. 2010) (plan lacked feasibility where the funding source was "speculative at best and visionary at worst"). Thus, when considering feasibility, "a bankruptcy court must evaluate the possible impact of the debtor's ongoing civil litigation[.]" *In re Harbin*, 486 F.3d 510, 519 (9th Cir. 2007). A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely such as trying to enforce sanctioning fees that violate the face of an NGB's enabling legislation or violate antitrust laws. *See In re Am. Capital Equip., LLC*, 688 F.3d at 156; *accord In re DCNC N.C. I, LLC*, 407 B.R. 651, 667 (Bankr. E.D. Pa. 2009); *In re Thompson*, No. 92-7461, 1995 WL 358135, at *3-4 (Bankr. E.D. Pa. 1995). The Debtors now characterize NCR's objection as a business dispute which they "hotly" contest which only furthers the argument that their Plan is not feasible. More likely than a lawsuit by NCR is that the potential remedy will be that NCR's member institutions or other colleges and universities would move to revoke USA Rugby's status through the United States Olympic Committee as the national governing body.

42. If a lawsuit or revocation process were to ensue, the overreaching by USA Rugby would likely catch the attention of other collegiate institutions such as the NCAA, United States Collegiate Athletic Association, National Association of Intercollegiate Athletics, National Junior College Athletic Association, and the National Christian College Athletic Association and single sport organizations similar to NCR such as the National Collegiate Club Golf Association, the National Intercollegiate Rugby Association ("NIRA"),[16] the Inter-Collegiate Sailing Association, who all operate under the same exemption for Restricted Amateur Athletic Competitions.

43. Section 3.1 of the Plan states, in relevant part. as follows:

---

[16] NIRA was founded in 2015 and is another good example of a single sport independent amateur organization which is operating under the emerging sports programs in the NCAA.

<u>3.1. Ability to Initially Fund Plan</u>

The Debtor believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash, are attached hereto as Schedule 3.1. These forecasts are forward looking statements. Generally, forward-looking statements include expressed expectations of future events. ***All forward-looking statements are inherently uncertain as they are based on various expectations and assumptions concerning future events and they are subject to numerous known and unknown risks and uncertainties which could cause actual events or results to differ materially from those projected. Due to those uncertainties and risks, you are urged not to place undue reliance on the same, especially given the uncertainties associated with the Covid-19 pandemic. The Debtor undertakes no obligation to update or revise these statements to reflect future developments. In addition, the Debtor undertakes no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results over time***.

Section 3.1 of the Plan (emphasis added).

Further, Section 3.2 of the Plan states, in relevant part, as follows:

<u>3.2. Ability to Make Future Plan Payments and to Operate Without Further Reorganization</u>

The Debtor shall submit all or such portion of its future earnings or other future income to the supervision and control of the Trustee as is necessary for the execution of the Plan. The Debtor has provided projected financial information in Schedule 2.5. The Debtor's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $11,001,882.00. The final Plan payment is expected to be paid by August, 2025. ***These forecasts are forward-looking statements. Generally, forward-looking statements include expressed expectations of future events. All forward-looking statements are inherently uncertain as they are based on various expectations and assumptions concerning future events and they are subject to numerous known and unknown risks and uncertainties which could cause actual events or results to differ materially from those projected. Due to those uncertainties and risks, you are urged not to place undue reliance on the same, especially given the uncertainties associated with the Covid-19 pandemic. The Debtor undertakes no obligation to update or revise these statements to reflect future developments. In addition, the Debtor undertakes no obligation to update or revise forward looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results over time***.

Section 3.2 of the Plan. (emphasis added). In the same breath, the Debtor invoke the COVID-19 pandemic, but do not take into account the known shutdowns and other restrictions on return to play that will have an obvious impact on their membership revenue.

44.    "[P]roof of value [requires] more substantial evidence than merely a debtor's personal estimates." *Bankwest, N.A. v. Todd*, 49 B.R. 633, 635 (D.S.D. 1985) (citing *In re Martin*, 761 F.2d 472, 477 (8th Cir. 1985)). The Debtor states that it may fund and pay its obligations under the Plan by using membership funds. The Plan contains no information showing that the Debtor's business operations will yield sufficient revenue to fund the Plan. Similarly, there is no information in the Plan elaborating on the Debtor's efforts to cut expenses, such as salaries. The only detail in the original Plan as filed regarding operating costs for the ongoing operations of the Debtor is the that the CEO of the Debtor will draw a salary in the amount of $175,000. *See* Plan, section 2.7. The Debtors have now included in their recent amendment to the Plan information for their new CFO.

45.    Satisfaction of a Plan's feasibility requirement has generally required some reasonable expectation of success. *In re Cherry*, 84 B.R 134, 137 (Bankr. N.D.Ill. 1988). The operating reports submitted concurrently with the Plan are not particularly compelling, as the Debtor projects membership in the amount of $4.9 million for 2021, with $600,000 coming in September 2020 and $1.5 million in 2021. *See* Plan, p. 58 of 60. When analyzing the projections of revenue, it is unclear which formulas the Debtor used to arrive at their national office revenue conclusions. How much is or will the Debtor charge its members in order to forecast those projections? How many members is the Debtor projecting it will register and at what rate? The Debtor has projected National office revenue of $5.8 million over sixteen (16) months; it appears that these numbers are being used for the following membership cycle year

2021/2022 and included August and September which adds an additional $1.8 million to their revenue projections for 2020/2021. There is nothing to show the creditors or the Court that these months are proper examples; indeed, these months could be the Debtor's best months thus far.

46.     A further review of the Debtor's monthly operating reports demonstrates that the Debtor does not generate sufficient income to make the payments envisioned by the Plan. The Debtor shows a 2020-2021 National Office (excluding the National Team) income of $1 million. However, this includes $500,000 from World Rugby because of the COVID-19 pandemic which, upon information and belief, has to be "one-time" in nature, as well as $1 million from the month of September 2021—but September 2021 is in Fiscal Year 2022. *See* Plan, p. 58 of 60. Once you net these two items out, the National Office loses $500,000 through August 2021. This is before doubts are raised on total membership registrations, particularly how the COVID-19 pandemic could be negative on total membership registrations. When looking at USA Rugby's financial projections, a number of questions and doubts arise regarding the accuracy of their assumptions. USA Rugby's lack of projected membership disclosure (how many members, when, at what membership fee) and aggressive membership retention soon after facing a COVID-19 pandemic adds to the low confidence around their projections. In its Memo of Law, the Debtor indicates that its projections excluded NCR's estimated 10,000 members.[17] Despite that assertion NCR still has the following concerns which could be resolved with further information. Specific issues with their projections include:

- The Debtor's Plan in section 3.2 states that they will achieve average cash flow of $11,001,882 by 2025. However, the Debtor's audited financial statements posted on their website reveal:

---

[17] Revenue projections are too high based on known departures of previous members. National Collegiate Rugby with its 600 college teams and 15,000 players and coaches, approximately 10% of USA Rugby's 2019-20 membership, does not plan on joining USA Rugby at current offered membership rates. In FY 2020, NCR members paid USA Rugby $675,000 or 13% of revenue projections. No agreement has been reached with NCR so few, if any, NCR members will join USA Rugby.

- o    FY 2018: -$2,253,840 ($2 million c/f loss)

- o    FY 2017:  $2,031,562

- o    FY 2016:  $1,003,783

- o    FY 2015:    $498,351

- o    FY 2014:  $1,149,684

- o    FY 2013:      -$44,921 ($44 thousand c/f loss)

- Revenue projections are too high based on previous, non-COVID-19 pandemic Fiscal year audits.  For the 12 months ending Sept. 2021, USA Rugby projects total member revenues of $5,192,898.  This must aggressively assume 100%+ membership rebound equaling FYE 2018 and 2017 audited statements showing membership dues of $5,221,704 and $5,037,491.  Assuming every current rugby player will re-sign within 12 months from now during a pandemic seems farfetched unless USA Rugby has a plan to fight typical membership churn to retain current members and invest in membership growth, which takes additional funding.  However, no such plans have been shown.  A 10% decline in members because of pandemic challenges (schools/universities/cities/states not allowing high contact sports like rugby) would result in at least $500,000 less revenues.  Much higher revenue losses are likely.

- Revenue Projections are too high based on lower membership fees USAR is offering for 2020-21 memberships.  USA Rugby average fee per member was $41 in 2019-20, much higher than the $18-$36 membership fee USA Rugby has offered to National Collegiate Rugby and many other groups for 2020-21 membership (NCR members previously paid an even higher rate of $45 to be a USA Ruby member).  Upon information and belief, Youth & High School will now pay $14 to be a USA Rugby member instead of a much higher $25-$35 membership fee previously.  Lower fee rates with no corresponding expense reduction would result in 5-20% lower revenues, or $250,000 to $1,000,000 lower than forecast.

- "One-time" World Rugby COVID-19 support erroneously included in projections.  July-Dec 2020 results in a Loss of $433,000 without World Rugby's one time COVID-19 support of $500,000.  Because no support from World Rugby is shown in 2021, this must be considered one-time in nature and not a reliable source of revenue.

- USA Rugby's Fiscal Year end is December 31.  However, because USA Rugby uses only partial year information for their 2020, 2021, and combined 2020-21 year projections, their projections omit high expense/low revenue months and look rosier than they should be.  Using a

monthly expense of $440,500 (the avg monthly expense for the previous 9 months they do show) for the 3 months Oct-Dec they omit in 2021, USA Rugby would have $1,321,500 more in expenses. USA Rugby projects only $290,000 of membership revenues in Oct-Dec 2020. The "new" 12-month 2021 projection would show a $91,000 loss if the 3 months of higher expenses and low revenues were included.

- In total, the revenue projections are likely $1,175,000 to $2,500,000 higher than expected because of the items shown above. Projected losses could reach $500,000 or higher because of this lost revenue.

Because many organizations have secured alternative liability insurance coverage, it will be unlikely that the Debtor will reach such high membership revenues, especially in light of the current COVID-19 pandemic. NCR and other organizations have pursued their own alternatives for insurance due to uncertainty that USA Rugby would emerge from bankruptcy, relying on the proposed reorganization plans proposed January cited herein, and USA Rugby's CEO, Mr. Ross stating that USA Rugby had not yet secured insurance at the Debtor's continued 341 meeting.

47. The Plan, as proposed, is not feasible in that there is no reserve for shortfalls in the event that the operations of the Debtor are insufficient to service the Plan payments. USA Rugby did provide to NCR certain information that addresses reserves, but we could not find such reserves detailed it in any document that had been filed with the Court. Upon information and belief, the Debtor's sole source of income is from membership dues and/or under a yet undisclosed arrangement – this is speculative at best and, as such, there is limited ability to fund Plan payments. There is no discussion as to the current business of the Debtor, what income is being generated, what estimates of future income are realistic and the prospects that the company will be successfully reorganized in the event the Debtor's Plan is approved.

48. The Plan fails to include a bona-fide liquidation analysis of the Debtor's estate. There is no explanation as to how the value of the assets was determined. The Balance Sheet attached to the Plan reflects assets in the amount of $1,660,722.63 per Effective Date. That

being said, the Liquidation Analysis attached to the Plan fails to indicate how any liquidation values were determined and how the liquidation value of all of the Debtor's assets is only $1,660,722.63. The general statements that creditors will receive more in chapter 11 than a liquidation under chapter 7 is insufficient to satisfy the Debtor's obligations to provide reasonable information to creditors. In addition, the Debtor provided no detail of the estimated costs under the Plan versus the estimated costs in chapter 7.

49. In general, the objectives and purposes include providing debtors with a fresh start, discouraging debtor misconduct, liquidating and distributing expeditiously the bankruptcy estate to its creditors, and "achieving fundamental fairness and justice." *See, In re American Capital Equip., LLC,* 688 F.3d 145, 157 (3d Cir. 2012). For purposes of determining good faith, the focus is on the plan proposed and whether it will produce a fair result within the objectives and purposes of the Bankruptcy Code. *See, e.g., In re Combustion Engineering, Inc.,* 391 F.3d 190, 247 (3d Cir. 2004); *In re PWS Holding Corp.,* 228 F.3d 224, 242 (3d Cir. 2000).

50. Accordingly, unless the Debtor provides additional evidence of a consistent revenue flow or convincingly shows that the Plan can be funded in another fashion, the terms of the Plan cannot be met, the creditors are without adequate information to evaluate the terms of the Plan, the Plan is filed in bad faith and, based on the information provided thus far, the Plan appears infeasible. NCR believes and, therefore, avers that the aforementioned inadequacies preclude a finding that the Plan contains adequate information so as to enable a creditor to make a reasoned and informed decision on the merits of the Plan. Equally as important is that the deficiencies recited above in respect to the Plan are such that the Plan cannot be confirmed as a

matter of law. Given all of the material omissions by the Debtor in its Plan and its massive overstatement of its projected revenue, the Plan was not proposed in good faith.

**B.**     **The Plan Impermissibly Contains an Injunction in Favor of Current and Former Board of Directors**

51.     Sections 6.2 and 6.3 of the Plan contains an injunction against all unsecured creditors of the Debtor from continuing any actions, in law or in equity, that were or could have been brought against the Debtor or any of its "predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals. . . ." *See* Plan, Section 6.2.

52.     Courts have identified five (5) factors that are relevant in determining whether to approve a debtor's injunction or release:

a.     an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;
b.     a substantial contribution to the plan by the non-debtor;
c.     the necessity of the release to the reorganization;
d.     the overwhelming acceptance of the plan and release by creditors and interest holders; and
e.     the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*See, e.g., In re Hercules Offshore, Inc.,* 565 B.R. 732, 756 (Bankr. D. Del. 2016); *In re Wash. Mut., Inc.,* 442 B.R. 314, 346 (Bankr. D. Del. 2011); *In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Techs.,* 303 B.R. 48, 71-72 (Bankr. D. Del. 2003). The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *See, Wash. Mut.,* 442 B.R. at 346. However, these factors "form the foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case." *See, Id.,* at 347. Applying these strictures to the case at hand, the Debtor's proposed injunction satisfies none of the five (5) factors recited above. As such, the injunction is impermissible, and the Plan is not confirmable.

**C. The Plan Cannot Be Confirmed Because it Provides an Impermissible Discharge or Third-Party Release and Fails to Meet the Standard Recognized in this Circuit for Releases of Debtor Claims**

51.     The injunction that the Plan would grant to the Debtor's board of directors is tantamount to an impermissible discharge or third-party release and fails to meet the standard recognized in this Circuit for releases of debtor claims.  Most notably, and upon information and belief, there has been no form of consideration to the Debtor's estate in return for the gratuitous releases to insiders.  The Plan proposes very broad releases solely for the benefit of insiders when they have provided no value in exchange.  There is no valid justification or need for the injunctions that would be in the best interest of the estate or its creditors. In the absence of any such justification, the only conclusion  that can be reached is that the injunctions were inserted at the insistence of the Debtor's former and/or current board of directors, for their sole benefit.

52.     The non-Debtor injunction proposed in Sections 6.2 and 6.3 of the Plan may be viewed as a non-consensual, third-party releases, since it would enjoin actions by one non-debtor against another. "In evaluating releases, courts distinguish between the debtor's release of non-debtors and third parties' release of non-debtors".  *Washington Mut.*, 442 B.R. at 352 (citing, *In re Exide Techs.*, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003).  Courts use "different analyses to evaluate releases by a debtor of non-debtor third parties and releases by a non-debtor or other non-debtor third parties." *Id.*

53.     Non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in "extraordinary cases."  *Genesis Health Ventures,* 266 B.R. at 608, citing *Gilbert v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212 (3d Cir. 2000).  In *Continental,* the Third Circuit did "not establish a rule regarding conditions under which non-debtor releases and permanent injunctions are appropriate or permissible," but determined that

the non-consensual release of a non-debtor party in Continental's plan did "not pass muster under even the most flexible tests for the validity of non-debtor releases. The hallmarks of permissible non-consensual releases — fairness, necessity to the reorganization, and specific factual finding to support these conclusions — are all absent here." *Id.* at 214.

54.    The Plan contains no explanation as to why this chapter 11 might be considered an "extraordinary case" that would warrant the approval of broad third-party injunction. Consequently, the injunction, when viewed as a non-consensual third-party release, fails to meet the steep burden for approval in the Third Circuit. *See, Continental*, 203 F.3d at 214; *Washington Mut.*, 442 B.R. at 351.

55.    Further, the courts that have approved third-party releases typically have done so with the informed consent of the affected creditors. *In re Congoleum Corp.*, 362 B.R. 167, 192 n. 19 (Bankr. D.N.J. 2007); *In re Spansion*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan.") (citations omitted). Such is not the case here, as certain creditors were no given the opportunity to vote, and creditors were not given the opportunity to opt-out of the releases in connection with Plan voting.

56.    The Plan, as proposed, would not achieve the fundamental fairness the Bankruptcy Code requires and is not consistent with its objectives and purposes. Under Section 1129(a)(3), courts may only confirm reorganization plans proposed in good faith. "[T]he important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (*quoting In re Combustion Eng'g*, 391 F.3d 190, 247 (3d Cir. 2004).

57.     Those objectives and purposes include "preserving going concerns and maximizing property available to satisfy creditors," "giving debtors a fresh start in life," "discourag[ing] debtor misconduct," "the expeditious liquidation and distribution of the bankruptcy estate to its creditors," and "achieving fundamental fairness and justice." *In re WR Grace*, 729 F.3d 332, 346 (3d Cir. 2013) (internal citations omitted).  Equity holders, insiders and fiduciaries are not supposed to put their interests ahead of creditors' interests. Misplaced loyalty is a textbook example of debtor misconduct.

58.     Courts must scrutinize plans of reorganization that purport to release or enjoin claims against non-debtors.  The Bankruptcy Code prohibits the release and permanent injunction of claims against non-debtors under most circumstances.  *See* 11 U.S.C. § 524(e) ("Except as provided in subsection (a)(3) . . . discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").  Notwithstanding the language of Section 524, a plan of reorganization "may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A). A debtor may release claims in a plan pursuant to Section 1123(b)(3)(A) only where the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interest of the estate.  *In re Spansion*, 426 B.R. 114, 143 (Bankr. D. Del. 2010)(citations omitted).  Thus, when viewed as either an injunction or third-party release, Sections 6.2 and 6.3 of the Plan are facially impermissible and, as such, the Plan may not be confirmed.

59.     The Plan is not confirmable under Section 1129(a)(1) because the Plan violates Section 524(e) of the Bankruptcy Code.  Section 524(e) of the Bankruptcy Code prohibits the discharge of debt other than that of the debtor as part of a plan.  A plan is not confirmable if it does not comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).

Since the terms of the Plan violate Section 524(e) of the Bankruptcy Code, the Plan is not confirmable.

60.     The Plan is further not confirmable because it violates Fed. R. Bankr. P. 3016, which states that "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c). There is no such conspicuous language in the Plan, simply the unsupported statement that unspecified claims against "the Debtor, the Reorganized Debtor, and the Estate, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members . . . from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor" will be enjoined as of confirmation of the Plan.

61.     Section 1129(a)(3) of the Bankruptcy Code requires that a Plan be "proposed in good faith and not by any means forbidden by law." *See* 11 U.S.C. §1129(a)(3). In this context, the test for "good faith" is whether "the plan was proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *Matter of Sound Radio, Inc. ("Sound Radio I"*), 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part*, *remanded in part* 103 B.R. 521 (Bankr. D.N.J. 1989) ("*Sound Radio II*"), *aff'd o.b.*, 908 F.2d 964 (3d Cir. 1990) (citation omitted).

62.     The injunction in the Plan is intended only for the benefit of the former/current board of directors of the Debtor and, as such, these provisions contravene these objectives and

purposes of the Bankruptcy Code. Accordingly, those elements of the Plan do not constitute the good faith required by Section 1129(a)(3) of the Bankruptcy Code.

## <u>RESERVATION OF RIGHTS</u>

63. NCR reserves the right to supplement this Objection to the extent that the above-captioned Debtor modifies or amends the Plan.

64. NCR hereby joins all objections, if any, to the confirmation of the Plan not inconsistent with the Objections set forth herein and reserves the right to supplement this Objection at or prior to the hearing or continued hearing based upon additional information supplied by the Debtor.

65. NCR is not a competitor of USA Rugby. USA Rugby is a national governing body and NCR has kept itself separate from the responsibilities of a NGB. Unfortunately, USA Rugby has come to rely too heavily on membership dues. Consequently, when NCR was able to offer services of higher quality to colleges it became a "competitor" because USA Rugby felt that it is *entitled* to those dues. As an emerging sport and a sport with great promise, the rugby community has entrusted USA Rugby with many of the basic functions necessary to develop the sport, often out of necessity due to the nascent nature of rugby in this country. In terms of college rugby, USA Rugby has, in particularly trying times, been unable or unwilling to support the vast majority of the schools playing rugby, but has been willing to take college team money. Necessity was also the inspiration for Mr. Cohen and NCR, who filled a vacuum created by neglect and disinterest by USA Rugby in collegiate rugby. Now, despite the effect of the pandemic on colleges and related sports, particularly club sports, USA Rugby does not praise NCR for finding replacement registration and insurance, in reliance on reports from USA Rugby. Instead USA Rugby resorts to imposing fines and penalties in derogation of its responsibilities as

the National Governing Body of the sport citing some sort of contractual right it has with unnamed colleges to excuse these actions. NCR encourages teams and players to become members of USA Rugby as has been noted in this Objection. What NCR does not want to happen is that USA Rugby emerges from bankruptcy and continues along a path of self-preservation that sacrifices the growth of the sport by attacking the efforts of organizations like NCR. NCR should not be considered a competitor but an ally at best and someone to simply leave alone so it can complete its mission at worse.

WHEREFORE, NCR respectfully requests that this Court enter an order (a) deeming the Plan infeasible and unconfirmable for the foregoing reasons absent resolution of NCR's objections (b) requiring USA Rugby's cooperation with information requests, if any, concerning NCR member dues, and (c) grant such other and further relief as the Court deems just and necessary.

Dated: August 28, 2020              **ELLIOTT GREENLEAF**

*/s/ Rafael X. Zahralddin-Aravena*
Rafael X. Zahralddin-Aravena (No. 4166)
Eric M. Sutty (No. 4007)
1105 North Market Street, Suite 1700
Wilmington, DE 19801
Telephone: (302) 384-9400
Email: rxza@elliottgreenleaf.com
ems@elliottgreenleaf.com

*Counsel for National Collegiate Rugby Organization, Inc.*